IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

HUMAN GENOME SCIENCES, INC.,    )
    )
    Plaintiff,    )
    )
    )
v.    )
    )   Civil Action No. 07-526 (***)
AMGEN INC. and IMMUNEX CORP.,    )
    )
    Defendants    )
    )

## ANSWER

Defendants Amgen Inc. and Immunex Corporation (collectively, "IMMUNEX") by and through its undersigned counsel, answer the Complaint of Plaintiff Human Genome Sciences, Inc. ("Plaintiff"), as follows:

## NATURE OF ACTION

1.    IMMUNEX admits that Plaintiff purports to plead a cause of action pursuant to 35 U.S.C. § 146 to review the Judgment, filed July 27, 2007, of the Board of Patent Appeals and Interferences (the "Board") of the United States Patent and Trademark Office in Interference No. 105,381 ("the '381 Interference").

## JURISDICTION AND VENUE

2.    IMMUNEX admits the allegations of paragraph 2 of the Complaint.

3.    IMMUNEX admits the allegations of paragraph 3 of the Complaint.

## PARTIES

4.    Upon information and belief, IMMUNEX admits the allegations contained in paragraph 4 of the Complaint.

5.    IMMUNEX admits the allegations contained in paragraph 5 of the Complaint.

6.    IMMUNEX admits the allegations contained in paragraph 6 of the Complaint.

7.    IMMUNEX admits the allegations contained in paragraph 7 of the Complaint.

8.    IMMUNEX admits that it derives revenue from products that are used in Delaware.  Except as expressly admitted, the remaining allegations of paragraph 8 of the Complaint are denied.

## THE PATENT INTERFERENCE

9.    IMMUNEX admits that Plaintiff purports that the action arises from the judgment filed on July 27, 2007 by the Board in the '381 Interference.  IMMUNEX further admits that Exhibit A is a copy of the judgment entitled "Judgment – Order to Show Cause" in the '381 Interference.

10.    IMMUNEX admits that the '381 Interference count relates to a purified TRAIL receptor polypeptide, which is known as TRAIL-R2 or TR-2.  IMMUNEX admits that the claims of United States Patent No. 6,642,358 involved in the '381 Interference relate to a purified TRAIL-R2 polypeptide.  Except as expressly admitted, the remaining allegations of paragraph 10 of the Complaint are denied

11.    Upon information and belief, IMMUNEX admits that Plaintiff purports to be the assignee of United States Application No. 10/005,842 ("the "842 Application"), filed December 7, 2001, entitled "Death Domain Containing Receptor 5."  IMMUNEX further admits that the

'842 Application was filed in the names of Jian Ni, Reiner L. Gentz, Guo-Liang Yu, Jeffrey Su, and Craig A. Rosen. IMMUNEX further admits that Exhibit B purports to be a copy of the specification, the unamended claims, abstract and drawings of the '842 Application. Except as expressly admitted, the remaining allegations of paragraph 11 of the Complaint are denied.

12.    IMMUNEX admits that Immunex Corporation is the owner of the entire right, title, and interest in and to United States Patent No. 6,642,358, issued on November 4, 2003 ("the '358 Patent") from United States Application Serial No. 09/578,392, filed on May 25, 2000, entitled "Receptor that Binds TRAIL," that Charles Rauch and Henning Walczak are the inventors of the '358 Patent, and that Immunex Corporation is the recorded assignee of the '358 Patent. IMMUNEX further admits that Immunex Corporation is a wholly-owned subsidiary of Amgen Inc. IMMUNEX further admits that it prosecuted the '358 Patent and participated the '381 Interference. Except as expressly admitted, the remaining allegations of paragraph 12 of the Complaint are denied.

13.    IMMUNEX admits that on October 5, 2005 the Board declared the '381 Interference upon the suggestion of the patent examiner who was examining the '842 Application. Except as expressly admitted, the remaining allegations of paragraph 13 of the Complaint are denied.

14.    IMMUNEX admits that on July 27, 2007, the Board issued Judgment – "Order to Show Cause" in the '381 Interference adverse to Human Genome Sciences (Party Ni). IMMUNEX further admits that, during the '381 Interference, the Board ruled:

    a. "Ni substantive motion 1 to substitute Ni proposed count 2 for current Count 1 is denied." Decision on Motions in Interference 105,381, mailed March 26, 2007 ("Decision on

Motions") page 2, lines 5-6. A true and correct copy of the Decision on Motions is attached hereto as Exhibit A;

    b. "Ni substantive motion 2 for benefit for the purpose of priority is dismissed as moot as to Ni proposed count 2." Decision on Motions, page 2, lines 6-7;

    c. "Ni substantive motion 2 for benefit for the purpose of priority is ...granted as to the 29 July 1997 filing date of the 60/054,021 application for Count 1 and otherwise denied (as to Application No. 60/040,846, filed March 17, 1997)." Decision on Motions, page 2, line 6-8; page 7, line 19 to page 28, line 22;

    d. "Ni substantive motion 3 seeking judgment that all Rauch's involved claims are unpatentable under 35 U.S.C. § 102(e) as anticipated by U.S. Patent 6,872,568 is denied." Decision on Motions, page 2, lines 8-11;

    e. "Ni miscellaneous motion 4 to exclude certain evidence is denied." Decision on Motions, page 2, line 11;

    f. "Rauch substantive motion 1 for benefit for the purpose of priority as to Count 1 is granted as to the 28 March 1997 and 4 June 1997 filing dates of applications 08/829,536 and 08/869,852, respectively." Decision on Motions, page 2, lines 12-14;

    g. "Rauch substantive motion 3 is granted to the extent that Ni claims 35, 36, 38-45, 47-54, 56-61, 75, 83, 92, 99, 100, 102-109, 111-116, 127-133, 168-178 and 180-203 are unpatentable under 35 U.S.C. § 102(e) as anticipated by U.S. Patent 6,072,047." Decision on Motions, page 2, lines 16-19; and

    h. "[S]ince the '568 patent has only been shown to be entitled to a filing date of 4 May 2000 for prior art purposes and Rauch's involved claims have been shown to be entitled to a

filing date of at least 26 June 1997, the '568 patent does not qualify as prior art vis-a-vis Rauch's involved claims under § 102(e). It is not necessary to consider whether Rauch's involved claims are entitled to one or more of the filing dates of Rauch's still earlier filed '852, '536, '255 or '861 application. Moreover, since the '568 patent has not been shown to be prior art under § 102(e), it is not necessary for us to consider the content of the '568 patent. Based on the foregoing, Ni substantive motion 3 is denied." Decision on Motions, page 64, lines 10-19.

Except as expressly admitted, the remaining allegations of paragraph 14 of the Complaint are denied.

15.    Upon information and belief, IMMUNEX admits the allegations of paragraph 15 of the Complaint.

16.    Upon information and belief, IMMUNEX admits the allegations of paragraph 16 of the Complaint.

17.    Upon information and belief, IMMUNEX admits the allegations of paragraph 17 of the Complaint.

18.    IMMUNEX denies the allegation of paragraph 18 of the Complaint.

19.    IMMUNEX denies the allegation of paragraph 19 of the Complaint.

20.    IMMUNEX denies the allegation of paragraph 20 of the Complaint.

21.    IMMUNEX denies the allegation of paragraph 21 of the Complaint.

## PLAINTIFF'S PRAYER FOR RELIEF

22.    IMMUNEX denies that Plaintiff is entitled to the relief it seeks or any relief at all for the allegations made in the Complaint.

## AFFIRMATIVE DEFENSES

## FIRST AFFIRMATIVE DEFENSE

23.    Plaintiff's '842 Application claims 35, 36, 38-45, 47-54, 56-61, 75, 83, 92, 99, 100, 102-109, 111-116, 127-133, 168-178 and 180-203 are unpatentable under 35 U.S.C. § 102.

## SECOND AFFIRMATIVE DEFENSE

24.    Plaintiff is not entitled to relief because IMMUNEX is entitled to priority of invention.

## COUNTERCLAIMS

Defendants and Counterclaimants Immunex Corporation and Amgen Inc. (collectively, "IMMUNEX"), for its Counterclaims against Plaintiff Human Genome Sciences, Inc. allege as follows:

## THE PARTIES

25.    Counterclaimant Immunex Corporation, a wholly-owned subsidiary of Amgen Inc., is a Washington corporation having a place of business at 1201 Amgen Court West, Seattle, Washington. Immunex Corporation is the owner of United States Patent No. 6,642,358 involved in Interference No. 105,381 ("the '381 Interference").

26.    Counterclaimant Amgen Inc. ("Amgen") is a Delaware corporation having a place of business at One Amgen Center Drive, Thousand Oaks, California.

27.    Upon information and belief, Counterdefendant Human Genome Sciences, Inc. ("Human Genome Sciences") is a Delaware corporation having a place of business in Rockville, Maryland. Upon information and belief, Human Genome Sciences is the assignee of United States Patent Application No. 10/005,842 ("the '842 Application") involved in the '381 Interference.

## JURISDICTION AND VENUE

28.    This Court has subject matter jurisdiction over this action pursuant to 35 U.S.C. § 146 and 28 U.S.C. §§ 1331 and 1338.

29.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(c).

## BACKGROUND

30.    In the Decision on Motions in the '381 Interference, mailed March 26, 2007 ("Decision on Motions"), the Board decided that the '842 Application claims 35, 36, 38-45, 47-54, 56-61, 75, 83, 92, 99, 100, 102-109, 111-116, 127-133, 168-178 and 180 ("Ni's involved claims") are not patentable under 35 U.S.C. § 102(e). In a Judgment filed on July 27, 2007, the Board reaffirmed its judgment as to the unpatentability of Ni's involved claims under 102(e) and ordered that "judgment as to Count 1 (the sole count in the interference; Paper 1, page 6) is awarded against Junior Party HUMAN GENOME SCIENCES."

31.    Ruling on Rauch Substantive Motion 1, the Board held that IMMUNEX was not entitled to benefit for the purpose of priority of the February 13, 1997 filing date of application 08/799,861 ("the '861 Application") or of the March 12, 1997 filing date of the 08/815,255 application ("the '255 Application"). Decision on Motions, page 42, line 4 to page 57, line 12.

## FIRST COUNTERCLAIM

32.    IMMUNEX repeats and re-alleges paragraphs 25-31 as if fully set forth herein.

33.    Claims 35, 36, 38-45, 47-54, 56-61, 75, 83, 92, 99, 100, 102-109, 111-116, 127-133, 168-178 and 180 of its '842 Application are not patentable under 35 U.S.C. § 102, and thus, Human Genome Sciences is not entitled to a patent on those claims.

## SECOND COUNTERCLAIM

34.    IMMUNEX repeats and re-alleges paragraphs 25-31 as if fully set forth herein.

35.    The Board's Decision on Motions erroneously denies IMMUNEX benefit for the purpose of priority of the filing date of the '861 and '255 Applications and should be reversed.

## THIRD COUNTERCLAIM

36.    IMMUNEX repeats and re-alleges paragraphs 25-31 as if fully set forth herein.

37.    IMMUNEX is entitled to priority of invention, and thus, Human Genome Sciences is not entitled to a patent on claims 35, 36, 38-45, 47-54, 56-61, 75, 83, 92, 99, 100, 102-109, 111-116, 127-133, 168-178 and 180 of its '842 Application.

## PRAYER FOR RELIEF

Wherefore, Defendants and Counterclaimants respectfully request the following relief:

1.    The Court enter judgment affirming the Board's judgment adverse to Human Genome Sciences;

2.    The Court enter judgment in favor of IMMUNEX that Human Genome Sciences is not entitled to a patent containing claims 35, 36, 38-45, 47-54, 56-61, 75, 83, 92, 99, 100, 102-109, 111-116, 127-133, 168-178 and 180 of the '842 Application;

3.    The Court enter judgment in favor of IMMUNEX that Human Genome Sciences claims 35, 36, 38-45, 47-54, 56-61, 75, 83, 92, 99, 100, 102-109, 111-116, 127-133, 168-178 and 180 of its '842 Application are unpatentable under 35 U.S.C. § 102;

4.    The Court enter judgment in favor of IMMUNEX that Human Genome Sciences is not entitled to present a case on priority of invention;

5.    The Court reverse each and every decision of the Board that is adverse to IMMUNEX;

6.    The Court award IMMUNEX its attorney's fees and costs;

7.    The Court grant IMMUNEX such other and further relief as may be deemed appropriate and just.

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

_____

Melanie K. Sharp (No. 2501)
Monté T. Squire (No. 4764)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801
P.O. Box 391
Wilmington, Delaware 19899-0391
(302) 571-6681
msharp@ycst.com

Michael J. Wise
Lauren Sliger
PERKINS COIE LLP
1620 – 26th Street
Sixth Floor, South Tower
Santa Monica, CA  90404-4013
(310) 788-3210
mwise@perkinscoie.com

*Attorneys for Defendants and Counterclaimants*
*Amgen Inc. and Immunex Corporation*

## CERTIFICATE OF SERVICE

I, Melanie K. Sharp, Esquire, hereby certify that on October 22, 2007, I caused to

be electronically filed a true and correct copy of the Answer with the Clerk of the Court using

CM/ECF, which will send notification that such filing is available for viewing and downloading

to the following counsel of record:

John G. Day
Steven J. Balick
Lauren E. Maguire
Ashby & Geddes
500 Delaware Avenue, 8th Floor
Wilmington, DE 19801

I further certify that on October 22, 2007, I caused a copy of the foregoing

document, to be served by hand delivery on the above-listed counsel of record and on the

following non-registered participants in the manner indicated.

## BY E-MAIL (by agreement of counsel):

Richard L. DeLucia
John R. Kenny
A. Antony Pfeffer
Kenyon & Kenyon LLP
One Broadway
New York, NY  10004-1007

Melanie K. Sharp (No. 2501)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE  19801
(302) 571-6681
msharp@ycst.com

# EXHIBIT A

The opinion in support of the decision being
entered today is <u>not</u> binding precedent of the Board.

Paper 101

By:    Trial Section Merits Panel
       Board of Patent Appeals and Interferences         Filed: March 26, 2007
       Mail Stop Interference
       P.O. Box 1450
       Alexandria, VA 22313-1450
       Tel:    571-272-9797
       Fax:    571-273-0042


UNITED STATES PATENT AND TRADEMARK OFFICE

───────────

BEFORE THE BOARD OF PATENT APPEALS
AND INTERFERENCES
(Administrative Patent Judge Richard E. Schafer)

───────────

**Human Genome Sciences, Inc.**
Junior Party
(Application 10/005,842-IFW
Inventors:  Jian Ni, Reiner L. Gentz,
Guo-Liang Yu and Craig A. Rosen),

v.

**Immunex Corp.,**
Senior Party
(Patent 6,642,358
Inventors:  Charles Rauch and Henning Walczak)

┌─────────────────────────┐
│        **MAILED**       │
│                         │
│      MAR **2 6** 2007   │
│  U.S. PATENT AND TRADEMARK OFFICE │
│   BOARD OF PATENT APPEALS │
│      AND INTERFERENCES  │
└─────────────────────────┘

───────────

Patent Interference No. 105,381 (RES)

───────────

Before:  SCHAFER, HANLON and SPIEGEL, <u>Administrative Patent Judges</u>.

SPIEGEL, <u>Administrative Patent Judge</u>.

**DECISION - MOTIONS - Bd.R. 125(a)**

## I.    Introduction

This is a decision on the motions remaining in interference no. 105,381.

Junior party Ni has filed four motions. Senior party Rauch has filed five motions.

Ni substantive motion 1 to substitute Ni proposed count 2 for current Count 1 is **denied**.  Ni substantive motion 2 for benefit for the purpose of priority is **dismissed** as moot as to Ni proposed count 2, **granted** as to the 29 July 1997 filing date of the 60/054,021 application for Count 1 and otherwise **denied**.  Ni substantive motion 3 seeking judgment that all Rauch's involved claims are unpatentable under 35 U.S.C. § 102(e) as anticipated by U.S. Patent 6,872,568 is **denied**.  Ni miscellaneous motion 4 to exclude certain evidence is **denied**.

Rauch substantive motion 1 for benefit for the purpose of priority as to Count 1 is **granted** as to the 28 March 1997 and 4 June 1997 filing dates of applications 08/829,536 and 08/869,852, respectively, and otherwise **denied**. Rauch substantive motion 2 to designate Ni claims 46, 55, 63, 64, 110 and 118 as corresponding to Count 1 is **denied**.  Rauch substantive motion 3 is **granted** to the extent that Ni claims 35, 36, 38-45, 47-54, 56-61, 75, 83, 92, 99, 100, 102-109, 111-116, 127-133, 168-178 and 180-203 are unpatentable under 35 U.S.C. § 102(e) as anticipated by U.S. Patent 6,072,047, **moot** as to anticipation under § 102(e) by U.S. Patents 6,642,358 and 6,569,642, and otherwise **denied**. Rauch responsive motion 4 is **dismissed** as moot in view of the denial of Ni substantive motion 1.  Rauch miscellaneous motion 5 to exclude certain evidence is **dismissed** as moot.

1    **II.    Findings of Fact (FF)**

2        The following findings of fact are supported by a preponderance of the

3    evidence.

4        1.   The junior party is Jian NI, Reiner L. GENTZ, Guo-Liang YU and Craig A.

5             Rosen ("**Ni**").

6        2.   Ni is involved in the interference on the basis of application 10/005,842

7             ("the '842 application," NX 2025), filed 7 December 2001.

8        3.   The '842 application has been accorded benefit for the purpose of priority

9             of the 17 March 1998 filing date of application 09/042,583 ("the '583

10            application," NX 2024).

11       4.   Ni's real party-in-interest is Human Genome Sciences, Inc. ("HGS").

12       5.   The senior party is Charles RAUCH and Henning WALCZAK ("**Rauch**").

13       6.   Rauch is involved in the interference on the basis of U.S. Patent

14            6,642,358 ("the '358 patent," RX 1012), issued 4 November 2005, based

15            on application 09/578,392 ("the '392 application"), filed 25 May 2000.

16       7.   The '392 application has been accorded benefit for the purpose of priority

17            of the 26 June 1997 filing date of application 08/883,036 ("the '036

18            application," RX 1018), which issued 6 June 2000 as U.S. Patent

19            6,072,047 ("the '047 patent," RX 1048)

20       8.   Rauch's real party-in-interest is Immunex Corp. ("Immunex").

21       9.   The subject matter of the interference is defined by one count.

22       10.  Count 1 is "Claim 6 of U.S. Patent 6,642,358" (Paper 1, p. 3).

23       11.  Claim 6 of the '358 patent, written in independent form, reads:

1  A purified TRAIL-R polypeptide comprising an amino
2  acid sequence that is at least 90% identical to the
3  amino acid sequence presented in SEQ ID NO:2
4  wherein said polypeptide binds TRAIL.

5  12. According to the '358 patent, SEQ ID NO:2 is the 440 amino acid

6  sequence of a full length human receptor protein (including the N-

7  terminal signal peptide), "TRAIL-R," encoded by the DNA of SEQ ID

8  NO:1 (RX 1012, c. 1, I. 66 - c. 2, I. 2 and c. 22, II. 7-11).

9  13. The claims of the parties are:

10  Ni          35-72, 75, 83, 92, 99-133, 152-178 and 180-203
11  Rauch       1-41

12  14. The claims of the parties which correspond to Count 1 are:

13  Ni          35, 36, 38-45, 47-54, 56-61, 75, 83, 92, 99, 100, 102-
14              109, 111-116, 127-133, 168-178 and 180-203
15  Rauch       1, 4-6, 8-11, 17-19, 26-28, 34, 37, 38 and 40

16  15. The claims of the parties which do not correspond to Count 1, and

17  therefore are not part of this interference, are:

18  Ni          37, 46, 55, 62-72, 101, 110, 117-126 and 152-167
19  Rauch       2, 3, 7, 12-16, 20-25, 29-33, 35, 36, 39 and 41

20  Other findings of fact follow below.

21  **III.    Ni Substantive Motion 1**

22  Pursuant to 37 CFR § 41.121(a)(1)(i), Ni moves to redefine the scope of

23  the interference by substituting proposed count 2 for current Count 1 (Paper 29).

24  Rauch opposes (Paper 52); Ni replies (Paper 60).

25  16. Ni's proposed count 2 reads (Paper 29, p. 1, ¶ 1):
26  A purified TRAIL-R polypeptide comprising an amino
27  acid sequence that is at least 90% identical to the
28  amino acid sequence presented in SEQ ID NO:2

1         wherein said polypeptide binds TRAIL or induces

2         apoptosis.

3        17. According to Ni, its proposed count 2 simply incorporates Rauch claims 5

4          and 6, as does the current count, and adds the language "or induces

5          apoptosis" (id.).

6       It is our understanding that the source of SEQ ID NO:2 in Ni's proposed

7 count 2 is the involved '358 patent of Rauch.  With this understanding, we now

8 address Ni motion 1.

9       Ni argues that the abilities to bind TRAIL and to induce apoptosis are

10 inherent properties of the polypeptide of Count 1, although only the former is

11 expressly recited in the count (Paper 29, p. 7, ¶ 3).  A party seeking to change

12 the count in an interference must demonstrate a genuine need to change the

13 count.  As stated in Louis v. Okada, 59 USPQ2d 1073, 1076 (Bd. Pat. App. & Int.

14 2001),

15            [a]t a minimum, ... a preliminary motion to
16        broaden out the count on the basis that a party's best
17        or earliest proofs are outside the current count (1)
18        should make a proffer of the party's best proofs, (2)
19        show that such best proofs indeed lie outside of the
20        scope of the current count, and (3) further show that
21        the proposed new count is not excessively broad with
22        respect to what a party needs for its best proofs.

23       Ni seeks to change the count by adding the limitation "or induces

24 apoptosis" as an alternative to the limitation "binds TRAIL" (FF 16).  Ni seeks to

25 change the current count because its best proofs do not explicitly recite that the

26 TRAIL-R polypeptide of the count binds TRAIL (FF 18).  However, the fact that

27 Ni's "best proofs" do not explicitly recite the language of the count does not alone

1  establish that those proofs are not directed to "subject matter" defined by the

2  count.  "The invention is not the language of the count but the subject matter

3  thereby defined."  Silvestri v. Grant, 496 F.2d 593, 598, 181 USPQ 706, 709

4  (CCPA 1974).  In appropriate circumstances, express limitations of the count

5  may be shown to be inherent in the proofs, id. ("In reaching this conclusion, we

6  do not disregard the fact that the count also requires that the ampicillin

7  possesses greater storage-stability than hydrated ampicillin and have a

8  molecular weight of about 349.  However, we regard these as inherent properties

9  of Form II ampicillin which add nothing to the count definition beyond that

10  determined by the [other limitations].").[1]  The limitation said not to be disclosed

11  by Ni's best proofs, i.e., the ability to bind TRAIL, may be shown to be an

12  inherent property of the TRAIL-R polypeptide of the count.  In fact, Ni argues that

13  the ability to bind TRAIL and the ability to induce apoptosis are both inherent

14  properties of the TRAIL-R polypeptide of the count:

15          The ability to bind TRAIL is an expressly recited
16          property of the polypeptide and it is an inherent
17          property of the polypeptide of SEQ ID NO:2.
18          Similarly, the ability of the polypeptide of SEQ ID
19          NO:2 to induce apoptosis is also an inherent property
20          of the polypeptide of SEQ ID NO:2.

21  [Paper 29, p. 7, ¶ 3 (citation to material facts omitted).]  Additionally, Ni has not

22  asserted that there are polypeptides meeting the amino acid sequence

---

[1] In Silvestri, the count was directed to a new crystalline form of ampicillin which was
"substantially free of water in the chemically bound state" and had a molecular weight of about
349, a particular infrared ("IR") spectrograph and improved storage stability vis-à-vis the
previously known form of ampicillin. Id., 496 F.2d at 595-96, 181 USPQ at 709-710.  The court
held that it was sufficient to possess the claimed compound and to characterize it by its water
content and IR spectrograph, without demonstrating the knowledge of the ampicillin's molecular
weight because the molecular weight "add[s] nothing to the count beyond that determined by the
water content and infrared spectrograph." Id., 496 F.2d at 599, 181 USPQ at 709.

1    requirements of the count which would induce apoptosis, but not bind TRAIL.

2    Consequently, adding the phrase "or induces apoptosis" to Count 1 has not been

3    shown to be necessary to encompass Ni's best proofs.  Furthermore, changing

4    the scope of the count would leave Ni in essentially the same position it is in now

5    of having to prove an inherent property of the TRAIL-R polypeptide of the count

6    (FF 18).  Hence, Ni has failed to demonstrate that its best proofs are outside the

7    scope of the current count and, therefore, that there is a genuine need to change

8    the count.

9            Based on the foregoing, Ni substantive motion 1 is **denied**.

10   **IV.    Rauch Responsive Motion 4**

11           Pursuant to 37 CFR § 41.121(a)(2), Rauch moves to be accorded benefit

12   for the purpose of priority of the (i) 26 June 1997, (ii) 4 June 1997, (iii) 28 March

13   1997, (iv) 12 March 1997 and (v) 13 February 1997 filing dates of U.S.

14   applications (i) 08/883,036, (ii) 08/869,852, (iii) 08/829,536, (iv) 08/815,255 and

15   (v) 08/799,861, respectively, as to Ni's proposed count 2 (Paper 45).  Rauch

16   responsive motion 4 is contingent upon the grant of Ni substantive motion 1 to

17   substitute Ni's proposed count 2 for current Count 1.  Since the contingency has

18   not occurred, Rauch responsive motion 4 is **dismissed** as moot.

19   **V.    Ni Substantive Motion 2**

20           Pursuant to 37 CFR §41.121(a)(1)(ii), Ni moves to be accorded benefit for

21   the purpose of priority of the 17 March 1997 and 29 July 1997 filing dates of its

22   earlier filed provisional applications 60/040,846 ("the '846 application," NX 2042)

23   and 60/054,021 ("the '021 application," NX 2056), respectively, as to Count 1

1    and, contingent on the grant of Ni substantive motion 1, as to Ni's proposed

2    count 2 (Paper 30). Rauch opposes (Paper 53); Ni replies (Paper 61).

3          To the extent Ni substantive motion 2 is contingent upon the grant of Ni

4    substantive motion 1, it is **dismissed** as moot because the contingency has not

5    occurred.

6          As discussed above, the subject matter of Count 1 is directed to a purified

7    TRAIL-R polypeptide having an amino acid sequence that is at least 90%

8    identical to SEQ ID NO:2 of Rauch's involved '358 patent, wherein the

9    polypeptide binds TRAIL (FF 11).

10         18. TRAIL (**T**NF-**R**elated **A**poptosis-**I**nducing **L**igand) is a member of the TNF

11             ligand family known to be capable of inducing apoptosis when added to

12             certain cells, e.g., Jurkat cells (NX 2096[2]).

13         19. The '021 and '846 application are both provisional applications.

14         20. The '021 application was filed 29 July 1997 (NX 2056, cover sheet).

15         21. The '846 application was filed 17 March 1997 (NX 2042, cover sheet).

16         22. Figure 1 of the '021 application is said to show the nucleotide and

17             deduced amino acid sequences of "human Death Domain Containing

18             Receptor 5" (DR5) obtained from the cDNA clone deposited as ATCC

19             Deposit No. 97920 on 7 March 1997 (NX 2056, p. 1, ll. 7-9; p. 6, ll. 5-6; p.

20             7, ll. 29-33; p. 9, ll. 9-12; p. 10, ll. 34-35).

21         23. According to the '021 specification, DR5 is a 411 amino acid protein (id.,

22             p. 26, ll. 9-10).

---

[2] Wiley et al., "Identification and Characterization of a New Member of the TNF Family that
Induces Apoptosis," Immunity, Vol. 3, pp. 673-682 (December 1995) (NX 2096).

1    24. Example 6 of the '021 specification is said to show that a DR5

2        extracellular domain-Fc fusion construct (DR5-Fc) binds TRAIL (id., p.

3        50, l. 6 - p. 51, l. 2; Figures 6A-6C).

4    25. Figure 1 of the '846 application is said to show the nucleotide and

5        deduced amino acid sequences of DR5 obtained from the cDNA clone

6        deposited as ATCC Deposit No. 97920 on 7 March 1997 (NX 2042, p. 1,

7        ll. 5-6; p. 3, ll. 22-25; p. 5, ll. 24-27).

8    26. According to the '846 specification, DR5 is a 411 amino acid protein (id.,

9        p. 6, ll. 25-27).

10   27. Figure 2 of the '846 application is said to compare the deduced amino

11       acid sequence of DR5 to the amino acid sequences of three known TNF

12       family death receptor proteins -- human tumor necrosis factor receptor 1

13       (human TNFR1), human Fas protein and DR3 protein (id., p. 5, ll. 8-13).

14   28. According to the '846 specification, similarities between the amino acid

15       sequences shown in Figure 2 "**strongly suggest** that DR5 is also a

16       death domain containing receptor with the ability to induce apoptosis,"

17       i.e., that DR5 is a putative death receptor protein of the TNF receptor

18       family (id., p. 6, ll. 31-33, emphasis added).

19   29. Further according to the '846 specification, "TNF-family ligands induce

20       various cellular responses by binding to TNF-family receptors, including

21       the DR5 of the present invention.  Cell which express the DR5

22       polypeptide **are believed to have** a potent cellular response to DR5

23       ligands ... " (id., p. 26, ll. 12-15, emphasis added).

1    30. The '846 specification defines "TNF-family ligand" as

2    naturally occurring, recombinant, and synthetic
3    ligands that are capable of binding to a member of the
4    TNF-receptor family and inducing the ligand/receptor
5    signaling pathway. Members of the TNF ligand family
6    include, but are not limited to, **DR5 ligands**, TRAIL,
7    TNF-α, lymphdtoxin-α (LT-α, also known as TNF-ß),
8    LT-ß (found in complex heterotrimer LT-α2-ß), FasL,
9    CD40, CD27, CD30, 4-IBB, OX40 and nerve growth
10   factor (NGF). [Id., p. 31, ll. 4-9, emphasis added.]

11   31. The amino acid sequence of the DR5 protein shown in the respective

12   Figures 1 of the '021 and '846 applications are identical.

13   32. It is undisputed that the amino acid sequences shown in Figures 1 of the

14   '021 and '846 applications are at least about 93% identical to the amino

15   acid sequence of SEQ ID NO:2 as recited in Count 1, with 411 of 440

16   total amino acids being identical (see Paper 53, p. 22 where Rauch

17   admits Ni's Statement of Material Facts (SMFs) 7 and 8 as set forth in

18   Paper 30, p. 26).

19   33. Thus, the '021 application describes an enabled embodiment within the

20   scope of Count 1, i.e., a DR5 polypeptide having an amino acid

21   sequence that is at least 90% identical to the amino acid sequence of

22   SEQ ID NO:2 of the '358 patent (FFs 22, 31 and 32) and which binds

23   TRAIL (FF 24).

24   34. Rauch does not dispute Ni's claim to benefit for the purpose of priority of

25   the filing date of the '021 application (Paper 53).

26   Based on the foregoing, we accord Ni benefit for the purpose of priority of

27   the filing date of the '021 application as to Count 1.

1    While the '846 application describes (Figure 1) a DR5 polypeptide having a

2    deduced amino acid sequence which is at least 90% identical to the amino acid

3    sequence set forth in SEQ ID NO:2 of the '358 patent (FF 32), the disclosure of

4    the '846 application <u>suggests</u> that the DR5 polypeptide is a death domain

5    containing receptor with the ability to induce apoptosis (FF 28). However, the

6    disclosure of the '846 application does not describe preparing a DR5 polypeptide

7    (or ligand binding portion thereof) or binding the ligand TRAIL to the DR5

8    polypeptide (or ligand binding portion thereof). Rather, the disclosure of the '846

9    application <u>suggests</u> that a DR5 polypeptide binds a "DR5 ligand" (FFs 29 and

10   30).

11   Ni's position is premised on classifying DR5 as a "putative TNF death

12   receptor" based on the described similarity between the amino acid sequences of

13   DR5 and three previously known TNF death receptors TNFR1, Fas and DR3 in

14   the '846 application. According to Ni, TNFR1, Fas and DR3 were all known to

15   induce apoptosis upon activation and, therefore, that same function should be

16   imputed to DR5 by virtue of the described similarity in amino acid sequences

17   between DR5 and the three TNF death receptors. Ni argues that the '846

18   specification explicitly teaches that DR5 induces apoptosis and binds to a TNF

19   ligand selected from a limited list including TRAIL. Ni further argues that, based

20   on the doctrine of inherency, the '846 application need not expressly recite that

21   DR5 binds TRAIL so long as the '846 application describes the subject matter of

22   the Count. [Paper 30, p. 2, ¶ 3 and ¶ bridging pp. 9-10.]

1    35. Ni relies on the direct testimony of John C. Reed, M.D., Ph.D. (NX 2103)

2        in support of its position.

3    36. Dr. Reed has been qualified as an expert to give opinions on the subjects

4        of apoptosis and of the tumor necrosis family of ligands (TNFs) and

5        receptors (TNFRs), including death receptors.

6    37. According to Dr. Reed, the deduced amino acid sequence of human DR5

7        described in the '846 application has all the canonical (structural)

8        features of a classic death receptor of the TNFR family, i.e., a leader

9        peptide, conserved cysteine-rich domain(s), a transmembrane domain

10       and a cytosolic domain containing a "death domain" (NX 2103, ¶ 28).

11   38. Further according to Dr. Reed, the death domain "is necessary and

12       sufficient for apoptosis induction, at least when overexpressed in

13       mammalian cells" (id., ¶ 21).

14   39. Still further according to Dr. Reed, DR5 shares the highest degree of

15       amino acid sequence identity with then known death receptor proteins

16       human TNFR1, Fas and DR3 (id., ¶ 29).

17   40. Dr. Reed states that the deduced amino acid sequence of the "death

18       domain" region of the DR5 protein described in Ni's '846 application was

19       approximately 21, 32 and 33 percent identical to the amino acid

20       sequences of the death domains of Fas, TNFR1 and DR3, respectively,

21       "using Lipman-Pearson Protein Alignment (with the following parameters:

22       Ktuple 2; Gap Penalty 4; Gap Length Penalty 12)" (id., ¶ 31).

1    41. Dr. Reed opines that a death domain amino acid sequence identity of

2    approximately 21-33 percent is "significant" because Chinnaniyan (NX

3    2058) reported that the death domain of DR3 was 47 and 23 percent

4    identical to that of TNFR1 and Fas, respectively, while Marsters (NX

5    2059) reported that the death domain of DR3 was 48 and 20 percent

6    identical to that of TNFR1 and Fas, respectively (NX 2103, ¶ 31).

7    42. Chinnaiyan reported using MegAlign$^{TM}$ software to align the compared

8    amino acid sequences (NX 2058, Fig. 1).

9    43. MegAlign$^{TM}$ software can create alignments between two or more

10    sequences according to different methods, e.g., the clustal method or the

11    Jotun Hein method (see e.g., U.S. Patent 6,277,568, col. 8, ll. 22-41).

12    44. Neither Chinnayian or Marsters reported the alignment program and

13    parameters used to obtain their respective percent sequence identity

14    scores.

15    45. Dr. Reed did not explain percent sequence identity scoring, e.g., how

16    different alignment methods and parameters calculate percent sequence

17    identity scores; how different alignment methods are compared

18    (normalized to account for the use of different parameters, e.g.,

19    sequence lengths, gaps, gap positions, etc.); the significance, if any, of

20    comparing sequences within predicted structural features (e.g., a death

21    domain or extracellular domain) versus over the entire primary amino

22    acid sequence; standard error of the method(s) used; use of iteration,

23    etc.

1    46. For example, according to Tartaglia,[3]

2              [i]t has been noted previously that the intracellular
3              domain of TNF-R1 shares a **weak homology (29%**
4              **identity over 45 amino acids)** with the intracellular
5              domain of Fas antigen.  Upon further inspection of
6              these sequences, we noted that introduction of a 1
7              amino acid gap in the Fas sequence extended the
8              region of homology an additional 20 amino acids
9              (Figure 3).  [NX 2067, p. 846, col. 2, ¶ 1, emphasis
10             added.]

11   47. Nonetheless, Dr. Reed believes that one of ordinary skill in the art would

12        have reasonably expected the putative death receptor DR5 of the '846

13        specification to have utilities similar to the known utilities of known death

14        receptors TNFR1, Fas and DR3 (NX 2103, ¶¶ 33-34).

15   48. According to Dr. Reed, "**the most reasonable conclusion to draw** from

16        Ni's March 17, 1997 application is that DR5 is expected, by persons of

17        ordinary skill in the art, to be a novel death receptor" and, therefore,

18        skilled artisans "**would have predicted** that activation of DR5 would

19        induce apoptosis" (NX 2103, ¶ 32, emphasis added).

20   49. Further according to Dr. Reed, activation (aggregation) of a death

21        receptor could be caused by (i) ligand binding to the death receptor, (ii)

22        antibody binding to the death receptor or (iii) overexpression of the death

23        receptor on the cell surface (id., ¶ 24).

24   50. Dr. Reed testified that

25             if one would want to determine which TNF ligand DR5
26             binds, Ni's March 17, 1997 application [i.e., the '846
27             application], in combination with what was known in
28             the art at the time, provides all of the necessary
29             information.  For example, Ni's March 17, 1997

---

[3] Tartaglia et al. (Tartaglia), "A Novel Domain within the 55 kd TNF Receptor Signals Cell Death,"
Cell, Vol. 74, pp. 845-853 (10 September 1993) (NX 2067).

1    application states that **DR5 binds to a TNF-family**
2    **ligand** (Exhibit 2042, pg. 4, ¶¶2-3; pg. 26, ¶1; pgs 28-
3    29; pg. 31, ¶1, pg. 31, ¶1 [sic]), which would have
4    been expected by a person of ordinary skill in the art
5    in view of the literature that was available by March
6    17, 1997.  Additionally, Ni's March 17, 1997
7    application specifically defines "a TNF family ligand"
8    as a limited number of molecules, one of which is
9    TRAIL.  (Exhibit 2042, pg. 31, lines 4-9).  The Ni
10   March 17, 1997 application also teaches assays, such
11   as cellular response **assays, that could be used to**
12   **determine whether** TRAIL, or any other of **the listed**
13   **TNF ligands, binds to DR5**.  (Exhibit 2042, pg. 26,
14   lines 12-26; pg. 27, line 21 through pg. 29, line 6).
15   **Alternatively**, as of March 17, 1997, **it would have**
16   **been routine** for a person of ordinary skill in the art **to**
17   **have tested whether DR5 binds to the TNF-family**
18   **ligands recited in Ni's May [sic] 17, 1997**
19   **application**.  Thus, if one wanted to
20   have determined whether DR5 bound to a TNF
21   ligand, including TRAIL, the Ni March 17, 1997
22   application, in combination with what was known in
23   the art at the time, teaches all of the needed
24   information.  [NX 2103, ¶ 56, emphasis and bracketed
25   text added.]

26   51. Dr. Reed notes that while most TNF family receptors have been shown

27       experimentally to bind to specific TNF family ligands, some receptors "do

28       not have known receptors to date, or a delay of many years occurred

29       before the specific ligand was established" (NX 2103, ¶ 18).

30   52. According to the '846 specification, there are eleven known members of

31       the TNF ligand family, i.e., TNF-α, lymphotoxin-α (LT-α, also known as

32       TNF-ß), LT-ß (found in complex heterotrimer LT-α2-ß), FasL, CD40,

33       CD27, CD30, 4-1BB, OXO40, nerve growth factor (NGF) and TRAIL (NX

34       2042, p. 1, ll. 21-25 and p. 31, ll. 6-9).

35   53. The '846 specification defines "TNF-family ligand" as

1    naturally occurring, recombinant, and synthetic
2    ligands that are capable of binding to a member of the
3    TNF receptor family and inducing the ligand/receptor
4    signaling pathway.  Members of the TNF ligand family
5    include, but are not limited to, **DR5 ligands**, TRAIL,
6    TNF-α, lymphdtoxin-α (LT-α, also known as TNF-ß),
7    LT-ß (found in complex heterotrimer LT-α2-ß), FasL,
8    CD40, CD 27, CD30, 4-1BB, OX40 and nerve growth
9    factor (NGF).  [<u>Id</u>., p. 31, ll. 4-9, emphasis added.]

10   54. Dr. Reed relies on Ni's later filed '201 application (NX 2056, Figure 6A)

11   and on a later published August 1997 article (NX 2031[4]) to support his

12   testimony that DR5 "necessarily" binds to TRAIL and "necessarily"

13   induces apoptosis (NX 2103, ¶ 57).

14   To be accorded benefit for the purpose of priority in an interference

15   proceeding "means Board recognition that a patent application provides a proper

16   constructive reduction to practice under 35 U.S.C. 102(g)(1)."  37 CFR § 41.201.

17   A constructive reduction to practice "means a described and enabled anticipation

18   under 35 U.S.C. 102(g)(1) in a patent application of the subject matter of a

19   count."  <u>Id</u>.  To fulfill the written description requirement, the patent specification

20   must describe an invention in sufficient detail that one skilled in the art can

21   clearly conclude that the inventor invented what is claimed.  <u>Lockwood v. Am.</u>

22   <u>Airlines, Inc.</u>, 107 F.3d 1565, 1572, 41 USPQ2d 1961, 1966 (Fed. Cir. 1997).

23   The specification "need not describe the claimed subject matter in exactly the

24   same terms as used in the claims; it must simply indicate to persons skilled in the

25   art that as of the [filing] date the applicant had invented what is now claimed."

26   <u>Eiselstein v. Frank</u>, 52 F.3d 1035, 1038, 34 USPQ2d 1467, 1470 (Fed. Cir. 1995)

---

[4] Guohua et al. (Guohua), "An Antagonist Decoy Receptor and a Death Domain-Containing
Receptor for TRAIL," <u>Science</u>, Vol. 277, pp. 815-818 (8 August 1997).  Three of the six coauthors
are also Ni inventors.

1    (citations omitted).  Furthermore, "the fact that a characteristic is a necessary

2    feature or result of a prior-art embodiment (that is itself sufficiently described and

3    enabled) is enough for inherent anticipation, even if that fact was unknown at the

4    time of the prior invention."  Toro Co. v. Deere & Co., 69 USPQ2d 1584, 1590

5    (Fed. Cir. 2004) (citations omitted).  Benefit for the purpose of priority focuses on

6    the subject matter of a count and only requires a constructive reduction to

7    practice of a single embodiment within the scope of the count.  Falkner v. Inglis,

8    463 F.3d 1376, 1379, 79 USPQ2d 1001, 1004 (Fed. Cir. 2006); Hunt v.

9    Treppschuh, 523 F.2d 1386, 1389, 187 USPQ 426, 429 (CCPA 1975).[5]

10        Here, the subject matter of the count is directed to a functional protein, i.e., a

11    purified TRAIL-R polypeptide having an amino acid sequence that is at least 90%

12    identical to SEQ ID NO:2 of Rauch's involved '358 patent, wherein the

13    polypeptide binds TRAIL (FF 11).  Relying on the testimony of Dr. Reed, Ni

14    argues that the similarity between the deduced amino acid sequence of DR5 and

15    the known amino acid sequences of three TNF death receptor proteins, i.e.,

16    TNFR1, Fas and DR3, as described in the '846 application is sufficient to

17    characterize DR5 as a putative TNF death receptor protein and to predict that

18    DR5 has utilities/functions similar to those of known death receptor proteins, e.g.,

19    induction of apoptosis upon activation.

20        Neither the disclosure of the '846 application nor the testimony of Dr. Reed

21    is as explicit as Ni argues.  The '846 application suggests that DR5 is a putative

22    TNF death receptor protein (FF 28).  Dr. Reed testified that the most reasonable

_____

[5] In contrast, benefit for the purpose of 35 U.S.C. § 120 and related statutes focuses on the
subject matter of the claim and requires the application for which benefit is sought to describe and
enable the entire scope of the claim.

1    conclusion a person of ordinary skill in the art would draw from the '846

2    application is that DR5 "is expected ... to be a novel death receptor" (FF 48).

3    The '846 specification does not describe preparing DR5 or a ligand binding

4    portion thereof (e.g., expressing and purifying DR5 from the DNA of Figure 1).

5    The '846 specification does not describe an activated (functional) DR5 or identify

6    the TNF ligand which activates (binds to) DR5.

7            Since TRAIL was known to be capable of inducing apoptosis (FF 18),

8    identifying TRAIL as the TNF ligand which bound to DR5 in the '846 specification

9    would have been one way of describing DR5 as capable of inducing apoptosis.

10   Dr. Reed testified that '846 application "states that DR5 binds to a TNF-family

11   ligand" and that there were "assays, that could be used to determine whether

12   TRAIL, or any other of the listed TNF ligands, binds to DR5" (FF 50). Dr. Reed

13   further testified that "it would have been routine for one of ordinary skill in the art

14   to have tested whether DR5 binds to the TNF-family ligands recited" in the '846

15   application, "including TRAIL" (FF 50). Notably, the '846 specification

16   enumerates "DR5 ligands" as separate and distinct ligands in its list of TNF

17   ligands, including TRAIL (FF 53), implying that DR5 might bind to either a known

18   TNF ligand, e.g., TRAIL, or as yet unknown TNF ligand, i.e., a DR5 ligand, or

19   another TNF ligand known to be capable of inducing another function, e.g., cell

20   proliferation.

21           In short, there is neither explicit nor implicit disclosure in the '846

22   application said to show that the DR5 polypeptide encoded by the DNA of Figure

23   1 is a functional/bioactive protein. The cognate ligand for DR5 is not explicitly

1    identified in the '846 application, although it would have been routine for one of

2    ordinary skill in the art to do so using known techniques, as testified to by Dr.

3    Reed (FF 50).  Moreover, there could be no explicit description of an activated

4    DR5 based on antibody binding or overexpression in mammalian cells absent

5    obtaining the DR5 polypeptide (e.g., by expressing the product of the DNA of

6    Figure 1) against which to raise an antibody.  Finally, a person skilled in the art

7    could not have reasonably predicted the function(s) of DR5 based solely on the

8    similarity between its deduced amino acid sequence as set forth in Figure 1 of

9    the '846 application and the known amino acid sequences of TNFR1, Fas and

10   DR3 in view of the state of the art when the '846 application was filed for the

11   following reasons.

12          Genes encode proteins by providing a sequence of nucleic acids that is

13   translated into a sequence of amino acids.  Methods used to identify novel genes

14   are classified into two types, i.e., homology based or non-homology based.  In

15   homology based methods, for example, clones from a cDNA library are cloned

16   and analyzed (sequenced).  The resultant nucleotide sequences and/or deduced

17   amino acid sequences are checked against databases for similarity (homology)

18   to previously characterized sequences on the theory that molecules with similar

19   sequences would be expected to perform similar functions.  However, one of the

20   difficulties in identifying a functional protein is that function depends not only on

21   the amino acid sequence of the protein, but also on other factors, e.g., the three-

22   dimensional structure of the protein.

1    In order for a protein to function properly its amino acid sequence (primary

2    structure) must fold itself up into a complex three-dimensional shape which

3    allows for molecular recognition.  Molecular recognition often involves only a

4    small number of key amino acid residues on the functional surfaces of interacting

5    molecules.  These residues are dispersed in diverse regions of the primary

6    amino acid sequence due to the complex structural organization of the protein.

7    There are multiple levels to the structural organization of a protein.  The *primary*

8    *structure* of a protein refers to the linear arrangement of amino acid residues

9    along a polypeptide chain.  *Secondary structures* form through interactions

10   between amino acids typically found near each other in the peptide chain which

11   fold parts of the chain into regular structures, e.g., α helices and ß sheets.

12   *Tiertiary structure* folds both the secondary structures and the regions between

13   them into compact three-dimensional shapes in an energetically favourable way.

14   *Quaternary structure* refers to the organization of several polypeptide chains into

15   a single protein molecule, e.g., hemoglobin is a tetramer.  Consequently, amino

16   acid residues rather near to each other in a protein's primary structure may be

17   rather distant in the protein's ultimate quaternary structure.  [See generally,

18   MOLECULAR CELL BIOLOGY ("MCB"), second edition, Darnell et al., W.H.

19   Freeman and Company, New York, NY (1990), pp. 44-48 (copy enclosed).]

20   For example, an enzyme is a protein that catalyzes a biochemical

21   reaction.  The function of an enzyme relies on the structure of its "active site," a

22   specific cavity-like region on the surface of the three-dimensional enzyme which

23   allows a spatial fit (molecular recognition) between the enzyme and its substrate

1    (reactant in the reaction being catalyzed). The active site contains key amino

2    acids that bind the substrate and are involved in the reaction catalyzed by the

3    enzyme. These key amino acids are brought into proximity (into the active site)

4    by protein folding. [See generally, MICROBIOLOGY: An Introduction, Tortora et

5    al., The Benjamin/Cummings Publishing Company, Inc., Menlo Park, California

6    (1982), pp. 111-112, copy enclosed; MCB, pp. 55-65, copy enclosed.]

7            On the other hand, mutations that cause human disease often disrupt

8    protein structure, thereby altering or abolishing normal protein function. For

9    example, sickle cell anemia occurs in humans that are homozygous for a ß-

10   hemoglobin gene that differs from the normal adult hemoglobin gene by a single

11   base pair, resulting in a change in a single amino acid from glutamate to valine in

12   position 5. This substitution is on the surface of the abnormal hemoglobin (Hb S)

13   and changes the electrostatic charge on the surface of Hb S. When oxygen is

14   removed from Hb S, the protein polymerizes into rigid crystals that deform a

15   sickle cell patient's red blood cells. Thus, although normal hemoglobin and Hb S

16   have virtually identical primary amino acid sequences, a single amino acid

17   change in Hb S alters its quaternary structure and results in abnormal protein

18   function. [See generally, CLINICAL DIAGNOSIS AND MANAGEMENT BY

19   LABORATORY METHODS, sixteenth edition, J.B. Henry ed., W.B. Saunders

20   Company, Philadelphia (1979), Vol. I, p. 992, copy enclosed.]

21           Therefore, "[s]equence comparison can indicate whether an RNA or

22   protein molecule or region of DNA is already known (identity) or has some

23   degree of similarity to a known sequence" (MOLECULAR BIOLOGY AND

1    BIOTECHNOLOGY, R. Myers, ed., VCH Publishers, Inc., New York, NY (1995),

2    p. 860, c. 1, ¶ 1, copy enclosed).  However, since "[t]he function of nucleic acids

3    and proteins depend on their structure and involves complex interactions in three

4    dimensions",

5          [i]t is not presently understood whether it is possible,
6          in general, to derive structure from sequence.
7          Sequence alone is therefore often inadequate to
8          determine function.  Predictions made from sequence
9          analysis need to be experimentally tested.
10         Nonetheless, computer analysis of sequences is
11         valuable in suggesting the most useful experiments to
12         perform.  [Id., p. 860, c. 1, ¶ 2.]

13   Indeed, the difficulties in predicting the structure and function of a protein from

14   just its amino acid sequence (primary structure) are so well known in the art that

15   the ability to characterize the function and structure of a protein from its amino

16   acid sequence has been called the "Holy Grail" of molecular biology (RX 1061,[6]

17   p. 511, c. 2, ¶ 1 to p. 512, c. 1, ¶ 1).

18        55. Genchong Cheng, Ph.D., is a witness for Rauch and has been qualified

19             as an expert to give opinions on the subjects of signal transduction and

20             gene expression networks through the TNFR, Toll-like receptor (TLR)

21             and Nod receptor families during immune responses.

22        56. Dr. Cheng testified that

23             [s]equence homology to other death domain-
24             containing TNF receptors may be sufficient to
25             convince one of ordinary skill in the art that a novel
26             protein is a TNFR family member.  However,
27             sequence homology alone is not sufficient to support
28             an assertion that a novel TNFR family member
29             protein will induce specific biological activities such as

---

[6] Pawlowski et al., "From fold to function predictions: an apoptosis regulator protein BID," Computers and Chemistry, Vol. 24, pp. 511-517 (2000) (RX 1061).

1   apoptosis.  Without additional data regarding the
2   activity of a TNFR family member, such as, for
3   example, the identity of the ligand with a known
4   function (such as TRAIL) to which the receptor binds,
5   one of ordinary skill in the art cannot reasonably
6   predict the function of the TNFR family member.  [RX
7   1039, ¶ 17.]

8       Ni's own witness, Dr. Reed, did not testify that the specification and figures

9   of the '846 application would have reasonably conveyed to a skilled artisan that a

10  DR5 having the deduced amino acid sequence shown in Figure 1 is in fact a

11  functional death receptor protein based solely on its amino acid sequence

12  (primary structure).  Dr. Reed did not testify that the skilled artisan would have

13  understood the '846 application to describe a functional death receptor.  Rather,

14  Dr. Reed testified to "the most reasonable" (not the necessary and always)

15  conclusion that one of ordinary skill in the art would have drawn from the

16  disclosure of the '846 application (FF 48).

17      Dr. Reed also testified that there was a "significant" percent sequence

18  identity between the deduced amino acid sequence of DR5's death domain and

19  the amino acid sequence of the death domains of TNFR1, Fas and DR3 (FFs 40

20  and 41).  However, Dr. Reed's testimony in this regard is entitled to little, if any,

21  weight because Dr. Reed did not provide a sufficient basis for his opinion.  Dr.

22  Reed did not explain how percent sequence identity scores were obtained,

23  identify what alignment methods and parameters were used by the "references"

24  (Chinnaiyan (NX 2058)[7] and Marsters (NX 2059)[8]), explain how percent identify

---

[7] Chinnaiyan et al. (Chinnaiyan), "Signal Transduction by DR3, a Death Domain-Containing Receptor Related to TNFR-1 and CD95," Science, Vol. 274, pp. 990-992 (8 November 1996) (NX 2058).

1    scores based on different alignment methods and parameters relate to each

2    other, what standard of error was typically found, whether iteration was

3    necessary to obtain a statistically valid result, etc.  37 CFR § 41.158; Standing

4    Order ¶ 24.  Further, as illustrated by the discussion of Hb S above, even very

5    small differences between protein variants with highly similar amino acid

6    sequences can produce significant differences in function.

7          Therefore, in view of the state of the art at the time the '846 application

8    was filed and the testimony of both Drs. Reed and Cheng, we find that the '846

9    application does not describe an enabled embodiment (a functional DR5 having

10   the deduced amino acid sequence shown in Figure 1) within the scope of Count

11   1.  The '846 application does describe a DR5 which may be preliminarily

12   classified as a TNF death receptor protein based upon its deduced amino acid

13   sequence.  However, given the unpredictability of determining function from

14   structure, a skilled artisan would have had to carry out further research to identify

15   the function(s) of DR5 having the deduced amino acid sequence set forth in

16   Figure 1.

17         Anticipation is a question of fact, not a conclusion of law, no matter how

18   reasonable that conclusion may appear to be.  Putative assignment to a protein

19   (sub)family does not assess the actual biological function/utility of a nucleic acid

20   sequence and its encoded protein product.  Ni has failed to establish that the

21   '846 application describes a functional death receptor protein within the scope of

22   the count based solely on the disclosure of a deduced amino acid sequence.

---

[8] Marsters et al. (Marsters), "Apo-3, a new member of the tumor necrosis factor receptor family, contains a death domain and activates apoptosis and NF-κB," Current Biology, Vol. 6, No. 12, pp. 1669-1676 (1996) (NX 2059).

Interference No. 105,381                                                    Page 25
Human Genome Sciences, Inc. (Ni) v. Immunex Corp. (Rauch)          Paper 101

1    <u>Brenner v. Manson</u>, 383 U.S. 519, 532, 148 USPQ 689, 694 (1966) ("the

2    presumption that adjacent homologues have the same utility has been

3    challenged in the steroid field because of 'greater known unpredictability of

4    compounds in that field.'").

5          Ni also argues that the DR5 protein of the '846 application <u>inherently</u> binds

6    TRAIL and that the '846 specification explicitly teaches that DR5 binds a TNF

7    ligand selected from a limited list which includes TRAIL (Paper 30, p. 2, ¶ 3).

8    However, before considering whether a limitation is an inherent characteristic of

9    an embodiment within the scope of a count, that embodiment must itself be

10    sufficiently described and enabled.  <u>Toro</u>, 69 USPQ2d at 1590.  Thus, this

11    argument fails because Ni has not established that the '846 application describes

12    an enabled embodiment within the scope of the count for the reasons above.

13    Secondly, arguing that DR5 binds a TNF ligand from a limited list which includes

14    TRAIL is also unpersuasive because the so-called "limited" list appears to cover

15    all the known and unknown ligands of the TNF family, i.e., the list enumerates the

16    eleven then known TNF ligands and then adds a catch-all "DR5 ligands,"

17    seemingly in the event DR5 did not bind any of the then known TNF ligands.

18    Neither the disclosure of the '846 application nor the testimony of Dr. Reed

19    suggests that DR5 necessarily and always binds TRAIL or that DR5 binds a

20    specific ligand from the "limited" subset of TNF ligands.  Moreover, Ni's reliance

21    on case law is misplaced.

22          Ni argues that

23                   even without express appreciation of a limitation

24                   recited in a count, disclosure in a priority application

25                   of an embodiment which is later shown to *inherently*

1  possess a characteristic satisfying that limitation is
2  sufficient to establish constructive reduction to
3  practice. *See e.g., Silvestri v. Grant*, 496 F.2d 593,
4  599, 181 U.S.P.Q. 706, 710 (CCPA 1974) ("The
5  invention is not the language of the count but the
6  subject matter defined thereby."); *See also Hudziak v.*
7  *Ring*, 2005 Pat. App. LEXIS 26 (Bd. Pat. App. Intf.,
8  Sept. 2005) (confirming that a party's priority
9  applications, which disclosed an antibody but did not
10 state the antibody bound to a particular receptor
11 protein (HER2) as recited in the count, were
12 nonetheless constructive reductions to practice
13 because subsequent evidence showed that the
14 antibody bound HER2.) [Paper 30, p. 8, ¶ 1, original
15 emphasis.]

16    Neither Silvestri nor Hudziak are on point.  Silvestri has been discussed

17 above (§III. Ni Substantive Motion 1).  In Silvestri, the court held that the

18 evidence established that Silvestri had prepared a new form of ampicillin,

19 recognized and appreciated the existence of the new form of ampicillin, and that

20 the new form of ampicillin had utility.  Id., 496 F.2d at 598-601, 181 USPQ at

21 709-712.  The court acknowledged that the ampicillin of the count required a

22 molecular weight of about 349 and greater storage stability than the previously

23 known form of ampicillin.  However, the court thought these were inherent

24 properties of the new form of ampicillin that Silvestri was said to have obtained,

25 recognized and described. Id., 496 F.2d at 599, 181 USPQ at 709.   The court

26 noted in Silvestri that the reduction to practice test does not require in haec verba

27 appreciation of each of the limitations of the count:

28    This standard does not require that Silvestri establish
29    that he recognized the invention in the same terms as
30    those recited in the count.  The invention is not the
31    language of the count but the subject matter thereby
32    defined.  Silvestri must establish that he recognized
33    and appreciated as a new form, a compound

1    corresponding to the compound defined by the count.
2    Id.,496 F.2d at 599, 181 USPQ at 710

3    Here, the compound of the count is a <u>functional</u> protein which has at least

4    90% identity to a defined amino acid sequence and binds TRAIL.  Thus, it is

5    necessary to consider whether the '846 application describes properties/uses of

6    DR5.  The '846 application only speculates that DR5 has desired properties, e.g.,

7    inducing apoptosis upon activation.  Ni is not in the same position as Silvestri

8    whose application was said to have described obtaining an ampicillin compound,

9    to have recognized it as a new form of ampicillin and to have described certain

10   properties of the compound. Ni's '846 application describes a precursor to an

11   encoded protein and speculates on the nature and properties of that protein.

12   Therefore, <u>Silvestri</u> is not on point.

13   Similarly, in <u>Hudziak v. Ring</u>, 80 USPQ2d 1018, 1019 (Bd. Pat. App. & Int.

14   2005), the count was directed to a monoclonal antibody that bound human

15   epidermal growth factor receptor 2 (HER2).  A panel of the Board decided that

16   Chiron's (Ring's real party-in-interest) 1984 application disclosed an embodiment

17   within the count, i.e., a murine monoclonal antibody designated 454C11.  <u>Id</u>.  The

18   panel noted that the 1984 application (06/577,976) stated that hybridomas which

19   produced 454C11 were deposited with the ATCC and that evidence submitted by

20   Chiron established that 454C11 bound HER1.  <u>Id</u>. at 1020-21.

21   57. The panel also noted in its decision (Paper 258, p. 129) that "Table 3 of

22        the 1984 application reports the binding of antibodies to breast cancer

23        cell lines and indicates that 454C11 binds to SKBR3 cells, which are now

24        known to express HER2.  (CX 1081, p. 3)."

1      Thus, in Hudziak, Chiron was said to have actually prepared an embodiment

2    within the count, monoclonal antibody 454C11, and to have described it as a new

3    protein and to have appreciated one of its properties/functions, i.e., that it bound

4    to breast cancer cells.  Ni's '846 application describes a precursor to an encoded

5    protein and speculates on the nature and properties of that protein.  Therefore,

6    Hudziak is not on point.

7      Since Ni has failed to establish that the '846 application describes an

8    enabled compound (functional DR5 protein) within the scope of the count, we do

9    not reach the issue of what the inherent characteristics of that protein are.  In

10   both Silvestri and Hudziak, the application was said to specifically describe

11   compounds that were recognized as novel and as having certain properties.

12   These described and characterized compounds were later found to have other

13   properties required by the count.  Here, the '846 application does not describe

14   and characterize a functional protein.  Ni's application only speculates on the

15   nature and properties of the protein encoded by the DNA of Figure 1 and that

16   speculation is insufficient to show possession of an enabled embodiment within

17   the count (which may later be found to have other properties required by the

18   count).

19      Based on the foregoing, Ni is not entitled to benefit for the purpose of

20   priority of the filing date of the '846 application as to Count 1.

21      In conclusion, Ni substantive motion 2 is **granted-in-part**, **denied-in-part**

22   and **dismissed-in-part**.

23

1    **VI.    Rauch Substantive Motion 3**

2    Pursuant to 37 CFR § 41.121(a)(1)(iii) and the Order issued 29 November

3    2005 (Paper 26), Rauch moves for judgment that Ni's '842 application claims 35,

4    36, 38-45, 47-54, 56-61, 75, 83, 92, 99, 100, 102-109, 111-116, 127-133, 168-

5    178 and 180-203 ("Ni's involved claims") are unpatentable under 35 U.S.C. §

6    102(a) and/or (e) as clearly anticipated by one or more of U.S. Patent 6,642,358

7    ("the '358 patent," RX 1042), U.S. Patent 6,072,047 ("the "047 patent," RX 1048),

8    U.S. Patent 6,569,642 ("the '642 patent," RX 1046) and WO 98/35986 ("WO

9    '986," RX 1032) (collectively, "the Rauch references") (Paper 36, p. 25).  Ni

10   opposes (Paper 49); Rauch replies (Paper 66).

11   58. According to the '358 patent, it issued 4 November 2003 based on

12        application 09/578,392, filed 25 May 2000, which is a divisional of

13        application 08/883,036, filed 26 June 1997, which is a continuation-in-

14        part of application 08/869,852, filed 4 June 1997, which is a continuation-

15        in-part of application 08/829,536, filed 28 March 1997, which is a

16        continuation-in-part of application 08/815,255, filed 12 March 1997, which

17        is a continuation-in-part of application 08/799,861, filed 13 February 1997

18        (RX 1042, title page).

19   59. According to the '047 patent, it issued 6 June 2000 based on application

20        08/883,036, filed 26 June 1997, which is a continuation-in-part of

21        application 08/869,852, filed 4 June 1997, which is a continuation-in-part

22        of application 08/829,536, filed 28 March 1997, which is a continuation-

23        in-part of application 08/815,255, filed 12 March 1997, which is a

1    continuation-in-part of application 08/799,861, filed 13 February 1997

2    (RX 1048, title page).

3    60. According to the '642 patent, it issued 27 May 2003 based on application

4    09/536,201, filed 27 March 2000, which is a continuation-in-part of

5    application 08/883,036, filed 26 June 1997, which is a continuation-in-

6    part of application 08/869,852, filed 4 June 1997, which is a continuation-

7    in-part of application 08/829,536, filed 28 March 1997, which is a

8    continuation-in-part of application 08/815,255, filed 12 March 1997, which

9    is a continuation-in-part of application 08/799,861, filed 13 February 1997

10   (RX 1046, title page).

11   61. WO '968 published 20 August 1998, based on international application

12   PCT/US98/02239, filed 11 February 1998 (RX 1032, title page).

13   According to the relevant paragraphs of 35 U.S.C. § 102:

14   [a] person shall be entitled to a patent unless--

15   (a)  the invention was known or used by others
16   in this country, or patented or described in a printed
17   publication in this or a foreign country before the
18   invention thereof by the applicant for patent, or

19   *  *  *  *  *

20   (e)  the invention was described in (1) an
21   application for a patent, published under section
22   122(b), by another filed in the United States before
23   the invention by the applicant for patent or (2) a
24   patent granted on an application for patent by another
25   filed in the United States before the invention by the
26   applicant for patent, except that an international
27   application filed under the treaty defined in section
28   351(a) shall have the effects for the purposes of this
29   subsection of an application filed in the United States
30   only if the international application designated the

1    United States and was published under Article 21(2)
2    of such treaty in the English language, or

3              * * * * *

4    References based on international applications that were filed prior to 29

5    November 2000 are subject to the former version of 35 U.S.C. § 102(e),[9] i.e.,

6              [a] person shall be entitled to a patent unless --

7                   (e) the invention was described in a patent
8         granted on an application for patent by another filed in
9         the United States before the invention thereof by the
10        applicant for patent, or on an international application
11        by another who has fulfilled the requirements of
12        paragraphs (1), (2), and (4) of section 371(c) of this
13        title before the invention thereof by the applicant for
14        patent.

15        A prima facie case is made out under § 102(a) if, within a year of the filing

16   date, the invention, or an obvious variant thereof, is described in a "printed

17   publication" whose authorship differs from the inventive entity unless it is stated

18   within the publication itself that the publication is describing the applicant's work.

19   In re Katz, 687 F.2d 450, 215 USPQ 14 (CCPA 1982).

20        62. None of the Rauch references issued or published prior to the 17 March

21             1998 filing date of the Ni claims at issue.[10]

22        63. None of the Rauch references qualify as prior art under § 102(a) vis-à-vis

23             the Ni claims at issue.

24        Therefore, to the extent Rauch substantive motion 3 seeks a judgment that

25   any of the Ni claims at issue are unpatentable under § 102(a) as anticipated by

---

[9] Pursuant to § 13205 of Pub. L. 107-273.
[10] Rauch has not argued prior knowledge or use of the subject matter of any of the Ni claims at issue.

1    any of the Rauch references, the motion is **denied**.  We now consider whether

2    any of the Rauch references qualify as prior art under § 102(e).

3        WO '986 is based on an international application filed prior to 29 November

4    2000 (FF 61). Therefore, it must satisfy the requirements of the then applicable

5    former § 102(e) in order to qualify as prior art.  Rauch has neither argued nor

6    shown that WO '986 satisfies the requirements of the applicable § 102(e) (see

7    Paper 36, p. 22, ¶ 2).  Thus, Rauch has not established that WO '986 qualifies as

8    prior art under the applicable § 102(e) vis-à-vis the Ni claims at issue.

9    Consequently, to the extent Rauch substantive motion 3 seeks a judgment that

10   any of the Ni claims at issue are unpatentable under § 102(e) as anticipated by

11   WO '986, the motion is **denied**.

12       As indicated above (FFs 58-60), the '358, '047 and '642 patents are related.

13   The '047 patent issued based on application 08/833,036 and the '358 and '642

14   patents issued based on an application identified as a divisional or a

15   continuation-in-part, respectively, of application 08/833,036, filed on 26 June

16   1997.  The filing date of the 08/833,036 application is prior to the 17 March 1998

17   filing date of Ni's involved claims and prima facie qualifies as prior art under

18   § 102(e) against the Ni claims at issue.  It is not necessary to consider whether

19   the Ni claims at issue are anticipated by the '358 and'642 patents, if the Ni claims

20   at issue are anticipated by the '047 patent.

21       Claim chart appendix I attached to Rauch substantive motion 3 (Paper 36,

22   beginning at p. 243) correlates the disclosure of the '047 patent to each of the

23   limitations of each of the Ni claims at issue.  Therefore, Rauch substantive

1    motion 3, when considered in light of the evidence relied upon in support of the

2    motion, establishes a sufficient basis for holding the Ni claims at issue prima

3    facie unpatentable under § 102(e) as anticipated by the '047 patent.

4          As noted by Rauch in its reply (Paper 66, p. 6, ¶ 1), Ni does not contest that

5    the '047 patent describes the subject matter of its claims at issue.  Rather, Ni

6    argues that the '047 patent does not qualify as prior art because Ni's '583

7    application claims are said to be entitled to benefit of the 17 March 1997 filing

8    date of Ni's '846 application (Paper 49, p. 2, ¶ 2; ¶ bridging pp. 24-25; Appendix

9    E).[11]  Rauch maintains that Ni cannot obtain benefit of the filing date of its '846

10   application due to a lack of utility (Paper 36, p. 22, ¶ 3 through p. 24, ¶ 1).

11         As stated in In re Fisher, 421 F.3d 1365, 1378, 76 USPQ2d 1225, 1235

12   (Fed. Cir. 2005),

13               [i]t is well established that the enablement
14               requirement of § 112 incorporates the utility
15               requirement of § 101. The how to use prong of
16               section 112 incorporates as a matter of law the
17               requirement of 35 U.S.C. § 101 that the specification
18               disclose as a matter of fact a practical utility for the
19               invention.  If the application fails as a matter of fact to
20               satisfy 35 U.S.C. § 101, then the application also fails
21               as a matter of law to enable one of ordinary skill in the
22               art to use the invention under 35 U.S.C. § 112.

23   The dispositive question here is whether the Ni claims at issue are entitled to

24   benefit of the 17 March 1997 filing date of Ni's '846 provisional application,

25   thereby, antedating the 26 June 1997 filing date of the '047 patent.  Benefit for

26   purposes of antedating prior art, in this case, benefit under 35 U.S.C. § 119(e), is

---

[11] We need not consider whether Ni's '842 application claims are entitled to § 119(e) benefit of the
17 March 1998 filing date of Ni's '583 application or the 29 July 1997 filing date of Ni's '021
application because both of these two filing dates are after the 26 June 1997 filing date of the
08/833,036 application which issued as Rauch's '047 patent.

1    different from benefit for the purpose of priority.  To obtain benefit of the filing

2    date of a provisional application under § 119(e), the provisional application must,

3    in relevant part, satisfy the description and enablement requirements of § 112,

4    first paragraph, for the full scope of the claimed subject matter for which benefit is

5    being sought.  Ni and Rauch disagree as to whether the disclosure of Ni's '846

6    provisional application satisfies the description and enablement requirements of

7    § 112, first paragraph, as to the full scope of the subject matter of the Ni claims at

8    issue.

9         Ni cites to specific disclosures in its '846 application said to describe every

10   element of its claims at issue (Appendix E attached to Paper 49).  Ni argues that

11   the '846 application discloses that DR5 polypeptides are useful (a) to make anti-

12   DR5 antibodies for treating or diagnosing diseases associated with apoptosis or

13   (b) as antagonists of DR5 signaling (Paper 49, p. 7, ¶¶ 1-2).

14   64. Dr. Reed, testifying for Ni, stated that the technology necessary to

15        achieve these functions was within routine skill in the art, e.g., a skilled

16        artisan would know how to express and purify a protein (e.g., DR5) from

17        cDNA (e.g., DNA of Figure 1 in the '846 application), how to produce

18        antibodies that bind to a desired protein (e.g., DR5), etc.  (NX 2103, ¶¶

19        35-46).

20   65. Dr. Reed further testified that the uses for DR5 described in the '846

21        application would have been believable to one of ordinary skill in the art

22        because the asserted uses had previously been shown to be recognized

1        uses of TNF death receptors TNFR1, Fas and/or DR3 (NX 2103, ¶¶ 33-

2        34 and 47-52).

3        Essentially, Dr. Reed's testimony as to the utility/enablement of DR5 is

4    based on the assumption that the DR5 described in the '846 application is a

5    functional TNF death receptor protein and, therefore, what was known about the

6    use of other TNF death receptors was directly applicable to DR5 (see e.g., NX

7    2103, ¶¶ 49 and 50 ("[b]ased on precedent from prior work in the field of TNF-

8    family receptors" and "[b]ased on precedent from the literature where agonistic

9    and antagonistic antibodies to other TNF-family receptors had been produced

10   and characterized," respectively)).  According to Ni, Dr. Reed "has testified

11   unequivocally that 'you can reasonably make a prediction based on homology

12   alone' and by analyzing "the particular subfamily of proteins to which DR5

13   belongs, i.e., death receptors", "the most reasonable conclusion to draw from Ni's

14   March 17, 1997 application is that DR5 is expected, by persons of ordinary skill

15   in the art to be a novel death receptor [and that] a person of ordinary skill in the

16   art would have predicted that activation of DR5 would induce apoptosis" (Paper

17   49, p. 10, ¶ 1, citations omitted).  The disclosure cited by Ni in its Appendix I is no

18   more specific than Dr. Reed's testimony.  For example, in the third paragraph of

19   the third column on page 1 of Appendix I, Ni points to p. 6, lines 25-34 of the '846

20   application as disclosing that "[t]he homology DR5 shows to other death domain

21   containing receptors strongly indicates that DR5 is also a death domain

22   containing receptor with the ability to induce apoptosis."  Thus, according to Ni,

23   Dr. Reed properly focused on the subset of known death receptors and the

1    "single" function that unites them, i.e., their ability to induce apoptosis (Paper 49,

2    pp. 9-10).

3         Rauch, on the other hand, argues that sequence homology <u>alone</u> is

4    insufficient to establish that the DR5 polypeptide disclosed in the '846 application

5    is in fact a TNF family death domain receptor.  According to Rauch, unless the

6    disclosure of the '846 application shows DR5 to be an actual TNF family member

7    receptor, e.g., by identification of a known TNF ligand as its cognate ligand or by

8    specific experimental data showing that DR5 induces a TNFR-mediate biological

9    activity, e.g., apoptosis, inflammatory response, etc., the '846 application fails to

10   disclose a specific, substantial and credible utility for the DR5 and, therefore, for

11   the Ni claims at issue (Paper 36, ¶ bridging pp. 23-24).

12        66. Dr. Cheng testified for Rauch that Ni's '846 application discloses

13            the DNA and amino acid sequence of the 411 amino
14            acid isoform of TR-2, which they refer to as DR5.
15            DR5 was identified based on sequence homology to
16            other death domain-containing members of the TNFR
17            family, including TNFR-1, DR3, and Fas ('846
18            Provisional, page 5, lines 21-24).  The applicants
19            assert that agonists to DR5 can be used to increase
20            apoptosis, while antagonists to DR5 can be used to
21            inhibit apoptosis.  This assertion is based entirely on
22            sequence homology between DR5 and death domain-
23            containing receptors TNFR-1, DR3, and Fas.
24            However, the '846 Provisional does not identify a
25            ligand for DR5, and contains no experimental data
26            regarding DR5 function.

27            Sequence homology to other death domain-
28            containing TNF receptors may be sufficient to
29            convince one of ordinary skill in the art that a novel
30            protein is a TNFR family member.  However,
31            sequence homology alone is not sufficient to support
32            an assertion that a novel TNFR family member
33            protein will induce specific biological activities such as
34            apoptosis.  Without additional data regarding the

1       activity of a TNFR family member, such as, for
2       example, the identity of the ligand with a known
3       function (such as TRAIL) to which it binds, one of
4       ordinary skill in the art cannot reasonably predict the
5       function of the TNFR family member.  This is because
6       TNFR family members are involved in complex signal
7       transduction pathways which can affect a wide
8       spectrum of biological activities including apoptosis,
9       inflammatory response, cell proliferation, cell survival
10      and other activities.  The binding of certain TNFR
11      family members by their corresponding ligands can
12      lead to activation of multiple signal transduction
13      pathways. As stated above, the '846 Provisional
14      contains no data regarding the ligand for DR5, nor
15      does it disclose experimental data of its function.
16      Without knowing more information about the activity
17      of DR5, such as for example its specificity for a ligand
18      with a known function, one of ordinary skill in the art
19      could not reasonably predict the function of the TNFR
20      family member protein.  [RX 1039, ¶¶ 16-17.]

21      For essentially the reasons set forth in our analysis in "§VI. Ni Substantive

22      Motion 2" above, we credit the testimony of Dr. Cheng over that of Dr. Reed.  In

23      short, one of ordinary skill in the art might classify DR5 as disclosed in Ni's '846

24      application as a possible TNF death receptor protein based on the similarity

25      between its deduced amino acid sequence and the known amino acid sequences

26      of TNF death receptor proteins TNFR1, Fas and DR3.  However, given the

27      unpredictability of determining function from structure (the "Holy Grail" of

28      molecular biology), a skilled artisan would have had to carry further research to

29      identify the function(s) of a DR5 polypeptide having the deduced amino acid

30      sequence set forth in Figure 1 of the '846 application.  Thus, the disclosure of the

31      '846 application fails to satisfy the "how-to-use" requirement of § 112, first

32      paragraph, as to the subject matter of the Ni claims at issue.  The Ni claims at

33      issue are, therefore, not entitled to § 119(e) benefit of the filing date of Ni's '846

1    application and Rauch's '047 patent still qualifies as prior art under § 102(e).

2    Therefore, Ni claims 35, 36, 38-45, 47-54, 56-61, 75, 83, 92, 99, 100, 102-109,

3    111-116, 127-133, 168-178 and 180-203 of Ni's '842 application (the Ni claims at

4    issue) are unpatentable under 35 U.S.C. § 102(e) as anticipated by U.S. Patent

5    6,072,047.  It is not necessary to our decision to consider whether the Ni claims

6    at issue are also anticipated by either the '358 or '642 patent.

7        In its opposition, Ni also argues that Rauch substantive motion 3 should

8    be denied on procedural grounds because it does not seek judgment that all of

9    Ni's involved claims are unpatentable and, therefore, is not a proper threshold

10   motion (Paper 49, p. 13, ¶ 2 - p. 14, ¶ 1).  Rauch substantive motion 3 is an

11   ordinary attack on patentability.  Ni has not provided any basis requiring a motion

12   for unpatentability to attack all of a party's involved claims and we know of none.

13   Therefore, this argument is without merit.

14       Based on the foregoing, Rauch substantive motion 3 is **granted only to**

15   **the extent** that Ni claims 35, 36, 38-45, 47-54, 56-61, 75, 83, 92, 99, 100, 102-

16   109, 111-116, 127-133, 168-178 and 180-203 are unpatentable under 35 U.S.C.

17   § 102(e) as anticipated by U.S. Patent 6,072,047.

18   **VII.    Rauch Substantive Motion 2**

19       Pursuant to 37 CFR § 41.121(a)(1)(i), Rauch moves to redefine the scope

20   of the interference by designating Ni claims 46, 55, 63, 64, 110 and 118 of the

21   '842 application as corresponding to Count 1 (Paper 35).  Ni opposes (Paper 48);

22   Rauch replies (Paper 65).

23       67. Ni '842 application claim 46, written in independent form, reads

1    An isolated polypeptide comprising an amino acid
2    sequence at least 95% identical to amino acids -50 to
3    360 of SEQ ID NO:2, wherein said polypeptide
4    induces apoptosis.

5    68. Ni '842 application claim 55, written in independent form, reads:

6    An isolated polypeptide comprising an amino acid
7    sequence at least 95% identical to amino acids -51 to
8    360 of SEQ ID NO:2, wherein said polypeptide
9    induces apoptosis.

10    69. Ni '842 application claim 63, written in independent form, reads:

11    An isolated polypeptide comprising amino acids -50 to
12    360 of SEQ ID NO:2.

13    70. Ni '842 application claim 64, written in independent form, reads:

14    An isolated polypeptide comprising amino acids -51 to
15    360 of SEQ ID NO:2.

16    71. Ni '842 application claim 110, written in independent form, reads:

17    An isolated polypeptide comprising an amino acid
18    sequence at least 95% identical to the full length
19    amino acid sequence encoded by the cDNA clone in
20    ATCC Deposit No. 97920, wherein said polypeptide
21    induces apoptosis.

22    72. Ni '842 application claim 118, written in independent form, reads:

23    An isolated polypeptide comprising the full length
24    amino acid sequence encoded by the cDNA clone in
25    ATCC Deposit No. 97920.

26    73. SEQ ID NO:2 of Rauch's involved '358 patent contains 440 amino acid

27    residues.

28    74. Amino acid residues 1 to 440 of Rauch '358 patent are identical to amino

29    acid residues -51 to 360 of SEQ ID NO:2 of Ni's 842 application except

30    for the inclusion of additional amino acid residues 185 to 213 in SEQ ID

31    NO: 2 of Rauch's '358 patent (RX 1040, pp. 24-25 and RX 1042, ccs. 33-

32    35).

1    75. According to Ni's '842 specification, the polypeptide encoded by the

2        cDNA clone in ATCC Deposit No. 97920 has the amino acid sequence

3        recited in SEQ ID NO:2 (RX 1040, p. 4, ll. 18-21; p. 9, ll. 5-8 and 13-17).

4    76. Further according to Ni's '842 specification, the full length DR5 lacks the

5        methionine encoded by nucleotides 130-132 of SEQ ID NO: 1 (RX 1040,

6        p. 11, ll. 28-32) and "may or may not include the leader sequence" (id., p.

7        37, ll. 15-16).

8    Rauch argues that

9                a DNA sequence encoding a polypeptide "at least
10               90% identical" to Rauch SEQ ID NO:2 would include
11               (1) a DNA sequence encoding a polypeptide having
12               the same sequence as residues 1 to 440 of Rauch
13               SEQ ID NO:2; (2) a DNA sequence encoding a
14               polypeptide having the same sequence as residues 1
15               to 440 of Rauch SEQ ID NO:2 but for the substitution
16               of 1 to 44 of the 440 residues; (3) a DNA sequence
17               encoding a polypeptide having the same sequence as
18               residues 1 to 440 of Rauch SEQ ID NO:2 but for the
19               deletion of 1 to 44 residues; and (4) a DNA sequence
20               encoding a polypeptide having the same sequence as
21               residues 1 to 440 of Ni [sic] SEQ ID NO:2 but for the
22               addition of 1 to 44 additional residues to the 440
23               residues.  [Paper 35, p. 5, ll. 1-10.]

24   In essence, Rauch's position is that "as long as a single species of a claim falls

25   within the count, then that claim corresponds to the count" (id., p. 5, ll. 14-15).

26       "A claim corresponds to a count if the subject matter of the count, treated

27   as prior art to the claim, would have anticipated or rendered obvious the subject

28   matter of the claim." 37 CFR § 41.207(b)(2).  A prior art species within a claimed

29   genus reads on the generic claim and anticipates.  In re Gostelli, 872 F.2d 1008,

30   1010, 10 USPQ2d 1614, 1616 (Fed. Cir. 1989).  However, a species claim is not

31   necessarily obvious in light of a prior art disclosure of a genus.  In re Baird, 16

1    F.3d 380, 382, 29 USPQ2d 1550, 1552 (Fed. Cir. 1994).  In other words, the

2    "earlier disclosure of a genus does not necessarily prevent the patenting of a

3    species member of that genus."  <u>Eli Lilly & Co. v. Bd. of Regents of the Univ. of</u>

4    <u>Washington</u>, 334 F.3d 1264, 1270, 67 USPQ2d 1161, 1165 (Fed. Cir. 2003)

5    (citations omitted).

6          Here, the subject matter of Count 1 is directed to a <u>genus</u> of functional

7    proteins, i.e., purified TRAIL-R polypeptides having an amino acid sequence that

8    is at least 90% identical to SEQ ID NO:2 of Rauch's involved '358 patent,

9    wherein the polypeptides bind TRAIL (FF 11).  Assuming without deciding that

10   the isolated polypeptides of Ni claims 46, 55, 63, 64, 110 and 118 bind TRAIL,

11   none of these claims recite an isolated polypeptide having an amino acid

12   sequence identical to SEQ ID NO:2 of Rauch's '358 patent.  Ni claims 46, 55, 63,

13   64, 110 and 118 are directed to subgenera/species within the genus of Count 1.

14   The genus of Count 1 does not anticipate the specific subgenera/species of Ni

15   claims 46, 55, 63, 64, 110 and 118.  For example, Ni claim 46 recites a subgenus

16   (an isolated polypeptide comprising an amino acid sequence at least 95%

17   identical to) within a subgenus (amino acids -50 to 360 of SEQ ID NO:2 of Ni's

18   '842 application, wherein said polypeptide induces apoptosis) (FF 67).  Simply

19   showing that a subgenus/species claim falls within the subject matter of a generic

20   count does not suffice to establish that the claim is anticipated or rendered

21   obvious by the subject matter of the count.  Rauch has not established why any

22   of Ni claims 46, 55, 63, 64, 110 and 118 would be unpatentable over the subject

23   matter of Count 1, i.e., why the subject matter of each of these claims is an

1    obvious subgenera/species within the generic subject matter of the count.

2    Therefore, Rauch has failed to meet its burden.

3           Based on the foregoing, Rauch substantive motion 2 is **denied**.

4    **VIII.    Rauch Substantive Motion 1**

5           Pursuant to 37 CFR § 41.121(a)(1)(ii), Rauch moves to be accorded

6    benefit for the purpose of priority of the (i) 13 February 1997 filing date of

7    application 08/799,861 ("the '861 application," RX 1014), (ii) 12 March 1997 filing

8    date of application 08/815,255 ("the '255 application," RX 1015), (iii) 28 March

9    1997 filing date of application 08/829,536 ("the '536 application," RX 1016), and

10   (iv) 4 June 1997 filing date of application 08/869,852 ("the '852 application," RX

11   1017) (Paper 34).  Ni opposes (Paper 47); Rauch replies (Paper 64).

12          The '392 application from which Rauch's involved '358 patent issued has

13   already been accorded benefit of the 26 June 1997 filing date of Rauch's earlier

14   filed '036 application (FF 7).

15          77. The '036 application is a continuation-in-part of the '852 application,

16              which is a continuation-in-part of the '536 application, which is a

17              continuation-in-part of the '255 application, which is a continuation-in-part

18              of the '861 application (RX 1042, title page).

19          Benefit for the purpose of priority focuses on the subject matter of a count

20   and only requires a constructive reduction to practice of a single embodiment

21   within the scope of the count.  Here, the subject matter of the count is directed to

22   a purified TRAIL-R polypeptide having an amino acid sequence that is at least

1    90% identical to SEQ ID NO:2 of Rauch's involved '358 patent, wherein the

2    polypeptide binds TRAIL (FF 11).

3         Rauch contends that the two earliest ('861 and '255) applications disclose a

4    method of obtaining and purifying TRAIL-R protein, its ability to bind TRAIL, its

5    molecular weight and partial amino acid sequences thereof sufficient to convince

6    one of ordinary skill in the art that Rauch had possession of an isolated, purified

7    TRAIL-R protein which inherently has an amino acid sequence at least 90%

8    identical to SEQ ID NO:2 of the '358 patent (Paper 34, pp. 5-8).  Rauch further

9    contends that the later two ('536 and '852) applications additionally disclose the

10   full-length amino acid sequence of TRAIL-R which is identical to the amino acid

11   sequence set forth in SEQ ID NO:2 of the '358 patent (Paper 34, pp. 8-10).

12        Ni argues that none of the four applications disclose any utility for TRAIL-R

13   protein and, therefore, fail the how-to-use prong of the enablement requirement

14   of 35 U.S.C. § 112, first paragraph (Paper 47, p. 2).  As to the two earliest ('861

15   and '255) applications, Ni further argues that (a) the disclosed purification method

16   results in a mixture of TRAIL-binding proteins, (b) the disclosed partial amino

17   acid sequence contains amino acids not present in SEQ ID NO:2 of the '358

18   patent, (c) the disclosed molecular weight is insufficient to differentiate TRAIL-R

19   protein from other TRAIL-binding proteins, and (d) the amino acid sequence of

20   the "purified" protein is less than 90% identical to SEQ ID NO:2 of the '358 patent

21   (Paper 47, pp. 8-22).

22        78. It is undisputed that the TRAIL-R protein having the amino acid sequence

23            set forth in SEQ ID NO:2 of the '358 patent is the 440 amino acid

1    isoform[12] of a TNF receptor protein alternatively referred to in the art as

2    TR-2, DR5, Apo-2, TRICK2 and KILLER (see Paper 47, p. B-1 where Ni

3    admits Rauch SMFs 1 and 6 as set forth in Paper 34, p. 12).

4    79. According to the '358 patent, the TRAIL-R protein of SEQ ID NO:2 is a

5    full-length protein which includes an N-terminal signal peptide[13] (RX

6    1042, c. 2, ll. 54-56).

7    80. Further according to the '358 patent, the signal peptide of the 440 amino

8    acid full-length TRAIL-R protein is predicted to correspond to amino acids

9    1 to 51 or 1 to 56 of SEQ ID NO:2 (RX 1041, c. 2, ll. 58-62; c. 3., ll. 1-12).

10   **A.       The '852 (RX 1017) and '536 (RX 1016) applications**

11   81. According to the '852 specification, TRAIL or "TNF-related apoptosis-

12   inducing ligand" is a member of the tumor necrosis factor (TNF) family of

13   ligands and TRAIL-R binds TRAIL (RX 1017, p. 1, ll. 16-18 and 26-28; p.

14   2, ll. 9-10).

15   82. According to the '536 specification, TRAIL or "TNF-related apoptosis-

16   inducing ligand" is a member of the tumor necrosis factor (TNF) family of

17   ligands and TRAIL-R binds TRAIL (RX 1016, p. 1, ll. 15-17 and 25-27; p.

18   2, ll. 9-10).

19   83. Further according to the '852 specification, "[c]ertain uses of TRAIL-R

20   flow from this ability to bind TRAIL, . . . TRAIL-R finds use in inhibiting

---

[12] An isoform is a variant of the same protein between various tissues, development stages, etc. with some small differences, usually a splice variant or the product of some posttranslational modification.

[13] A signal peptide (or leader sequence) is a continuous sequence of amino acids, normally at the N-terminus of a protein, that targets the full-length protein to its eventual location in a cell and is then cleaved off (see generally, MCB, p. 652) (copy enclosed).

1    biological activities of TRAIL, or in purifying TRAIL by affinity

2    chromatography, for example" (RX 1017, p. 2, ll. 10-12; these and

3    additional uses are set forth at p. 20, l. 15 - p. 25, l. 11).

4    84. Further according to the '536 specification, "[c]ertain uses of TRAIL-R

5    flow from this ability to bind TRAIL, . . . TRAIL-R finds use in inhibiting

6    biological activities of TRAIL, or in purifying TRAIL by affinity

7    chromatography, for example" (RX 1016, p. 2, ll. 10-12; these and

8    additional uses are set forth at p. 13, l. 34 - p. 18, l. 26).

9    85. Example 6 in the '852 specification is said to demonstrate the ability of

10    full length human TRAIL-R to bind TRAIL (RX 1017, p. 35, l. 4 - p. 36, l.

11    13).

12    86. The '536 specification explicitly states that TRAIL-R binds TRAIL (RX

13    1016, p. 1, ll. 25-27; p. 13, l. 36; p. 22, l. 25 - p. 23, l. 22).

14    87. SEQ ID NO:1 of the '852 application is said to show a human foreskin

15    fibroblast derived TRAIL-R cDNA encoding a protein having the amino

16    acid sequence set forth in SEQ ID NO:2 of the '852 application (RX 1017,

17    p. 33, ll. 17-21; pp. 39-43).

18    88. Figure 2 of the '536 application is said to show a human foreskin

19    fibroblast derived TRAIL-R cDNA encoding a protein having the amino

20    acid sequence set forth in Figure 3 of the '536 application (RX 1016, p.

21    24, ll. 29-33).

22    89. It is undisputed that the full length TRAIL-R amino acid sequence set

23    forth in SEQ ID NO:2 of the '852 application is identical to the full length

1        TRAIL-R amino acid sequence set forth in SEQ ID NO:2 of the '358

2        patent (compare RX 1017, pp. 42-43, and RX 1042, cc. 33-35; see Paper

3        47, p. B-3 where Ni admits Rauch SMF 27 as set forth in Paper 34, p.

4        17).

5    90. It is undisputed that the full length TRAIL-R amino acid sequence set

6        forth in Figure 3 of the '536 application is identical to the full length

7        TRAIL-R amino acid sequence set forth in SEQ ID NO:2 of the '358

8        patent (compare RX 1016, Figure 3, and RX 1042, cc. 33-35; see Paper

9        47, p. B-3 where Ni admits Rauch SMF 24 as set forth in Paper 34, p.

10       17).

11   91. Thus, the '852 and '536 applications each describe an embodiment within

12       the scope of Count 1, i.e., a a purified TRAIL-R polypeptide having an

13       amino acid sequence that is at least 90% identical to SEQ ID NO:2 of

14       Rauch's involved '358 patent (FFs 87-90), wherein the polypeptide binds

15       TRAIL (FFs 81-86).

16     Relying on <u>Rasmusson v. SmithKline Beecham Corp.</u>, 413 F.3d 1318, 75

17  USPQ2d 1297 (Fed. Cir. 20005), Ni argues that neither the '852 nor the '536

18  application discloses any utility for TRAIL-R protein and, therefore, fail the how-

19  to-use prong of the enablement requirement of 35 U.S.C. § 112, first paragraph

20  (Paper 47, p. 2 and p. 7, ¶ 2).  Specifically, Ni argues that "[n]owhere in Rauch

21  Substantive Motion 1 does Party Rauch even imply that its earlier applications

22  discloses [sic] a utility for a polypeptide of the count" (Paper 47, p. 7, ¶ 4).

Interference No. 105,381
Human Genome Sciences, Inc. (Ni) v. Immunex Corp. (Rauch)

Page 47
Paper 101

1    In essence, the only opposition raised by Ni is whether the '852 and '536

2    applications disclose an adequate utility/enablement for a polypeptide within the

3    scope of the count. First, Count 1 explicitly describes a utility for a polypeptide

4    within its scope, i.e., the polypeptide binds TRAIL. Second, Rauch asserted this

5    utility/enablement (Paper 34, p. 8, ¶ 3 - p. 10, ¶ 1) and pointed to express

6    descriptive support of an embodiment within the scope of Count 1 in the '852 and

7    '536 applications in Appendices F and E, respectively, of its motion. Third, the

8    '852 and '536 specifications explicitly state that TRAIL-R binds TRAIL (FFs 81-

9    86). Fourth, our finding that the '852 and '536 applications describe and enable

10   an embodiment within the scope of Count 1 is not inconsistent with the holding in

11   Rasmusson.

12   In Rasmusson both parties had interfering claims directed to methods of

13   treating prostate cancer comprising administering finasteride, a selective 5-α-

14   reductase inhibitor. An interference was declared by the Board of Patent

15   Appeals and Interferences (the Board). Rasmusson was involved in the

16   interference on the basis of an application which claimed priority to eight earlier

17   filed applications. SmithKline Beecham Corp. was involved in the interference on

18   the basis of two patents and corresponding reissue applications. On appeal from

19   the decision of the Board, the Federal Circuit affirmed the Board's holding that

20   Rasmusson was not entitled to benefit for the purpose of priority of the filing

21   dates of the eight earlier filed applications. Citing In re Brana, 51 F.3d 1560, 34

22   USPQ2d 1436 (Fed. Cir. 1995), the court said "a specification disclosure which

23   contains a teaching of the manner and process of making and using the invention

1    . . .must be taken as in compliance with the enabling requirement of the first

2    paragraph of § 112 <u>unless there is a reason to doubt the objective truth of the</u>

3    <u>statements contained therein</u> which must be relied on for enabling support"

4    (<u>Rasmusson</u>, 413 F.3d at 1323, 75 USPQ2d at 1300, emphasis added). The

5    court affirmed the Board's finding that one of ordinary skill in the art would not

6    have believed that finasteride was effective in treating prostate cancer in light of

7    the state of the art at the relevant time and because Rasmusson had failed to

8    provide experimental proof demonstrating the effectiveness of the invention (<u>id</u>.,

9    413 F.3d at 1324-25, 75 USPQ2d at 1301).

10        Here, the '852 and '536 specifications explicitly state that TRAIL-R binds

11    TRAIL (FFs 81-82).  The '852 and '536 specifications further describe certain

12    uses of TRAIL-R based on its ability to bind TRAIL, e.g., using TRAIL-R to purify

13    TRAIL by affinity chromatography (FFs 83-84).  Ni has not pointed to evidence of

14    record which raises doubts as to the objective truth of these statements in either

15    the '852 or '536 specifications, as was the case in <u>Rasmusson</u>.  For example, Ni

16    does not argue or provide evidence that a receptor protein that binds a ligand

17    could not be used to purify the ligand by affinity chromatography at the time the

18    '852 or '536 application was filed.  Alternatively, Ni does not provide any

19    evidence that the TRAIL-R protein set forth in SEQ ID NO:2 and Figure 3 of the

20    '852 and '536 applications, respectively, does not bind TRAIL.  Moreover, Ni

21    does not argue that the '852 and '536 applications fail to disclose any utility for

22    the TRAIL-R polypeptide set forth their respective SEQ ID NO:2 and Figure 3

23    (FFs 87-88).  In short, Rauch has described how to use a purified TRAIL-R

Interference No. 105,381
Human Genome Sciences, Inc. (Ni) v. Immunex Corp. (Rauch)

Page 49
Paper 101

1    polypeptide within the scope of the count, i.e., TRAIL-R binds TRAIL (Paper 34,

2    p. 8, ¶ 3 - p. 10, ¶ 1), and Ni has not provided any basis to doubt the objective

3    truth of express statements in the '852 and '536 specifications that the TRAIL-R

4    of their respective SEQ ID NO:2 and Figure 3 is useful to bind TRAIL.

5        Based on the foregoing, Rauch substantive motion 1 is **granted** as to the

6    '852 and '536 applications.

7    **B.**       **The '255 (RX 1015) and '861 (RX 1014) applications**

8    92. According to the '255 specification, TRAIL-R is a protein which binds

9        TRAIL and, thus, finds uses in affinity chromatography purification of

10        TRAIL and in inhibiting biological activities of TRAIL (RX 1015, p. 1, ¶ 5).

11    93. The '255 specification states that Example 1 discloses the isolation and

12        purification of human TRAIL-R protein with a molecular weight of about

13        52 kD from the cell membranes of Jurkat cells (RX 1015, p. 16, ¶ 3).

14    94. Specifically, "Jurkat cells are disrupted, and the subsequent purification

15        process includes affinity chromatography (employing a chromatography

16        matrix containing TRAIL), and reversed phase HPLC" (RX 1015, p. 4, ¶

17        5).

18    95. Further according to the '255 specification, Example 2 discloses the

19        amino acid sequences of tryptic fragments of TRAIL-R protein purified

20        from Jurkat cells and from PS-1 cells (RX 1015, p. 18, ¶ 4 - p. 19, ¶ 1).

21    96. TRAIL-R protein purified from Jurkat cells and from PS-1 cells were both

22        said to yield a tryptic fragment having the same amino acid sequence,

23        i.e., VPANEGD (RX 1015, p. 19, ¶ 1).

Interference No. 105,381
Human Genome Sciences, Inc. (Ni) v. Immunex Corp. (Rauch)

Page 50
Paper 101

1    97. Two other tryptic fragments obtained from TRAIL-R protein purified from

2    PS-1 cells were said to have amino acid sequences of VCEC and

3    SGEVELSSV, respectively (RX 1015, p. 19, ¶ 2).

4    98. Example 3 of the '255 specification is said to describe isolating and

5    amplifying a TRAIL-R DNA fragment from a PS-1 cell cDNA (RX 1015.,

6    p. 19, ¶ 3).

7    99. Figure 1 of the '255 application is said to show the nucleotide and

8    encoded amino acids sequences of the isolated TRAIL-R DNA fragment:

9    ETLRQCFDDFADLVPFDSWEPLMRKLGLMDNEIKVAKAEAAGHRDTLX

10    TML (RX 1015, p. 19, p. 19, ¶ 3; p. 24).

11    100.    According to the '861 specification, TRAIL-R is a protein which

12    binds TRAIL and, thus, finds uses in affinity chromatography purification

13    of TRAIL and in inhibiting biological activities of TRAIL (RX 1014, ll. 26-

14    30)

15    101.    The '861 specification states that Example 1 discloses the isolation

16    and purification of human TRAIL-R protein with a molecular weight of

17    about 52 kD from the cell membranes of Jurkat cells (RX 1014, p. 15, ll.

18    27-34).

19    102.    Specifically, "Jurkat cells are disrupted, and the subsequent

20    purification process includes affinity chromatography (employing a

21    chromatography matrix containing TRAIL), and reversed phase HPLC"

22    (RX 1014, p. 4, ll. 5-7).

1     103.     Further according to the '861 specification, Example 2 discloses the

2         amino acid sequences of tryptic fragments of TRAIL-R protein purified

3         from Jurkat cells and from PS-1 cells (RX 1014, p. 18, ll. 7-31).

4     104.     TRAIL-R protein purified from Jurkat cells and from PS-1 cells were

5         both said to yield a tryptic fragment having the same amino acid

6         sequence, i.e., VPANEGD (RX 1014, p. 18, ll. 7-25).

7     105.     Two other tryptic fragments obtained from TRAIL-R protein purified

8         from PS-1 cells were said to have amino acid sequences of VCEC and

9         SGEVELSSV, respectively (RX 1014, p. 18, ll. 27-32).

10    Rauch acknowledges that, unlike the '852 and the '536 applications, neither

11   the '255 nor the '861 applications disclose the full amino acid sequence of

12   TRAIL-R as presented in SEQ ID NO:2 of the '358 patent (Paper 34, p. 5, ¶ 3

13   and p. 7, ¶ 1).  Rauch argues that (a) the isolated, purified TRAIL-R protein

14   disclosed in the '255 and '861 applications <u>inherently</u> has an amino acid

15   sequence at least 90% identical to that set forth in SEQ ID NO:2 of the '358

16   patent and (b) the '255 and '861 applications disclose that TRAIL-R binds TRAIL

17   (Paper 34, p. 8, ¶ 1 and ¶ bridging pp. 7-8).  Rauch relies on the testimony of Dr.

18   Cheng in support of its position.

19     106.     According to Dr. Cheng, the disclosure of the '861 application,

20        specifically Examples 1 and 2, "would lead one of ordinary skill in the art

21        to conclude that the inventors had possession of an isolated, purified

22        protein that bound TRAIL at the time the '861 Application was filed" from

23        the membranes of Jurkat cells, said protein having a molecular weight of

Interference No. 105,381
Human Genome Sciences, Inc. (Ni) v. Immunex Corp. (Rauch)

Page 52
Paper 101

1    about 50-55 kD as determined by SDS-PAGE and a partial amino acid

2    sequence of VPANEGD (RX 1039, ¶ 8).

3    107.    Further according to Dr. Cheng,  the disclosure of the '255

4    application is substantially the same as that of the '861 application and

5    additionally discloses a 51 amino acid sequence bearing significant

6    homology to the death domains found in TNF receptor proteins TNFR1

7    and Fas (RX 1039, ¶ 10).

8    108.    Still further according to Dr. Cheng,

9    identification of a putative death domain in TRAIL-R,
10   combined with the experimental data previously
11   disclosed in the '861 Application showing the isolation
12   and purification of TRAIL-R, its molecular weight, and
13   its ability to bind TRAIL, would be sufficient to convey
14   to one of ordinary skill in the art that the inventors
15   were in possession of a TRAIL receptor belonging to
16   the TNFR family at the time the '255 Application was
17   filed in March of 1997 (RX 1039, ¶ 10).

18   109.    Dr. Cheng concluded that a skilled artisan would recognize that the

19   isolated, purified TRAIL-R protein disclosed in the '861 and '255

20   applications had an amino acid sequence which was later determined to

21   be a TR-2 sequence which is at least 90% identical to the amino acid

22   sequence set forth in Rauch SEQ ID NO:2 as required by Count 1 (RX

23   1039, ¶¶ 8-9).

24   Ni contends that Rauch's inherency theory is flawed.  Specifically, Ni argues

25   that any TRAIL-R protein purified by the method disclosed in the respective

26   Example 1 of the '861 and '255 specifications is necessarily the mature form of a

27   TRAIL-R protein, which lacks its leader sequence (signal peptide) and, therefore,

Interference No. 105,381
Human Genome Sciences, Inc. (Ni) v. Immunex Corp. (Rauch)

Page 53
Paper 101

1    would not have an amino acid sequence that is at least 90% identical to the

2    amino acid sequence of SEQ ID NO:2 of the '358 patent.  [Paper 47, p. 4, ¶ 2.]

3        110.    TRAIL-R protein is expressed on the membranes of Jurkat cells

4            (see e.g., RX 2137, p. 700, c. 2, ¶ 2).

5        111.    The isolation and purification method disclosed in Example 1 of the

6            '861 and '255 applications and of the '358 patent are essentially identical

7            (compare Example 1 in each of RX 1015 (pp. 16-18), RX 1014 (pp. 15-

8            17) and RX 1042 (cc. 23-25)).

9        112.    Dr. Cheng also testified that Example 1 of the '861 application and

10            the '358 patent are essentially identical, but for minor spelling

11            differences, e.g., abbreviating California as "CA" in one and "Calif" in the

12            other (NX 2124, p. 98, l. 3 - p. 99, l. 17).

13        113.    According to Dr. Cheng, the method of Example 1 would yield

14            mostly mature TRAIL-R protein because it was obtained from Jurkat cell

15            membranes  (NX 2124, p. 93, l. 13 - p. 95, l. 8; p. 101, ll. 3-7; p. 103, ll. 8-

16            12; p. 104, l. 17- p. 105, l. 3).

17        114.    According to the involved '358 patent, analysis of tryptic fragments

18            obtained from a mature TRAIL-R protein shows that its N-terminal is

19            amino acid residue 56 of SEQ ID NO:2, i.e., that a 55 amino acid

20            signal peptide was cleaved off of full length TRAIL-R protein when

21            TRAIL-R was inserted into the cell membrane (RX 1042, c. 3, ll. 1-32).

22        115.    Dr. Cheng testified that a mature form of TRAIL-R protein having

23            385 amino acid residues (i.e., missing its 55 amino acid leader

1    sequence) is 87.5 percent identical to 440 amino acid full length

2    TRAIL-R protein (NX 2124, p. 95, l. 25 - p. 97, l. 23 and p. 115, ll. 10-

3    21 (dividing 385 by 440 and multiplying by 100 to yield %)).

4    116.    However, according to Dr. Cheng, simply dividing the number of

5    identical residues in two proteins by the number of residues in the

6    longer protein was neither the only way of determining percent identity

7    between the proteins nor the preferred method (NX 2124, p. 108, ll. 20-

8    24).

9    117.    While the '358 patent specification does not define "percent

10    identity" as that term is used in its claims, the '358 specification states

11    that "percent identity may be determined, for example, by comparing

12    sequence information using the GAP computer program, version 6.0

13    described by Devereux et al. (*Nucl. Acids Res.* 12:387, 1984) (RX

14    1042. c. 6, l. 65 - c. 7, l. 1).

15    118.    In Dr. Cheng's opinion, the mature and full length forms of TRAIL-R

16    are the same protein because they are from the same gene (NX 2124,

17    p. 101, ll. 12-24).

18    119.    Neither Dr. Cheng nor Ni determined what percent identity a mature

19    form of TRAIL-R protein having 385 amino acid residues would have to

20    440 amino acid full length TRAIL-R protein set forth in SEQ ID NO:2 of

21    the '358 patent using the GAP computer program, version 6.0

22    described by Devereux et al. (*Nucl. Acids Res.* 12:387, 1984) set forth

23    in the '358 patent (RX 1042. c. 6, l. 65 - c. 7, l. 1).

1    The count requires, in relevant part, an isolated TRAIL-R polypeptide

2    having an amino acid sequence that is at least 90% identical to SEQ ID NO:2 of

3    the '358 patent. Rauch contends that the isolated, purified TRAIL-R protein

4    disclosed in the '255 and '861 applications <u>inherently</u> satisfies this limitation. As

5    stated in <u>In re Oelrich</u>, 666 F.2d 578, 581, 212 USPQ 323, 326 (CCPA 1981)

6    (quoting <u>Hansgirg v. Kemmer</u>, 102 F.2d 212, 214, 40 USPQ 665, 667 (CCPA

7    1994)), "[i]nherence, however, may not be established by probability or

8    possibilities. The mere fact that a certain thing may result from a given set of

9    circumstances is not sufficient."

10    It is clear from Dr. Cheng's testimony that there are a number of ways of

11    calculating percent identity between two given amino acid sequences, each of

12    which may yield a different result. By at least one calculation, a TRAIL-R protein

13    obtained from Jurkat cell membranes (as described in Rauch's '255 and '861

14    applications) would be <u>less than 90%</u> identical to SEQ ID NO:2 of the '358 patent

15    as required by Count 1 (i.e., Dr. Cheng calculated an 87.5 % identity (FF 115)).

16    Using a different method may give a different result (e.g., Tartaglia calculated

17    29% identity over 45 amino acids, but extended the region of homology an

18    additional 20 amino acids by introducing a single amino acid gap in one of the

19    sequences (FF 46)). While Dr. Cheng has stated that some methods of

20    calculating percent identity are preferred over others, neither Dr. Cheng nor

21    Rauch has pointed to evidence of record establishing an art recognized standard

22    method of calculating percent identity between amino acid sequences.

23    Furthermore, neither Dr. Cheng nor Rauch has pointed to an art recognized

1    method of calculation which establishes at least a 90% identity between the

2    amino acid sequences.  Additionally, software programs used to calculate

3    percent identity are programmed to create different alignments based on different

4    methods (FF 43).  In short, not only do different methods of calculating percent

5    identity give different  results, but also apparently there is no standard method in

6    the art for calculating percent identity.  Thus, one method might yield a percent

7    identity that falls within the count, while another method might not.  Since the

8    specification of the '358 patent does not define how to determine "percent

9    identity" (FF 117), there is no defined method for determining whether a

10    particular amino acid sequence is "at least 90% identical" to SEQ ID NO:2 of the

11    '358 patent as required by the count.  Moreover, to the extent the '358 patent

12    suggests that the GAP computer program, version 6.0 described by Devereux et

13    al. (*Nucl. Acids Res.* 12:387, 1984) might be the preferred method for

14    determining percent identity between two sequences (FF 117), neither Ni, Rauch

15    nor Dr. Cheng have shown that applying this calculation will result in at least 90%

16    sequence identity between mature and full length TRAIL-R proteins.  Therefore,

17    Rauch has failed to establish that the isolated, purified TRAIL-R protein disclosed

18    in the '255 and '861 applications <u>inherently</u> has an amino acid sequence at least

19    90% identical to that set forth in SEQ ID NO:2 of the '358 patent.  Consequently,

20    Rauch substantive motion 1 is **denied** as to the '255 and '861 applications.

21         Ni's argument that the '255 and '863 applications fail to satisfy the how-to-

22    use requirement of § 112, first paragraph, because the '255 and '863 applications

23    allegedly fail to disclose any utility for the described TRAIL-R protein is not

1    persuasive in view of their respective disclosures (FFs 92 and 100) and

2    Appendices D and C, respectively, attached to Paper 34 for substantially the

3    same reasons set forth above in regard to the '536 and '852 applications. It is

4    unnecessary to reach the merits of Ni's two remaining arguments based on

5    molecular weight and alleged errors in amino acid sequences. In particular, we

6    need not consider what effect errors in amino acid sequencing might have on the

7    percent identity between the sequence containing some errors and SEQ ID NO:2

8    of the '358 patent.

9           Based on the foregoing, Rauch substantive motion 1 is **granted** to the

10    extent that Rauch is accorded benefit for purposes of priority of the 4 June 1997

11    and 28 March 1997 filing dates of applications 08/869,852 and 08/829,536,

12    respectively, and **otherwise denied**.

13    **IX.    Ni Substantive Motion 3**

14           Pursuant to 37 CFR § 41.121(a)(1)(iii) and the Order issued 29 November

15    2005 (Paper 26), Ni seeks judgment that all of Rauch's involved claims, claims 1,

16    4-6, 8-11, 17-19, 26-28, 34, 37, 38 and 40, are unpatentable under 35 U.S.C.

17    § 102(e) as anticipated by U.S. Patent 6,872,568 ("Ni's '568 patent," NX 2004)

18    (Paper 31). Rauch opposes (Paper 54); Ni replies (Paper 62).

19    120.    Ni's '568 patent issued from application 09/565,009 ("the '009

20           application"), filed 4 May 2000 (NX 2004, title page (21), (22), (75)).

21    121.    The '009 application is said to be a continuation-in-part of

22           application 09/042,583 ("the '583 application," NX 2024), filed 17 March

23           1998 (NX 2004, title page (63)).

1    122.    When the '583 application was filed, Ni claimed benefit under 35

2         U.S.C. § 119(e) to provisional applications 60/040,846 (NX 2042) and

3         60/054,021 (NX 2056), filed 17 March 1997 and 29 July 1997,

4         respectively (NX 2024, p. 1, ll. 12-14).

5    123.    Rauch's involved '358 patent issued from the '392 application, filed

6         25 May 2000 (FF 6), after the filing of the '009 application.

7    124.    According to the '392 application, the '392 application is

8    (i)    a divisional of the '036 application (RX 1018), filed 26 June 1997,

9    (ii)   a continuation-in-part of the '852 application (RX 1017), filed 4 June

10   1997,

11   (iii)  a continuation-in-part of the '536 application (RX 1016), filed 28

12   March 1997,

13   (iv)   a continuation-in-part of the '255 application (RX 1015), filed 12

14   March 1997,

15   (v)    a continuation-in-part of the '861 application (RX 1014), filed 13

16   February 1997 (RX 1012, title sheet (60)).

17   Ni contends that Rauch's involved '358 patent claims are unpatentable under

18   35 U.S.C. § 102(e) based on Ni's '568 patent (Paper 31, p. 2, ¶ 4).  Ni's '568

19   patent issued from an application filed three weeks before Rauch's application

20   which issued as the '358 patent was filed (FFs 120 and 123).  Therefore, on its

21   face, the '568 patent is prior art to Rauch's involved claims.  However, both Ni

22   and Rauch assert that their respective '568 patent reference and involved claims

23   are entitled to benefit of the filing dates of a number of earlier applications (FFs

Interference No. 105,381
Human Genome Sciences, Inc. (Ni) v. Immunex Corp. (Rauch)

Page 59
Paper 101

1    121, 122 and 124).  Specifically, Ni argues that Rauch's claims are not entitled to

2    a priority date any earlier than the 28 March 1997 filing date of Rauch's '536

3    application, while Ni's '568 patent is entitled to the 17 March 1997 filing date of its

4    '846 application (Paper 31, p. 8, ¶ 1 and p. 11, ¶ 3).  Therefore, before deciding

5    whether the disclosure of Ni's '568 patent anticipates the subject matter of

6    Rauch's claims, we must first decide, as a matter of law, whether Ni's '568 patent

7    and Rauch's '358 patent are entitled to the filing date of one or more of the

8    applications to which they have claimed priority.

9        For prior art purposes, a patent is entitled to benefit of the filing date of a

10   parent application as to all subject matter carried over into the patent from the

11   parent application when the parent application discloses the invention claimed in

12   the reference patent pursuant to 35 U.S.C. § 120 (and related statutes).  In re

13   Wertheim, 646 F.2d 527, 539, 209 USPQ 554, 565-66 (CCPA 1981).  According

14   to § 120, a subsequent application is permitted to relate back to the filing date of

15   a prior application disclosing the same invention if the subsequent application is

16   for an invention disclosed in the manner provided by the first paragraph of 35

17   U.S.C. § 112, is submitted by the same inventor, is filed before the abandonment

18   of the first application and specifically refers to the parent application.  To satisfy

19   the requirements of § 112, there must be a written description and an enabling

20   disclosure of the full scope of the claimed subject matter.  Warner-Lambert Co.,

21   v. Teva Pharmaceuticals USA, Inc., 418 F.3d 1326, 1336-37, 75 USPQ2d 1865,

22   1871-72 (Fed. Cir. 2005) (full scope of claims must be enabled); Pandrol USA,

23   LP v. Airboss Railway Products, Inc., 424 F.3d 1161, 1165, 76 USPQ2d 1524,

1    1526 (Fed. Cir. 2005) (written description must show possession of the claimed

2    invention).  Moreover, to get the benefit of the filing date of an earlier application

3    under § 120 (and related statutes) where there is a chain of applications, there

4    must be a chain of copending applications each of which satisfies the

5    requirements of § 112, first paragraph, for the claimed subject matter.  In re

6    Hogan, 559 F.2d 595, 609, 194 USPQ 527, 540 (CCPA 1977).  Thus, to the

7    extent that a continuation-in-part application adds new matter, claims that are

8    dependent upon the new matter are only entitled to the filing date of the

9    continuation-in-part application and not that of the parent application.

10       Ni's '568 patent issued from a continuation-in-part application (the '009

11   application) of parent application 09/042,583 (FFs 120 and 121) which claimed

12   § 119(e) benefit of two provisional applications, 60/054,021 and 60/040,846 (FF

13   122).    Thus, in order for Ni's '568 patent to qualify as prior art § 102(e)(2) as of

14   the 17 March 1997 filing date of its '846 application, Ni must show (1) that the

15   subject matter claimed in the '568 patent was disclosed in the '583 parent

16   application and in the '846 provisional application and (2) that the subject matter

17   relied upon in the '846 provisional application was carried forward into the '583

18   parent application and into the '568 patent.

19       Ni fails to make either showing.

20   125.    The '568 patent claims isolated antibodies or fragments thereof that

21        specifically bind to a protein "consisting of amino acid residues 1 to 133

22        of SEQ ID NO:2" or to "the extracellular domain of the protein encoded

23        by the cDNA contained in ATCC Deposit No. 97920," isolated cells and

1        hybridomas producing said antibodies/fragments, and methods of

2        detecting DR5 using said antibodies/fragments (NX 2004, cc. 157-162).

3    Ni has neither argued nor pointed out where the antibody-based subject

4    matter claimed in the '568 patent is disclosed in the '583 parent application or in

5    either the '021 or '846 provisional application.  The '568 patent was based on a

6    continuation-in-part application and, therefore, presumptively contains additional

7    and/or different subject matter than the '583 parent application.  Ni has neither

8    argued nor pointed out where the subject matter of either provisional application

9    relied upon was carried forward into the '583 parent application and into the '568

10   patent.

11   Ni simply asserts that the '568 patent issued from the '009 application which

12   claimed priority as a continuation-in-part of the '583 application which claimed

13   priority to the '021 and '846 provisional applications (Paper 31, ¶ 2).  According to

14   Ni, the '846 application "contains the entire nucleic acid sequence and the

15   polypeptide sequence encoded thereby of a human DR5 protein" (Paper 31, p. 9,

16   ¶ 1 (citations to SMF omitted)).  The main focus of Ni's arguments is on

17   disclosure in the '846 provisional application alleged to disclose the subject

18   matter of Rauch's involved claims.  There is little, if any, discussion of the claims

19   of the '583 parent application and no argument or assertion that either the '583 or

20   '846 application provides § 112, first paragraph, support for the claimed subject

21   matter of the '568 patent.  Thus, Ni has failed as matter of law to establish prima

22   facie that its '568 patent is entitled to the filing date of the '583 parent application

23   or either the '021 or '846 provisional application.  Consequently, based on this

1    record, the '568 patent has only been shown to be entitled to a filing date of 4

2    May 2000 for prior art purposes.

3        Additionally, we do not see how the filing date of either the '021 or '846

4    provisional applications can be accorded to the '568 patent as its § 102(e) filing

5    date.  First, provisional applications were established to place domestic

6    applicants on equal footing with foreign applicants with respect to rights of

7    priority.  35 U.S.C. § 119(e).  Section 102(e) of title 35 provides, in relevant part,

8    that "A person shall  be entitled to a patent unless ... (e) the invention was

9    described in ... (2) a patent granted on an application for patent by another filed

10   in the United States before the invention by the applicant for patent ...".  Here, the

11   reference being relied upon to show unpatentability under § 102(e) is the '568

12   patent, not the '021 or '846 provisional application.  Second, in reaching its

13   conclusion in Wertheim[14] that a subsequent application is permitted to relate

14   back to the filing date of a prior application disclosing the same invention if the

15   subsequent application is for an invention disclosed in the manner provided by

16   the first paragraph of 35 U.S.C. § 112, the CCPA stated:

---

[14] In Wertheim, the examiner made a 35 U.S.C. § 103 rejection over a U.S. patent to Pfluger.
The Pfluger patent (Pfluger IV) was the child of a string of abandoned parent applications (Pfluger
I, the first application, Pfluger II and III, both continuations-in-part).  Pfluger IV was a continuation
of Pfluger III.  The court characterized the contents of the applications as follows:  Pfluger I -
subject matter A; Pfluger II - subject matter AB; Pfluger III, subject matter ABC; and, Pfluger IV -
subject matter ABC.  ABC anticipated the claims of the application being examined, but the filing
date of Pfluger III was later than the application filing date.  The Examiner reached back to
subject matter A in Pfluger I and combined this disclosure with another reference to establish
obviousness under § 103.  The court held that the Examiner impermissibly carried over subject
matter A and should have instead determined which of the parent applications contained the
subject matter which made Pfluger patentable.  Only if subject matter B and C were not claimed,
or at least not critical to the patentability of Pfluger IV could Pfluger IV rely on the filing date of
Pfluger I.  The court determined that Pfluger IV was only entitled to the filing date of Pfluger III
and reversed the rejection, noting that the added new matter C was critical to the claims of the
issued patent.

1               The dictum in Lund, supra, that

2                        * * * the continuation-in-part application is

3                        entitled to the filing date of the parent

4                        application as to all subject matter *carried over*

5                        into it from the parent application * * * for

6                        purposes of * * * utilizing the *patent* disclosure

7                        as evidence to defeat another's right to a

8                        patent * * * [emphasis in the original]

9               is hereby modified to further include the requirement

10             that the application, the filing date of which is needed

11             to make a rejection must disclose, pursuant to

12             §§ 120/112, the invention claimed in the reference

13             patent.  Where continuation-in-part applications are

14             involved, the logic of the Milburn holding as to secret

15             prior art would otherwise be inapplicable.  Without the

16             presence of a patentable invention, no patent could

17             issue "but for the delays of" the PTO.

18   Wertheim, 646 F.2d at 539, 209 USPQ at 565-66.  Here, Ni has not shown that

19   the subject matter claimed in the '568 patent could have issued earlier "but for

20   the delays" of the PTO and, therefore, the '568 patent was entitled, as a matter of

21   law, to the filing of either provisional application as its § 102(e) filing date.  No

22   U.S. patent can issue from a provisional application filed under § 111(b).

23   Therefore, any time a provisional application is pending is not a delay that can be

24   attributed to the PTO under the Milburn delay theory.  Again, Ni has failed as

25   matter of law to establish prima facie that its '568 patent is entitled to the filing

26   date of either the '021 or '846 provisional application.

27        Rauch, on the other hand, appears to have confused benefit accorded for

28   purpose of priority in an interference contest with benefit accorded under § 120

29   (see e.g., Paper 54, p. 17).  Nonetheless, Rauch has provided detailed claim

30   charts said to show where the claimed subject matter of Rauch's involved '358

31   patent is supported by each of its asserted priority applications (Paper 54,

1    Appendices D through H).  For example, Rauch asserts that Appendix H (Paper

2    54, pp. 143-166) describes where the '036 parent application, said to be a

3    divisional of the application from which Rauch's involved '358 patent issued (FFs

4    122 and 123), provides support for each claim of Rauch's involved '358 patent on

5    a claim-by-claim basis.  Based on the evidence submitted, Rauch has prima facie

6    established that its involved claims are at least entitled to benefit of the 26 June

7    1997 filing date of its '036 parent application.  Ni does not dispute Rauch's claim

8    to benefit of the filing date of the '036 application (Paper 31, p. 8, ¶ 1 and p. 11, ¶

9    3).

10        In summary, since the '568 patent has only been shown to be entitled to a

11   filing date of 4 May 2000 for prior art purposes and Rauch's involved claims have

12   been shown to be entitled to a filing date of at least 26 June 1997, the '568 patent

13   does not qualify as prior art vis-à-vis Rauch's involved claims under § 102(e).  It

14   is not necessary to consider whether Rauch's involved claims are entitled to one

15   or more of the filing dates of Rauch's still earlier filed '852, '536, '255 or '861

16   application.  Moreover, since the '568 patent has not been shown to be prior art

17   under § 102(e), it is not necessary for us to consider the content of the '568

18   patent.

19        Based on the foregoing, Ni substantive motion 3 is **denied**.

20   **X.    Rauch Miscellaneous Motion 5**

21        Pursuant to 37 CFR § 41.155(c), Rauch seeks to exclude selected

22   portions of the direct testimony of Dr. Reed that reference a person of ordinary

23   skill in the art from evidence (NX 2103, ¶¶ 16, 19, 21-28, 30-43, 45-48, 50-52, 56

1    and 63-64), contending that his definition of ordinary skill "is so broad that it fails

2    to limit 'one of ordinary skill in the art' to any substantive or realistic meaning of

3    such person" (Paper 76, p. 5, ¶ 2). Thus, Rauch argues, any statement by Dr.

4    Reed regarding what one of ordinary skill in the art would have known or

5    understood in 1997 is irrelevant, lacking foundation, prejudicial and confusing

6    (Paper 76, p. 6, ¶ 1). Rauch further seeks to exclude selected portions of the

7    redirect testimony of Dr. Reed from evidence as improper redirect, leading and

8    prejudicial (NX 2123, p. 169, ll. 2-21 and p. 172, l. 16 - p. 173, l. 13) (Paper 76, p.

9    9, ¶ 2; pp. 11-12). Finally, Rauch seeks to exclude selected portions of the direct

10   testimony of Dr. Andrew Badley (NX 2157, ¶¶ 26-27, 31-32 and 34-38), also

11   contending that Dr. Badley's definition of a "person of ordinary skill in the art" is

12   so flawed that any statement by Dr. Badley regarding what one of ordinary skill in

13   the art would have known or understood in 1997 is irrelevant, lacking foundation,

14   prejudicial and confusing (Paper 76, p. 13, ¶ 2 and p. 15, ¶ 1). Rauch further

15   contends that Dr. Badley lacks sufficient expertise on the subject matter of his

16   testimony (Paper 76, p. 16, ¶ 2).

17        126.      Rauch timely filed its objections to the evidence sought to be

18              excluded (RXs 1094 and 1095; NX 2123, p. 161; p. 166, l. 2; p. 169, ll. 10

19              and 16; p. 172, l. 20; p. 173, ll. 7-8).

20        Rauch identifies the objected to testimony of Dr. Reed as submitted in

21   support of Ni substantive motion 2, Ni reply 2, Ni reply 3 and Ni opposition 3 to

22   Rauch substantive motion 3 (Paper 76, Appendix D). First, Rauch's arguments

23   go to the weight to be accorded Dr. Reed's testimony based on the

1    reasonableness of his conclusions as assessed by one of ordinary skill in the art

2    in view of the state of the art at the relevant time, not to its admissibility.  Second,

3    having considered the testimony of both Dr. Reed and Dr. Cheng, we credited

4    the testimony of the latter over that of the former as discussed in our denial of the

5    relevant portion of Ni substantive motions 2 and 3 and in our grant of the relevant

6    portion of Rauch substantive motion 3.  Therefore, Rauch substantive motion 5 is

7    dismissed as moot to the extent it seeks to exclude selected portions of the direct

8    and redirect testimony of Dr. Reed since we have not relied upon either the direct

9    or redirect testimony of Dr. Reed to Rauch's detriment.

10    Rauch identifies the objected to testimony of Dr. Badley as submitted in

11    support of Ni opposition 1 to Rauch substantive motion 1, Ni opposition 3 to

12    Rauch substantive motion 3, Ni opposition 4 to Rauch substantive motion 4 and

13    Ni reply 3.  Again, Rauch's arguments go to the weight to be accorded Dr.

14    Badley's testimony based on the reasonableness of his conclusions as assessed

15    by one of ordinary skill in the art in view of the state of the art at the relevant time,

16    not to its admissibility.  Since Rauch substantive motion 4 was dismissed as

17    moot, we did not reach Ni opposition 4 thereto.  Furthermore, since Ni did not

18    meet its burden of proof as discussed in our denial of Ni substantive motion 3, we

19    did not reach Ni reply 3.  Similarly, as discussed in our denial of the relevant

20    portions of Rauch substantive motions 1 and 3, since Rauch did not meet its

21    burden of proof as movant, we did not reach Ni oppositions 1 and 3 thereto.

22    Likewise, as discussed in our granting of the relevant portions of Rauch

1   substantive motions 1 and 3, we credited the testimony of Dr. Cheng and did not

2   rely upon the direct testimony of Dr. Badley to Rauch's detriment.

3         Based on the foregoing, Rauch substantive motion 5 is **dismissed** as

4   moot since we have not relied upon any of the objected to testimony sought to be

5   excluded to Rauch's detriment.

6   **XI.        Ni Miscellaneous Motion 4**

7         Pursuant to 37 CFR § 1.155(c), Ni seeks to exclude from evidence:

8         (a)  exhibits related to Rauch's priority statements in (i) related interference

9   105,240 (RX 1074), (ii) this interference (RX 1025, RX 1038, RX 1052 and RX

10  1054)[15] and (iii) related interference 105,380 (RX 1051);

11        (b)  direct (RX 1074) and deposition (NX 2179-2181) testimony of Dr. Gavin

12  R. Screanton in related interference 105,240;

13        (c)  direct testimony of Norman Boiani (RX 1075); and,

14        (d)  selected portions of the redirect testimony of Dr. Cheng (NX 2124, p.

15  132, l. 16 - p. 135, l. 5 and p. 135, l. 9 - p. 136, l. 13) (Paper 86, pp. 1-2).  Rauch

16  opposes (Paper 80); Ni replies (Paper 88).

17        Ni contends (Paper 86, pp. 22-23) that

18                RX 1025, RX 1038, RX 1051, RX 1052 and RX 1054
19                should be excluded under FRE 901 for lack of
20                authentication and lack of foundation.  In addition,
21                these exhibits should be excluded under FRE 1001
22                (4), 1002, and 1003, *inter alia*, because none of these
23                exhibits appear to be originals nor admissible
24                duplicates of the originals.  Furthermore, these
25                exhibits should be excluded under FRE 403, *inter alia*,
26                because its [sic] probative value, if any, is outweighed

---

[15] Exhibits RX 1025 and RX 1038 are also relied upon in Rauch's priority statement in related
interference 105,240.

1    by considerations of waste of time, lack of
2    authentication and the reliability of the copies.

3              Furthermore, RX 1074, the declaration of Dr.
4    Gavin R. Screaton, should be excluded under FRE
5    403 because its probative value, if any, is far
6    outweighed by confusion of the issues.  In addition,
7    RX 1074 should be excluded under 37 C.F.R.
8    § 41.122(b) because the declaration does not
9    respond to arguments raised in an opposition but
10   merely is an attempt by Rauch to make additional
11   arguments in a reply that should have been raised in
12   a motion.  Furthermore, contingent upon the Board
13   excluding RX 1074, Party Ni moves to exclude NX
14   2179, NX 2180 and NX 2181 for being irrelevant
15   under FRE 401 and confusing the issues under FRE
16   403.

17             In addition, Party Ni moves to exclude RX
18   1075, the Declaration of Norman Boiani, under FRE
19   1002 because Exhibit A appears to be a photocopy,
20   not an original, of a laboratory notebook page.
21   Furthermore, Party Ni moves to exclude RX 1075
22   under FRE 403 because Exhibit A of RX 1075 is
23   taken out of context of the rest of the laboratory
24   notebook.  Party Ni's inability to determine the context
25   of Exhibit A is unfairly prejudicial and this prejudice far
26   outweighs any probative value of RX 1075.

27             Lastly, the above-cited portions of NX 2124
28   should be excluded under FRE 611(c), FRE 403, and
29   Cross Examination Guideline [3] of the Standing
30   Order.  The leading questions asked by Rauch's
31   counsel clearly suggested single answers to the
32   witness which resulted in the interjection of the
33   opinions of counsel for Rauch in place of Dr. Cheng's
34   opinions.  Clearly the prejudicial effect of such
35   testimony far outweighs its probative value, and the
36   above-cited evidence should be excluded or, at most,
37   accorded little weight by the Board.

38   Ni's motion has serious procedural defects.  Rule 155(c) provides that a

39   motion to exclude evidence must explain the objections and identify the

40   objections in the record.  As explained in Standing Order ¶ 21.3(a) a motion to

1    exclude evidence <u>shall</u> (1) identify where in the record the objection was

2    originally made and (2) identify where in the record the evidence was relied upon

3    by the opponent, and (3) address objections to exhibits (in whole or in part) in

4    exhibit numerical order.  According to Standing Order § 21.1, the objection to the

5    admissibility of evidence should be filed as part of a motion to exclude the

6    evidence.

7         First, Ni contends that it timely objected to exhibits RX 1025, RX 1038, RX

8    1051, RX 1052 and RX 1054 as shown in exhibits NX 2194 and NX 2195, filed in

9    support of its motion.

10   127.    Ni exhibits NX 2194 and NX 2195 are "REDACTED" papers entitled

11           "NI OBJECTIONS TO THE ADMISSIBITY OF RAUCH'S SUPPLEMENT

12           EXHIBIT 1054 AND RAUCH'S RESPONSES TO NI'S OBJECTIONS TO

13           EXHIBITS   AND 1050-1052" and "NI OBJECTIONS TO THE

14           ADMISSIBLITY OF RAUCH EXHIBITS    1050, 1051 AND 1052,"

15           respectively.

16   128.    Ni has not provided evidence that it timely objected to exhibits RX

17           1025 and RX 1038.

18   129.    Ni has not identified where in the record exhibits RX 1025, RX

19           1038, RX 1051, RX 1052, RX 1054 and RX 1075 were relied upon by

20           Rauch.

21   130.    According to Ni, RX 1074 and NX 2124 were relied upon in Rauch

22           replies 1, 3 and 4 (Paper 86, p. 6, ¶ 3 and p. 7, ¶ 1).

1      131.      Rauch's exhibit list (Paper 93, p. 7) identifies exhibit RX 1051 as a

2               document upon which Rauch will rely to prove its earliest corroborated

3               conception of the subject matter of the count in related interference

4               105,380.

5      132.      Similarly, Rauch's exhibit list (Paper 93, p. 10) identifies exhibit RX

6               1074 as the declaration of Dr. Gavin R. Screanton filed in related

7               interference 105,240.

8      Thus, the deposition testimony of Dr. Screaton (NX 2179-2181) is part of

9   related interference 105,240, not this interference.  Indeed, Ni's motion to

10  exclude NX 2179-2181 is expressly contingent upon the Board excluding Dr.

11  Screaton's direct testimony (RX 1074) (Paper 86, p. 22).

12     133.      Ni admits that Rauch has not relied on any testimony from Norman

13               Boiani to date in this interference (Paper 86, p. 6, ¶ 4).

14     Thus, Ni has failed to object timely to evidence it seeks to exclude (RX 1025

15  and RX 1038).  Furthermore, Ni is seeking to exclude evidence which is either

16  not of record in this interference (RX 1051, RX 1074, NX 2179-2181 and RX

17  1075[16]) and/or has not been relied upon by Rauch in this interference (RX 1075).

18  Therefore, Ni miscellaneous motion 4 to exclude evidence is **denied** as to

19  exhibits RX 1025, RX 1038, RX 1051, RX 1074, NX 2179-2181 and RX 1075.

20     134.      Exhibits RX 1025, RX 1038, RX 1052 and RX 1054 are identified

21               as documents said to prove Rauch's earliest corroborated date of

---

[16] Rauch's Exhibit List explicitly states that exhibit RX 1075 is **"WITHHELD"** in this interference (Paper 93, p. 10, original emphasis).

1    conception of the subject matter of the count in this interference (Paper

2    93, pp. 4, 5 and 7).

3    According to 37 CFR § 41.204(a)(2)(iv), a party filing a priority statement

4    must "[p]rovide a copy of the earliest document upon which the party will rely to

5    show conception." Exhibits RX 1025, RX 1038, RX 1052 and RX 1054 were

6    served by Rauch in fulfillment of the requirement (FF 133). Ni does not contend

7    that Rauch has relied on any of exhibits RX 1025, RX 1038, RX 1052 and RX

8    1054 in support of any of Rauch's motion/opposition/reply papers. The time for

9    Rauch to lay a foundation for and authenticate its exhibits RX 1025, RX 1038, RX

10   1052 and RX 1054 is when Rauch relies upon them, i.e., as part of its priority

11   motion. The time for us to weigh the reliability and probative value of exhibits RX

12   1025, RX 1038, RX 1052 and RX 1054 is when they are submitted as evidence

13   as part of Rauch's priority motion when the priority motion is filed. Therefore, Ni

14   miscellaneous motion 4 to exclude evidence is **denied** as to exhibits RX 1025,

15   RX 1038, RX 1052 and RX 1054.

16   As to the last evidence at issue, selected portions of the deposition

17   testimony of Dr. Cheng (NX 2124, p. 132, l. 16 - p. 135, l. 5 and p. 135, l. 9 - p.

18   136, l. 13), Ni contends that Rauch relied on the deposition testimony of Dr.

19   Cheng in Rauch replies 1, 3 and 4 (Paper 86, p. 7, ¶ 1).

20   135.    Ni explicitly directs our attention (Paper 86, pp. 17-18) to the

21   following testimony as an example of how the redirect testimony of Dr.

22   Cheng violates FRE 611(c), FRE 403 and Cross Examination Guideline

23   [3]:

1          MR. WISE:   Okay.  Back on the record.

2          Q.  I want to have you focus on paragraph 10.
3          Paragraph 10 you said, "The specification of the '861
4          application also contains additional substantial
5          disclosure regarding antibodies to TRAIL-R, including
6          methods for obtaining these antibodies and methods
7          of obtaining antigen binding fragments of these
8          antibodies."

9          And it says "'861 application, page 13, line 14 to page
10         15, line 6."

11         Where in the specification of the '861 application
12         would you find additional substantial disclosure
13         relating to the antibodies for TRAIL-R?

14         A.  You mean where I can find the information?

15         Q.  Yes.

16         A.  That's indicated here is the page 13 and the line
17         14 to 15, line 14 through page 15 of line 6.

18         Q.  Okay.  Can you direct  me to that, please.

19         A.  Where is the --

20         Q.  You have that there.  You were looking at the
21         claims and you were going to show me support and
22         specification.

23         MR. GOLDSTEIN:  Objection.

24         THE WITNESS:  So it's indeed in the page is 13,
25         there is a title, "Antibodies" section, and talking about
26         how antibody generated, including the monoclonal
27         and polyclone antibodies.

28         MR. GOLDSTEIN:  I am going to move to strike the
29         question and the answer.

30    First, since Rauch responsive motion 4 was dismissed as moot, we did not

31    reach Rauch reply 4.  Second, Ni did not explain where and how Rauch relied

32    upon the objected to portions of Dr. Cheng's redirect testimony in Rauch replies 1

1    and 3 to support its position.  For example, how did Rauch rely upon this

2    allegedly elicited testimony to support it motion 1 for benefit of the filing date of

3    an earlier application for the subject matter of a count directed to a genus of

4    functional proteins, i.e., purified TRAIL-R polypeptides having an amino acid

5    sequence that is at least 90% identical to SEQ ID NO:2 of Rauch's involved '358

6    patent, wherein the polypeptides bind TRAIL.  Third, to the extent Ni argues that

7    the objected to portions of Dr. Cheng's redirect testimony are irrelevant,

8    confusing or prejudicial, that objection goes to the weight to be accorded the

9    testimony, not its admissibility.  We have accorded Dr. Cheng's testimony the

10    weight appropriate to its relevance and the underlying facts and data relied upon

11    in support of his opinion.  Ni has not shown otherwise.  Therefore, Ni

12    miscellaneous motion 4 to exclude evidence is **denied** as to the selected

13    portions of the redirect deposition testimony of Dr. Cheng (NX 2124, p. 132, l. 16

14    - p. 135, l. 5 and p. 135, l. 9 - p. 136, l. 13).

15        Based on the foregoing, Ni miscellaneous motion 5 is **denied**.

16    **XII.    Order**

17        Based on the foregoing and for the reasons given, it is

18        ORDERED that Ni substantive motion 1 to substitute Ni proposed count 2

19    for current Count 1 is **denied**;

20        FURTHER ORDERED that Ni substantive motion 2 for benefit for the

21    purpose of priority is **dismissed** as moot as to Ni proposed count 2, **granted** as

22    to the 29 July 1997 filing date of the 60/054,021 application for Count 1 and

23    otherwise **denied**;

1      FURTHER ORDERED that Ni substantive motion 3 seeking judgment that

2   all Rauch's involved claims are unpatentable under 35 U.S.C. § 102(e) as

3   anticipated by U.S. Patent 6,872,568 is **denied**;

4      FURTHER ORDERED that Ni miscellaneous motion 4 to exclude certain

5   evidence is **denied**;

6      FURTHER ORDERED that Rauch substantive motion 1 for benefit for the

7   purpose of priority as to Count 1 is **granted** as to the 28 March 1997 and 4 June

8   1997 filing dates of applications 08/829,536 and 08/869,852, respectively, and

9   otherwise **denied**;

10     FURTHER ORDERED that Rauch substantive motion 2 to designate Ni

11  claims 46, 55, 63, 64, 110 and 118 as corresponding to Count 1 is **denied**;

12     FURTHER ORDERED that Rauch substantive motion 3 is **granted** to the

13  extent that Ni claims 35, 36, 38-45, 47-54, 56-61, 75, 83, 92, 99, 100, 102-109,

14  111-116, 127-133, 168-178 and 180-203 are unpatentable under 35 U.S.C.

15  § 102(e) as anticipated by U.S. Patent 6,072,047, **moot** as to anticipation under

16  § 102(e) by U.S. Patents 6,642,358 and 6,569,642, and otherwise **denied**;

17     FURTHER ORDERED that Rauch responsive motion 4 is **dismissed** as

18  moot in view of the denial of Ni substantive motion 1; and,

19     FURTHER ORDERED that Rauch miscellaneous motion 5 to exclude

20  certain evidence is **dismissed** as moot.

Interference No. 105,381                                              Page 75
Human Genome Sciences, Inc. (Ni) v. Immunex Corp. (Rauch)            Paper 101


```
_____   )
RICHARD E. SCHAFER              )
Administrative Patent Judge     )
                                )
                                )
_____   )    BOARD OF PATENT
ADRIENE LEPIANE HANLON          )       APPEALS AND
Administrative Patent Judge     )     INTERFERENCES
                                )
                                )
_____   )
CAROL A. SPIEGEL                )
Administrative Patent Judge     )
```


Enc:    MOLECULAR BIOLOGY AND BIOTECHNOLOGY, R. Meyers, ed., VCH Publishers, Inc.,
        New York, NY (1985), p . 860

        MOLECULAR CELL BIOLOGY, second edition, Darnell et al., W.H. Freeman and
        Company, New York, NY (1990), pp. 44-48.

        MICROBIOLOGY: An Introduction, Tortora et al., The Benjamin/Cummings Publishing
        Company, Inc., Menlo Park, California, (1982) pp. 111-112, copy enclosed; MCB, pp. 55-
        65.

        CLINICAL DIAGNOSIS AND MANAGEMENT BY LABORATORY METHODS, sixteenth
        edition, J. B. Henry ed., W.B. Saunders Company, Philadephia (1979), Vol. I, p. 992.

cc (overnight delivery)


Counsel for HUMAN GENOME SCIENCES, INC.:

     Jorge A. Goldstein, Esq.
     STERNE, KESSLER, GOLDSTEIN & FOX PPLC
     1100 New York Avenue, N.W.
     Washington, DC  20005-3934
     Tel:   202-371-2600
     Fax:   202-371-2540


Counsel for IMMUNEX CORPORATION:

     Michael J. Wise, Esq.
     PERKINS COIE LLP
     1620 26th Street
     6th Floor, South Tower
     Santa Monica, CA  90404-4013
     Tel:   310-788-3210
     Fax:   310-788-3399


Attorney for GENENTECH (Interference 105361):

     Oliver R. Ashe, Jr., Esq.
     ASHE, P.C.
     11440 Isaac Newton Sq. North
     Suite 210
     Reston, VA  20190
     Tel:   703-467-9001
     Fax:   703-467-9002

# Molecular Biology and Biotechnology

## A Comprehensive Desk Reference

*Edited by*
Robert A. Meyers



Robert A. Meyers, Ph.D.
3715 Gleneagles Drive
Tarzana, CA 91356, USA


*Management Supervised by:*
Chernow Editorial Services, Inc.,
1133 Broadway, Suite 721, New York, NY, USA

*Cover design by:* G & H SOHO, Inc.

Cover art courtesy of Dr. Alexander Wlodawer from Figure 1 of his article,
"AIDS, Inhibitor Complexes of HIV-1 Protease in."
Art prepared by Dr. Jacek Lubkowski.


Library of Congress Cataloging-in-Publication Data

Molecular biology and biotechnology : a comprehensive desk reference /
    Robert A. Meyers, editor.
        p.        cm.
    Includes bibliographical references and index.
    ISBN 1-56081-569-8 (alk. paper). — ISBN 1-56081-925-1 (pbk.: alk. paper)
    1. Molecular biology—Encyclopedias.   2. Biotechnology—Encyclopedias.
    I. Meyers, Robert A. (Robert Allen), 1936–
    QH506.M66155   1995
    574.8'8'03—dc20                                                    95-9063
                                                                        CIP

© 1995 VCH Publishers, Inc.

This work is subject to copyright.
All rights are reserved, whether the whole or part of the material is concerned,
specifically those of translation, reprinting, re-use of illustrations, broadcasting,
reproduction by photocopying machine or similar means, and storage in data
banks.
Registered names, trademarks, etc. used in this book, even when not specifically
marked as such, are not considered to be unprotected by law.

Printed in the United States of America

ISBN 1-56081-569-8 (hardcover)

Printing History:
10 9 8 7 6 5 4 3 2

ISBN 1-56081-925-1 (softcover)

Printing History:
10 9 8 7 6 5 4 3 2

Published jointly by:

| VCH Publishers, Inc. | VCH Verlagsgesellschaft mbH | VCH Publishers (UK) Ltd. |
| --- | --- | --- |
| 220 East 23rd Street | P.O. Box 10 11 61 | 8 Wellington Court |
| New York, NY 10010 | D-6940 Weinheim | Cambridge CB1 1HW |
| USA | Federal Republic of Germany | United Kingdom |

Fax: (212) 481-0897
E-mail address: order@vch.com

Sequences of nucleic acids in DNA and RNA and of amino acids in proteins define the primary structure of these molecules. Sequence analysis is carried out using computer programs that implement algorithms to determine sequence properties and to compare sequences. Sequence comparison can indicate whether an RNA or protein molecule or region of DNA is already known (identity) or has some degree of similarity to a known sequence. Sequence similarity may indicate similar structure or function. Sequence analysis can suggest the function of an unknown sequence based on the features it contains. Sequence analysis is a necessary preliminary to detailed experimental studies of structure, function, and interactions of biological macromolecules. Sequences are the information repository of the cell and a natural index to our growing understanding of cellular processes as dynamic systems of interactions between macromolecules.

# 1    PURPOSE OF SEQUENCE ANALYSIS

## 1.1    PREDICTION OF FUNCTION

Sequences that are unlike any known sequence may still be made to yield information that can suggest their possible function. The function of nucleic acids and proteins depends on their structure and involves complex interactions in three dimensions. It is not presently understood whether it is possible, in general, to derive structure from sequence. Sequence alone is therefore often inadequate to determine function. Predictions made from sequence analysis need to be experimentally tested. Nevertheless, computer analysis of sequences is valuable in suggesting the most useful experiments to perform.

## 1.2    REVEALING SIMILARITY

The first thing to do with a newly determined sequence is to compare it with all known sequences. The outcome may show identity to a known sequence, which may prove disappointing if one is hoping for something new. Similarity to a known sequence may suggest something new that can be characterized with relatively little effort. A totally unknown sequence may be a frustrating result: considerable effort will be needed to understand its function.

Sequence comparison is a nontrivial pursuit, and both statistical and biological considerations are involved. Statistically significant similarities (under some model and at some chosen level of significance) may be biologically meaningless. Sequence motifs that are statistically nonsignificant in similarity may encode the same function (this is likely to occur because the statistical model based on sequence alone is incomplete). In an area fraught with such difficulties, common sense and interpretation based on utility are paramount.

Sequence dissimilarity can range from identity, difference due to sequencing errors, difference due to population polymorphism (individual variants), and differences in multiple copies of a gene in a single individual (multigene families) to wide evolutionary divergence of genes in different organisms. Sequences that are similar due to common function may not share a common ancestral sequence in biological evolution. In general, ideas about the evolutionary relationships of sequences are not experimentally testable. Sequence homology (similarity due to descent from a common ancestor) is a hypothesis, not an observable fact, except in the case of microbial populations with high mutation rates and short generation times, which may be studied experimentally through time.

# 2    ANALYSIS OF SINGLE SEQUENCES

## 2.1    DNA COMPOSITION, ISOCHORES, AND CODON USAGE

Nucleotides in DNA sequences may be counted as singlets, doublets, or triplets in either strand. Doublets or triplets may be counted as overlapping or nonoverlapping in two or three phases, respectively, on either strand. The genomes of various organisms vary considerably in their DNA composition. Warm-blooded vertebrates have a higher G+C content, which correlates with the higher thermal stability of GC over AT base pairs. Composition of regions within a genome can also vary considerably. Mammalian genomes contain relatively GC-rich and AT-rich regions, which are called isochores. Overlapping doublet frequencies are highly characteristic for an organism. CG dinucleotides are less common than expected in vertebrates and angiosperms, probably because spontaneous deamination of 5-methylcytosine to thymine prevents the repair of methylated CpG. In DNA coding for protein, one phase of nonoverlapping triplets will be the phase of translation and the triplets will be codons. In a gene, the possible codons for each amino acid are unevenly used, and the frequency table for the 64 triplets is called codon usage. Codon usage is different between different species and between highly and lowly expressed gene in the same species.

## 2.2    MAPPING DNA SEQUENCE FEATURES

Mapping the position of features on a DNA sequence is an important step in investigating its function. It is easy to map sites that can be precisely defined, such as stop codons or restriction enzyme recognition sites. Once DNA has been sequenced, the sizes of the fragments produced with any enzyme can be readily calculated. Features such as promoters, splice junctions, and ribosome binding sites are very difficult to predict because they are hard to specify. Mapping is most simply achieved by comparing the probe sequence with each position of the DNA sequence in turn and noting the hits. More sophisticated algorithms exist for rapid searching in large problems.

## 2.3    REPETITIVE SEQUENCES

Direct repeats and inverted repeats (sometimes called dyad symmetries) are common in DNA from many sources. Mammalian genomes contain families of long (LINE) and short (SINE) repeats. Repeats of *L1* (*Kpn* I) type are 5000 to 7000 bp long and are present in the genome in $10^3$ to $10^4$ copies. Repeats of *Alu* type are 350 bp long and occur in as many as $9 \times 10^4$ copies. *Alu* repeats make human DNA hard to assemble from gel sequencing reads into the finished sequence. Inverted repeats occur in DNA coding for structural RNA, and these symmetry properties enable the RNA to fold into its secondary structure.

The dot plot is a diagram that reveals the presence of repeats and inverted repeats in sequences. It is also useful for comparing two different nucleic acid or protein sequences to detect regions of similarity. The dot plot is a rectangular array with rows labeled by one sequence and columns labeled by the other. A cell *i, j* can be used to represent the result of comparison of the *j*th residue of sequence A with the *i*th residue of sequence B. The simplest form of dot plot results from placing a diagonal mark in each cell where

# Molecular Cell Biology

SECOND EDITION



SCIENTIFIC TECHNICAL
INFORMATION CENTER

FEB 0 6 1994

PATENT & TRADEMARK OFFICE

JAMES DARNELL
*Vincent Astor Professor*
*Rockefeller University*

⌂

HARVEY LODISH
*Member of the Whitehead Institute for*
*Biomedical Research*
*Professor of Biology, Massachusetts*
*Institute of Technology*

⌂

DAVID BALTIMORE
*President*
*Rockefeller University*

SCIENTIFIC
AMERICAN
BOOKS

Distributed by W. H. Freeman and Company, New York

Cover illustration by Tomo Narashima

Library of Congress Cataloging-in-Publication Data

Darnell, James E.
  Molecular cell biology / James Darnell, Harvey Lodish, David
    Baltimore.—2d ed.
      p.   cm.
  Includes bibliographical references.
  ISBN 0-7167-1981-9:—ISBN 0-7167-2078-7
(international student ed.):
  1. Cytology.    2. Molecular biology.    I. Lodish, Harvey F.
II. Baltimore, David.    III. Title.
  [DNLM: 1. Cells.    2. Molecular Biology.    QH 581.2 D223m]
QH581.2.D37    1990
574.87'6042—dc20
DNLM/DLC                                                89-70096
for Library of Congress                                      CIP

Copyright © 1990 by Scientific American Books, Inc.

No part of this book may be reproduced by any mechanical,
photographic, or electronic process, or in the form of a
phonographic recording, nor may it be stored in a retrieval system,
transmitted, or otherwise copied for public or private use, without
the written permission of the publisher.

Printed in the United States of America

Scientific American Books is a subsidiary of Scientific American, Inc.
Distributed by W. H. Freeman and Company, 41 Madison Avenue,
New York, New York 10010 and 20 Beaumont Street,
Oxford OX1 2NQ England

  567890  KP  99876543

**44** *CHAPTER 2 ▸ MOLECULES IN CELLS*

*ent amino acids in proteins. Thus a 100-unit protein has $20^{100}$ (more than $10^{130}$) possible structures. This enormous variability means that cells and organisms can differ greatly in structure and function even though they are constructed of the same types of biopolymers produced by similar chemical reactions.*

*Starch (a storage form of glucose in plant cells), cellulose (a constituent of plant cell walls), and glycogen (a storage form of glucose in liver and muscle cells) are examples of another important type of biopolymer: the polysaccharide, which is built of sugar monomers (Figure 2-1). At least 15 different monomeric sugars can be bonded in multiple ways to form various polysaccharides; thus many polysaccharides are nonlinear, branched molecules.*

*Monomers are not the only small molecules important to cell structure. The lipids, for example, form the basic structure of cell membranes. Lipids cohere noncovalently in very large sheetlike complexes; the membranes thus formed are as crucial to living systems as are the biopolymers.*

*This chapter deals with the structures and some functions of biopolymers and small molecules; later chapters describe how the polymers are made and consider many of their other functions and interactions. ▲*



▲ **Figure 2-1** (a) Proteins, linear biopolymers called polypeptides, are formed from monomeric subunits termed amino acids. Each of the 20 different amino acids has a different R group, or side chain. Thus the polypeptide shown here, which is constructed of four amino acids, has $20^4$, or 160,000, possible structures. (b) Nucleic acids, also linear biopolymers, are formed from four monomers termed nucleotides, each of which has a different nitrogen-containing base structure (B). The nucleic acid shown here has $4^4$, or 256, possible structures. (c) Polysaccharides are built of monomeric saccharide (sugar) subunits. Because sugar residues can bind to one another at different positions, nonlinear branching polymers are often formed. The rings in (b) and (c) are depicted as Haworth projections (planar structures with a hint of perspective).

# Proteins

Proteins are the working molecules of the cell. They catalyze an extraordinary range of chemical reactions, provide structural rigidity, control membrane permeability, regulate the concentrations of metabolites, recognize and noncovalently bind other biomolecules, cause motion, and control gene function. These incredibly diverse tasks are performed by molecules constructed from only 20 different amino acids.

## Amino Acids—the Building Blocks of Proteins—Differ Only in Their Side Chains

The monomers that make up proteins are called amino acids because, with one exception, each contains an *amino group* (—NH₂) and an acidic carboxyl group (—COOH). The exception, proline, has an *imino group* (—NH—) instead of an amino group. At typical pH values in cells, the amino and carboxyl groups are ionized as —NH₃⁺ and —COO⁻. All amino acids are constructed according to a basic design: a central carbon atom, called the α carbon $C_\alpha$ (because it is adjacent to the acidic carboxyl group), is bonded to an amino (or imino) group, to the carboxyl group, to a hydrogen atom, and to one variable group, called a *side chain* or R group (Figure 2-2). The side chains give the amino acids their individuality.

The amino acids represent the alphabet in which linear proteins are "written"; any student of biology must be familiar with the special properties of each letter of this alphabet. These letters can be classified into a few distinct categories.

The side chains of four of the amino acids are highly ionized and therefore charged at neutral pH. *Arginine* and *lysine* are positively charged; *aspartic acid* and *glutamic acid* are negatively charged and exist as asparate and glutamate. The side chain of a fifth amino acid, *histidine*, is positively charged, but only weakly at neutral pH. In many cases, arginine may substitute for lysine, or aspartate for glutamate, with little effect on the structure or function of the protein.

*Serine* and *threonine*, whose side chains have an —OH group, can interact strongly with water by forming hydrogen bonds. The side chains of *asparagine* and *gluta-*

**POLAR BUT UNCHARGED R GROUPS**



▼ **Figure 2-2** The structures of the 20 common amino acids. In each structure, a central carbon atom (the α carbon) is bonded to an amino group (or to an imino group in proline), a carboxyl group, a hydrogen atom, and an R group. The R groups are in red.

Serine (Ser or S)
Threonine (Thr or T)
Asparagine (Asn or N)
Glutamine (Gln or Q)

**POSITIVELY CHARGED R GROUPS**    **NEGATIVELY CHARGED R GROUPS**    **SPECIAL AMINO ACIDS**



Lysine (Lys or K)
Arginine (Arg or R)
Histidine (His or H)
Glutamic acid (Glu or E)
Aspartic acid (Asp or D)
Cysteine (Cys or C)
Glycine (Gly or G)
Proline (Pro or P)

**HYDROPHOBIC R GROUPS**



Alanine (Ala or A)
Isoleucine (Ile or I)
Leucine (Leu or L)
Methionine (Met or M)
Phenylalanine (Phe or F)
Tryptophan (Trp or W)
Valine (Val or V)
Tyrosine (Tyr or Y)

mine have polar amide groups with even more extensive hydrogen-bonding capacities. Together with the charged amino acids, these amino acids constitute the nine hydrophilic or polar amino acids.

The side chains of several other amino acids—*alanine, isoleucine, leucine, methionine, phenylalanine, tryptophan,* and *valine*—consist only of hydrocarbons, except for the sulfur atom in methionine and the nitrogen atom in tryptophan. These nonpolar amino acids are hydrophobic; their side chains are only slightly soluble in water. *Tyrosine* is also strongly hydrophobic because of its benzene ring, but its hydroxyl group allows it to interact with water, making its properties somewhat ambiguous.

*Cysteine* plays a special role in proteins because its —SH group allows it to dimerize through an —S—S— bond to a second cysteine, thus covalently linking regions of polypeptide to one another. When the —SH remains free, cysteine is quite hydrophobic.

Two other special amino acids are *glycine* and *proline.* Glycine has a hydrogen atom as its R group; thus it is the smallest amino acid and has no special hydrophobic or hydrophilic character. Proline, as an imino acid, is very rigid and creates a fixed kink in a polypeptide chain. It is quite hydrophobic.

The structure of all amino acids except glycine are asymmetrically arranged around the α carbon, because it is bonded to four different atoms or groups of atoms

**46**   *CHAPTER 2 ▸ MOLECULES IN CELLS*



D-Alanine

L-Alanine

▲ **Figure 2-3**  Stereoisomers of the amino acid alanine. The α carbon is black.

(—NH₂, —COOH, —H, and —R). Thus all amino acids except glycine can have one of two stereoisomeric forms. By convention, these mirror-image structures are called the D and the L forms of the amino acid (Figure 2-3). They cannot be interconverted without breaking a chemical bond. With rare exceptions, only the L forms of amino acids are found in proteins.

## Polypeptides Are Polymers Composed of Amino Acids Connected by Peptide Bonds

The *peptide bond,* the chemical bond that connects two amino acids in a polymer, is formed between the amino group of one amino acid and the carboxyl group of another. This reaction, called *condensation,* liberates a water molecule:

$$^+H_3N—C—C—O^- + \,^+H_3N—C—C—O^- \xrightarrow{H_2O}$$

$$^+H_3N—C—C—N—C—C—O^-$$

Peptide bond

Because the carboxyl carbon and oxygen atoms are connected by a double bond, the peptide bond between car-

bon and nitrogen exhibits a partial double-bond character, as shown by the resonance structures

$$—C—C—NH—C— \longleftrightarrow —C—C\!=\!\overset{+}{N}H—C—$$

making it shorter than the typical C—N single bond. The six atoms of the peptide group (the two carbons of the adjacent amino acids and the carbon, oxygen, nitrogen, and hydrogen atoms of the bond) lie in the same plane (Figure 2-4a). However, adjacent peptide groups are not necessarily coplanar, due to rotation about the C—C$_α$ and N—C$_α$ bonds (Figure 2-4b).

A single linear array of amino acids connected by peptide bonds is called a *polypeptide*. If the polypeptide is short (fewer than 30 amino acids long), it may be called an *oligopeptide* or just a *peptide*. Polypeptides in living cells differ greatly in length; they generally contain between 40 and 1000 amino acids. Each polypeptide has a free amino group at one end (the N-terminus) and a free carboxyl group at the other (the C-terminus):

$$^+H_3N—C—C—N—C—C—N—C—C—N—C—C—O^-$$

Amino end (N-terminus) ... Carboxyl end (C-terminus)

A protein is not merely a linear string of amino acids. The polypeptide folds up to form a specific three-dimensional structure that can be a long rod, as in the *fibrous proteins* that give tissues their rigidity, or a compact ball called a *globular protein,* as in many proteins that catalyze chemical reactions (enzymes), or a combination of balls and rods. The polypeptide can be modified further by the covalent or noncovalent attachment of additional small molecules.

A protein adopts a stable, folded conformation mainly through noncovalent (ionic, hydrogen, van der Waals, and hydrophobic) interactions. Its stability is also enhanced by the formation of covalent disulfide bonds between cysteines in different parts of the chain. Proteins may also consist of multiple polypeptide chains held together by noncovalent forces and, in some cases, by disulfide bonds. A well-characterized example is the hemoglobin molecule, which consists of four chains: two identical α chains and two identical β chains (Figure 2-5).

## Three-dimensional Protein Structure Is Determined through X-ray Crystallography

The detailed three-dimensional structures of numerous proteins have been established by the painstaking efforts of many workers—notably, Max Perutz and John Kendrew, who perfected the x-ray crystallography of



◀ **Figure 2-4** (a) Because the carbon-nitrogen peptide bond has a partial double-bond character, the peptide group is planar. (b) However, there is considerable flexibility in the geometry of polypeptides: rotation is possible about the two covalent single bonds that connect each $\alpha$ carbon to the two adjacent planar peptide units. But some restrictions do apply to the values of $\psi$ and $\phi$. For example, if the pictured adjacent peptide groups were coplanar, then certain oxygen and hydrogen atoms would be separated by less than their van der Waals radii and would repel one another.

proteins, in which beams of x-rays are passed through a crystal of protein. The wavelengths of x-rays are about 0.1–0.2 nanometers (nm)—short enough to resolve the atoms in the protein crystal. The three-dimensional structure of the protein can be deduced from the *diffraction pattern* of discrete spots that is produced when the scattered radiation is intercepted by photographic film. Such patterns are extremely complex; as many as 25,000 diffraction spots can be obtained from a small protein. Elaborate calculations and modifications of the protein (such as binding of heavy metal) must be made to interpret the diffraction pattern and to solve the structure of the protein.

Recently, three-dimensional structures of some small proteins have been determined by nuclear magnetic resonance (nmr) methods. An advantage of this approach is that it avoids the need to crystallize the protein. A disadvantage is that it is limited to relatively small proteins (up to about 20,000 molecular weight).

## The Structure of a Polypeptide Can Be Described at Four Levels

The structures adopted by polypeptides can be divided into four levels of organization. *Primary structure* refers to the linear arrangement of amino acid residues along a



▲ **Figure 2-5** The conformations assumed by the two $\alpha$ and two $\beta$ chains in a molecule of hemoglobin. Each chain forms several $\alpha$ helices (see Figure 2-6). Only the backbones formed by the carbon and nitrogen atoms of the chains are shown here. A multitude of noncovalent interactions stabilize the conformations of the individual chains and the contacts between them. A heme group is bound to each chain. *After R. E. Dickerson and I. Geis, 1969, The Structure and Action of Proteins, Benjamin-Cummings, p. 56. Copyright 1969 by Irving Geis.*

polypeptide chain and to the locations of covalent bonds (mainly —S—S— bonds) between chains. *Secondary structure* pertains to the folding of parts of these chains into regular structures, such as α helices and β pleated sheets. *Tertiary structure* includes the folding of regions between α helices and β pleated sheets, as well as the combination of these secondary features into compact shapes (domains). *Quaternary structure* refers to the organization of several polypeptide chains into a single protein molecule, such as in hemoglobin.

## Two Regular Secondary Structures Are Particularly Important

*The α Helix*   Although some regions of proteins are held in unique and irregular conformations, much protein structure involves repeated use of a limited number of regular configurations. One common structure, the α helix, was first described by Linus Pauling and Robert B. Corey in 1951. Through careful model building, these scientists came to realize that polypeptide seg-



ments composed of certain amino acids tend to arrange themselves in regular helical conformations. In an α helix, the carboxyl oxygen of each peptide bond is hydrogen-bonded to the hydrogen on the amino group of the fourth amino acid away (Figure 2-6), so that the helix has 3.6 amino acids per turn. Each amino acid residue represents an advance of about 1.5 Å along the axis of the helix. Every C=O and N—H group in the peptide bonds participates in a hydrogen bond, and the rigid planarity of the peptide bonds contributes to the rigid shape of the helix. In this inflexible, stable arrangement of amino acids, the side chains are positioned along the outside of a cylinder. The hydrogen-bonding potential of the peptide bonds is entirely satisfied internally, so that the polar or nonpolar quality of the cylindrical surface is determined entirely by the side chains. At least some of the amino acids in most proteins are organized into α helices.

Certain amino acid sequences adopt the α-helical conformation more readily than others. What determines this propensity is complicated, but some simple factors are evident. For instance, proline is rarely found in α-helical regions because it cannot use its peptide nitrogen to make a hydrogen bond. Glycine also is an infrequent participant. Another inhibiting factor can be the tendency of multiple identically charged residues to repel each other.

The α helix is a rodlike element of protein structure that serves many functions. A globular protein can be made up of short α-helical rods connected by bends that allow the rods to interact with each other; hemoglobin, for instance, is 70 percent α helical (see Figure 2-5). Alternatively, a single rod can span a long distance, as in the protein on the surface of the influenza virus (Figure 2-7a). Even in extended molecules, a,b,c the α helix is usually found packed against other elements of protein, not as an isolated structure. Long fibers, such as the skin protein keratin or the muscle protein myosin (Figure 2-7b), can be formed by two or three α helices that wrap gently around each other to form *coiled coils*. Small rods of α helix interact with DNA in some DNA-binding proteins (Figure 2-7c). A helical rod bearing only hydrophobic side chains can span lipid membranes well because the hydrophilic peptide bonds are buried inside the helix.

Many α helices are *amphipathic:* they expose hydrophilic side chains on one face and hydrophobic side chains on another face. Looking down the central axis of an α helix (Figure 2-8a), the amino acid residues are arranged in a wheel; if the helix is amphipathic, most or all

◀ **Figure 2-6**   Models of the α helix. (a) This ribbonlike representation without R groups emphasizes the helical form. (b) This ball-and-stick representation emphasizes the role of the individual atoms and shows the R groups (green) that protrude from the helix body at regular intervals. Some of the planes of the Cα—CO—NH groups are shaded orange. Part (b) after L. Stryer, 1988, Biochemistry, 3d ed., W. H. Freeman and Company, p. 26.

valently bound prosthetic group. For example, staphylococcal nuclease—a bacterial enzyme of 149 residues that degrades DNA and RNA—is totally denatured in acid but renatures to its native conformation within 0.1 s after the solution is neutralized. The three-dimensional architecture of this protein is solely a consequence of interactions among its amino acids and with its aqueous environment. In such cases, the genetic program of the cell must only define the primary structure of the protein—the amino acid sequence—and the tertiary structure is assured. With care, most proteins can be carried through a denaturation-renaturation cycle. Thus it is generally true that linear structure determines three-dimensional architecture.

The native form of some proteins is not the conformation with the lowest free energy and consequently cannot be completely restored on renaturation. This is particu-larly true of multichain proteins. The two chains of insulin, for example, can be separated by a combination of reducing agents (to break the disulfide bridges) and concentrated solutions of such chemicals as urea (to disrupt hydrogen and hydrophobic bonds). When the insulin renatures in the presence of oxidizing agents that promote the formation of disulfide bridges, a number of stable multichain aggregates do form, but *native* insulin molecules make up only a minor proportion of them. In the others, the re-formed disulfide bridges connect inappropriate parts of the chain.

Insulin is formed by the partial proteolysis (breaking down) of proinsulin, its larger precursor (see Figure 2-13). Denatured proinsulin, as opposed to the denatured two-chain form of insulin, can renature to form the native structure of proinsulin with a high efficiency. Presumably, within the cell, either proinsulin or preproinsulin folds in such a way that the correct disulfide bridges form at the lowest free energy. The cell utilizes these intermediate stages to form insulin, whose stable conformation is not the one of lowest free energy.

## Enzymes

Protein catalysts called *enzymes* are mediators of the dynamic events of life; almost every chemical reaction in a cell is catalyzed by an enzyme. Like other catalysts, enzymes increase the rates of reactions that are already energetically favorable; more precisely, enzymes increase the rates of forward and reverse reactions by the same factor. The name of an enzyme usually indicates its function: the suffix *-ase* is commonly appended to the name of the type of molecule on which the enzyme acts. Thus proteases degrade proteins, phosphatases remove phosphate residues, and ribonuclease cleaves RNA molecules.

The chemicals that undergo a change in a reaction catalyzed by an enzyme are the *substrates* of that enzyme. Because little free energy may be liberated in either direction in reversible reactions, the distinction between chemicals that are substrates and those that are products is often arbitrary.

Most enzymes are found inside cells, but a number are secreted by cells and function in the blood, the digestive tract, or other extracellular spaces. In microbial species, some enzymes function outside the organism. The number of different types of chemical reactions in any one cell is very large: an animal cell, for example, normally contains 1000–4000 different types of enzymes, each of which catalyzes a single chemical reaction or set of closely related reactions. Certain enzymes are found in the majority of cells because they catalyze common cellular reactions—the synthesis of proteins, nucleic acids, and phospholipids and the conversion of glucose and oxygen into carbon dioxide and water, which produces most of the chemical energy used in animal cells. Other enzymes are



▲ **Figure 2-15**  Denaturation and renaturation of a protein. Most polypeptides can be completely unfolded by treatment with an 8 *M* urea solution containing mercaptoethanol (HSCH₂CH₂OH). The urea breaks intramolecular hydrogen and hydrophobic bonds, and the mercaptoethanol reduces each disulfide bridge to two —SH groups. When these chemicals are removed by dialysis, the —SH groups on the unfolded chain oxidize spontaneously to re-form disulfide bridges, and the polypeptide chain simultaneously refolds into its native configuration.

**56** *CHAPTER 2 ▸ MOLECULES IN CELLS*

found only in a particular type of cell within an organism, such as a liver cell or a nerve cell, because they carry out some chemical reaction unique to that cell. Also, many mature cells, including erythrocytes (red blood cells) and epidermal (skin) cells, may no longer be capable of making proteins or nucleic acids yet these cells still contain specific sets of enzymes that they synthesized at an earlier stage of differentiation.

## Certain Amino Acids in Enzymes Bind Substrates: Others Catalyze Reactions on the Bound Substrates

Two striking properties characterize all enzymes: their enormous *catalytic power* and their *specificity*. Quite often, the rate of an enzymatically catalyzed reaction is $10^6-10^{12}$ times that of an uncatalyzed reaction under otherwise similar conditions. The specificity of an enzyme is determined by the different rates at which it catalyzes closely similar chemical reactions or by its ability to distinguish between closely similar substrates.

Certain amino acid side chains of an enzyme are important in determining its specificity and its ability to accelerate the reaction rate. The properties of an enzyme are thus functions of its linear arrangement of amino acids and of the appropriate foldings of the peptide chain. Enzyme molecules have two important regions, or sites: one that recognizes and binds the substrate(s), and one that catalyzes the reaction once the substrate(s) have been bound. The amino acids in each of these key regions do not need to be adjacent in the linear polypeptide; they are brought into proximity in the folded molecule. In some enzymes, the catalytic site is part of the substrate-binding site. These two regions are called, collectively, the *active site*.

The binding of a substrate to an enzyme usually involves the formation of multiple noncovalent ionic, hydrogen, and hydrophobic bonds and van der Waals interactions (Figure 2-16). The array of chemical groups in the active site of the enzyme is precisely arranged so that the specific substrate can be more tightly bound than any other molecule (with the exception of some enzyme inhibitors) and the reaction can occur readily. In catalysis, covalent bonds between the enzyme and the substrate may be formed (and then broken) to reduce the activation energy for the reaction.

## Trypsin and Chymotrypsin Are Well-characterized Proteolytic Enzymes

The proteolytic (protein-digesting) enzymes trypsin and chymotrypsin are synthesized in the pancreas and secreted into the small intestine as inactive precursors, or *zymogens*, called trypsinogen and chymotrypsinogen, respectively. These zymogens are not activated until they reach the small intestine where they hydrolyze peptide



▲ **Figure 2-16** The specific binding of a substrate to an enzyme involves the formation of multiple noncovalent bonds. Here, two amino acid residues of the enzyme ribonuclease bind uracil, part of its substrate, by three hydrogen bonds. Substrates without the two C=O groups and one N—H group in the appropriate positions would be unable to bind or would bind less tightly. Other regions of the enzyme, not depicted here, bind other parts of the RNA substrate by hydrogen bonds and van der Waals interactions.

bonds of ingested proteins—a step in their digestion to single amino acids (Figure 2-17). The delay in activation serves an important regulatory purpose: it prevents the enzyme from digesting the pancreatic tissue in which it was made. Two irreversible proteolytic cleavages activate chymotrypsin. One cleavage removes serine 14 (the serine at position 14) and arginine 15 from chymotrypsinogen; the other removes threonine 147 and asparagine 148

▲ **Figure 2-17** The hydrolysis of a peptide bond by chymotrypsin.



▲ **Figure 2-18** A linear representation of the conversion of chymotrypsinogen into chymotrypsin by the excision of two dipeptides. The positions of the disulfide bridges are indicated. In the folded molecule, histidine 57, aspartate 102, and serine 195 are located in the active site.

(Figure 2-18). Removal of these two dipeptides activates the protease function of the enzyme.

The hydrolysis of peptide bonds is energetically favorable ($\Delta G^{\circ\prime} = -2$ kcal/mol). Nonetheless, the activation energy for an *uncatalyzed* peptide-bond hydrolysis—say, in a neutral aqueous solution of a protein at room temperature—is so high that there is little or no hydrolysis even after several months. Biochemists can chemically hydrolyze proteins into their constituent amino acids by treating them with a 6 $M$ solution of hydrochloric acid in an evacuated tube at 100°C for 24 h. Yet at 37°C and neutral pH, a molecule of trypsin or chymotrypsin can catalyze the hydrolysis of up to 100 peptide bonds per second. The power of enzymatically mediated catalysis is well-illustrated here: the addition of sufficient enzyme can do in seconds what otherwise would require harsh conditions and long times.

Chymotrypsin does not hydrolyze all peptide bonds; rather, it is selective for the peptide bond at the carboxyl ends of amino acids such as phenylalanine, tyrosine, and tryptophan, which have large hydrophobic side chains. Trypsin, by contrast, is specific for the peptide bond on the C-terminal side of lysine and arginine residues.

### Specific Amino Acid Side Chains of Chymotrypsin Aid in Substrate Binding

The reaction mechanism of chymotrypsin was deduced, in part, from the three-dimensional structure obtained by x-ray crystallography (Figure 2-19). The enzyme contains three polypeptides—the A, B, and C chains, which have 13, 131, and 97 amino acids, respectively. These chains are interconnected by disulfide bridges (see Figures 2-18 and 2-19). The molecule has two key structural features: the active site and the *hydrophobic cleft* (a crevice bordered by the side chains of several hydrophobic amino acid residues), which serves as the binding site for specific amino acid residues on the substrate. The conformation of this pocket allows the residues lining it to participate in hydrophobic interactions with the large hydrophobic side chains of phenylalanine, tyrosine, or tryptophan. Neither charged side chains nor small hydrophobic residues on the substrate can make the noncovalent bonds necessary to fit into the cleft.

The hydrophobic residues of most globular proteins are buried in the interior; when such proteins are in their native states, the peptide bonds linking the hydrophobic residues are not accessible to hydrolysis by chymotrypsin. Normally, stomach acids (pH 1) denature ingested proteins so that proteases in that organ can partly degrade them before their exposure to further digestion by chymotrypsin at neutral pH in the intestine.



▲ **Figure 2-19** A three-dimensional model of α-chymotrypsin determined from x-ray analysis. The N- and C-termini of the A, B, and C chains are indicated, as are the —S—S— bridges and the three amino acid residues of the active site (red). *After B. W. Matthews et al., 1967, Nature* **214**:652.

**58**  *CHAPTER 2 • MOLECULES IN CELLS*



(a) Enzyme–substrate complex

▲ **Figure 2-20** The mechanism of hydrolysis of a peptide bond by α-chymotrypsin. Red curved arrows represent the movement of electrons. (a) The substrate is bound to the enzyme so that the bond to be hydrolyzed is positioned near serine 195. The negative charge (blue) surrounding the oxygens in aspartate 102 induces a charge relay system, which is initiated when the oxygen atoms on Asp-102 attract a proton from the nitrogen atom on His-57. When the negative charge reaches the second nitrogen in His-57, the nitrogen removes the proton from the hydroxyl group on Ser-195. The resulting O⁻ attacks the carbon of the bound substrate to form (b) a tetrahedral intermediate, so called because the carbon atom of interest temporarily has four single bonds. The hydrogen bound to the second nitrogen in His-57 is then added to the nitrogen of the substrate. As a result, the C—N bond of the substrate breaks, leaving (c) R₁NH₂ and the acylenzyme intermediate

$$—(\text{Ser-195})—O—C—R_2$$

The $R_1NH_2$ is discharged from the enzyme and replaced by water. In the resulting structure (d), a similar charge relay system is induced, and His-57 removes a proton from the hydrogen-bonded $H_2O$. The OH⁻ thus generated attacks the carboxyl carbon of the acylenzyme to form (e) another tetrahedral intermediate. The bond between the tetrahedral carbon and the oxygen of Ser-195 is hydrolyzed to yield (f) $R_2COO^-$ bound noncovalently to the free enzyme, from which it is released. *After R. M. Stroud, et al., 1975, in Proteases and Biological Control, E. Reich et al., eds. Cold Spring Harbor Laboratory, p. 25.*

*Other Amino Acid Side Chains of Chymotrypsin Have Roles in Catalyzing the Hydrolysis of the Bound Substrate* The catalytic activity of chymotrypsin depends on three amino acid residues: histidine 57, aspartate 102, and serine 195. These amino acids are distant from one another in the primary structure of the protein (see Figure 2-18), but the chains are folded in such a way in the active enzyme molecule that the three side chains are close together, in the correct position for catalyzing the hydrolysis of a peptide bond in a protein bound to the enzyme (see Figure 2-19). When chymotrypsinogen is proteolytically activated, the polypeptide conformation is altered to bring these three residues into correct alignment.



(b) Tetrahedral intermediate

(c) Acylenzyme

(d) Acylenzyme

(e) Tetrahedral intermediate

(f) Enzyme–product complex

The hydrolysis reaction proceeds in two main steps. First, the peptide bond is broken and the carboxyl group is transferred to the hydroxyl residue of serine 195:

$$Enz-(Ser-195)-OH + R_1-NH-\overset{\overset{O}{\|}}{C}-R_2 \longrightarrow$$

Enzyme          Substrate

$$Enz-(Ser-195)-O-\overset{\overset{O}{\|}}{C}-R_2 + R_1-NH_2$$

Acylenzyme

Second, this *acylenzyme* intermediate is hydrolyzed:

$$Enz-(Ser-195)-O-\overset{\overset{O}{\|}}{C}-R_2 + H_2O \longrightarrow$$

$$Enz-(Ser-195)-OH + \ ^-O-\overset{\overset{O}{\|}}{C}-R_2 + H^+$$

Note that the second step restores the enzyme to its original state.

Aspartate 102 and histidine 57 facilitate the acylation reaction by removing the proton from serine 195 and adding it to the nitrogen of the departing amino group (Figure 2-20). In a similar manner, aspartate 102 and histidine 57 facilitate the hydrolysis of the acylenzyme. These enzymatically catalyzed steps—transfer of a proton from the enzyme to the substrate, formation of a covalent acylserine intermediate, and hydrolysis of the acylenzyme—all drastically reduce the overall activation energy of the proteolysis reaction.

The hydroxyl group on serine 195 is unusually reactive. The concept of an "active" serine residue at the active site predated the determination of the crystal structure of chymotrypsin. It was already known, for example, that the compound diisopropylfluorophosphate is a potent inhibitor of chymotrypsin; it reacts only with the hydroxyl on serine 195 to form a stable covalent compound that irreversibly inactivates the enzyme:

$$Enz-(Ser-195)-OH + F-\overset{\overset{O}{\|}}{P}OCH(CH_3)_2 \longrightarrow$$

$$\underset{HC(CH_3)_2}{|}$$

Diisopropylfluorophosphate

$$Enz-(Ser-195)-O-\overset{\overset{O}{\|}}{P}OCH(CH_3)_2 + HF$$

$$\underset{HC(CH_3)_2}{|}$$

*Trypsin and Chymotrypsin Have Different Substrate-binding Sites* A comparison of trypsin and chymotrypsin will emphasize the nature of the specificity of enzymatically catalyzed reactions. About 40 percent of the amino acids in these two molecules are the same; in particular, the amino acid sequences in the vicinity of the key serine residue are identical:

$$195$$
$$-Gly-Asp-Ser-Gly-Gly-Pro$$

The three-dimensional structures and catalytic mechanisms of these two enzymes are also quite similar, indicating that they evolved from a common polypeptide. The major difference between trypsin and chymotrypsin is found in the side chains of the amino acids that line the substrate-binding site. The negatively charged amino acids in this area of the trypsin molecule facilitate the binding of only positively charged (lysine or arginine) residues, instead of hydrophobic ones.

*Other Hydrolytic Enzymes Contain Active Serine*
Other, mostly unrelated, hydrolytic enzymes also contain an active serine residue that is essential for catalysis. For example, acetylcholinesterase catalyzes the hydrolysis of the neurotransmitter acetylcholine to acetate and choline:

$$H_3C-\overset{\overset{O}{\|}}{C}-O-CH_2-CH_2-\overset{+}{N}(CH_3)_3 + H_2O \longrightarrow$$

$$H_3C-\overset{\overset{O}{\|}}{C}-O^- + HO-CH_2-CH_2-\overset{+}{N}(CH_3)_3 + H^+$$

Diisopropylfluorophosphate is a potent, irreversible inhibitor of acetylcholinesterase as well as of chymotrypsin. The compound is lethal to animals because it blocks nerve transmission by causing a buildup of the transmitter substance. (The action of this transmitter is discussed in Chapter 20.)

## Coenzymes Are Essential for Certain Enzymatically Catalyzed Reactions

Many enzymes contain a *coenzyme*—a tightly bound small molecule or prosthetic group essential to enzymatic activity. Vitamins required in trace amounts in the diet are often converted to coenzymes. Coenzyme A, for instance, is derived from the vitamin pantothenic acid; the coenzyme pyridoxal phosphate is derived from vitamin $B_6$. To cite just one example of how coenzymes function, we consider pyridoxal phosphate. The aldehyde group

$$-\overset{\overset{O}{\|}}{C}-H$$

can form a covalent complex called a *Schiff base* with an $-NH_2$ group of an amino acid, which facilitates or lowers the activation energy for the breaking of bonds to the carbon of the amino acid. Figure 2-21 shows how pyridoxal phosphate catalyzes the decarboxylation of histidine to form histamine—a potent dilator of small blood vessels. Histamine is released by certain cells in the course of allergenic hypersensitivity.

**60**   *CHAPTER 2 • MOLECULES IN CELLS*



◄ **Figure 2-21**  Pyridoxal phosphate, a coenzyme, partici-
pates in many reactions involving amino acids. When it is
bound to histidine decarboxylase, as in this example, it forms
a Schiff base with the α amino group of histidine. The posi-
tive charge on the nitrogen of pyridoxal phosphate then at-
tracts the electrons from the carboxylate group of the histi-
dine, via a charge relay system. This weakens the bond
between the α carbon of the histidine and the carboxylate
group, causing the release of $CO_2$. Finally, histamine, the
reaction product, is hydrolyzed from the pyridoxal complex.

## Substrate Binding May Induce a Conformational Change in the Enzyme

When a substrate binds to an enzyme, molecules of com-
plementary charge or shape, or both, may simply fit to-
gether into a complex stabilized by a variety of noncova-
lent bonds. Such an interaction resembles the fitting of a
key into a lock and is said to occur by a *lock-and-key*
mechanism (Figure 2-22a).

In some enzymes, the binding of the substrate induces a
conformational change in the enzyme that causes the cat-
alytic residues to become positioned correctly. Molecules
that attach to the substrate-binding site, or *recognition
site,* of the enzyme but that do not induce a conforma-
tional change are not substrates of that enzyme. Thus an
enzyme differentiates between a substrate and a
nonsubstrate in two ways: Does the potential substrate
bind to the enzyme? If so, does it induce the correct con-
formational change? When both criteria are met, the en-
zyme-substrate complex is said to demonstrate *induced
fit* (Figure 2-22b).

An important example of induced fit is provided by the
enzyme hexokinase, which catalyzes the transfer of a
phosphate residue from ATP to a specific carbon atom of
glucose:



This is the first step in the degradation of glucose by cells.
X-ray crystallography has shown that hexokinase con-
sists of two domains. The binding of glucose induces a
major conformational change that brings these domains
closer together and creates a functional catalytic site (Fig-
ure 2-23). Only glucose and closely related molecules can
induce this conformational change, ensuring that the en-
zyme is used to phosphorylate only the correct substrates.
Molecules such as glycerol, ribose, and even water may
bind to the enzyme at the recognition site but cannot in-
duce the requisite conformational change, so they are not
substrates for the enzyme.



**(a) LOCK-AND-KEY**

Substrate

Active site

Enzyme

ES complex

**(b) INDUCED FIT**

Substrate

Active site

Enzyme

ES complex

▲ **Figure 2-22** Two mechanisms for the interaction of an enzyme and a substrate. (a) In the lock-and-key mechanism, the substrate fits directly into the binding site of the enzyme. (b) If binding occurs by induced fit, the substrate induces a conformational change in the enzyme that appropriately positions the substrate for catalysis.



Glucose

Hexokinase

Glucose–hexokinase complex

▲ **Figure 2-23** The conformation of hexokinase changes markedly when it binds the substrate glucose: the two domains of the enzyme come closer together to surround the substrate. Molecules such as the five-carbon sugar ribose can also bind to hexokinase by forming specific hydrogen bonds with groups in the substrate-binding pocket of the enzyme, but only glucose can form all of the bonds that cause the enzyme to change its conformation. *Courtesy of Dr. Thomas A. Steitz.*

## The Catalytic Activity of an Enzyme Can Be Characterized by a Few Numbers

Enzymatic specificity is usually quantified by discrimination ratios: a good substrate may be cleaved 10,000 times as fast as a poor substrate. The catalytic power of an enzyme on a given substrate involves two numbers: $K_m$, which measures the affinity of the enzyme for its substrate, and $V_{max}$, which measures the maximal velocity of enzymatic catalysis. Equations for $K_m$ and $V_{max}$ are most easily derived by considering the simple reaction

$$S \longrightarrow P$$
$$\text{(substrate} \longrightarrow \text{product)}$$

in which the rate of product formation depends on [S], the concentration of the substrate, and on [E], the concentration of the catalytic enzyme. For an enzyme with a single catalytic site, Figure 2-24(a) shows how $d[P]/dt$, the rate of product production, depends on [S] when [E] is kept constant.

At low concentrations of S, the reaction rate is propor-

tional to [S]; as [S] is increased the rate does not increase indefinitely in proportion to [S] but eventually reaches $V_{max}$, at which it becomes independent of [S]. $V_{max}$ is proportional to [E] and to a catalytic constant $k_{cat}$ that is an intrinsic property of the individual enzyme; halving [E] reduces the rate at all values of [S] by one-half.

When interpreting curves such as those in Figure 2-24, bear in mind that all enzymatically catalyzed reactions include at least three steps: (1) the binding of the substrate (S) to the enzyme (E) to form an enzyme-substrate complex (ES); (2) the conversion of ES to the enzyme-product complex (EP); and (3) the release of the product (P) from EP, to yield free P:

$$E + S \underset{\text{binding}}{\overset{}{\rightleftharpoons}} ES \xrightarrow{\text{catalysis}} EP \xrightarrow{\text{release}} P + E$$

In the simplest case, the release of P is so rapid that we can write

$$E + S \underset{k_2}{\overset{k_1}{\rightleftharpoons}} ES \xrightarrow{k_{cat}} E + P$$

The reaction rate $d[P]/dt$ is proportional to the concentration of ES and to the catalytic constant $k_{cat}$ for the given enzyme:

$$\frac{d[P]}{dt} = k_{cat}\,[ES] \qquad (1)$$

To calculate [ES], we assume the reaction is in a steady state, so that $k_1\,[E]\,[S]$, the formation rate of [ES], is equal to the rate of its consumption, either by dissociation of uncatalyzed substrate at a rate of $k_2\,[ES]$ or by catalysis at a rate of $k_{cat}\,[ES]$:

$$k_1\,[E]\,[S] = (k_2 + k_{cat})\,[ES] \qquad (2)$$

If

$$[E]_{tot} = [E] + [ES] \qquad (3)$$

(where $[E]_{tot}$ is the sum of the free and the complexed enzyme, or the total amount of enzyme), then we can combine equations (2) and (3) to obtain

$$[E]_{tot} = [E] + [ES] = \frac{(k_2 + k_{cat})}{k_1[S]}\,[ES] + [ES]$$

$$= [ES]\left[1 + \left(\frac{k_2 + k_{cat}}{k_1}\right)\left(\frac{1}{[S]}\right)\right]$$

If we define $K_m$, called the *Michaelis* constant, as

$$\frac{k_2 + k_{cat}}{k_1} \qquad (4)$$

then

$$[ES] = \frac{[E]_{tot}}{1 + K_m/[S]}$$

Thus

$$\frac{d[P]}{dt} = k_{cat}\,[ES] = k_{cat}\,[E]_{tot}\,\frac{1}{1 + K_m/[S]}$$

$$= k_{cat}\,[E]_{tot}\,\frac{[S]}{[S] + K_m} \qquad (5)$$

This equation fits the curves shown in Figure 2-24a. $V_{max}$, which is equal to $k_{cat}\,[E]_{tot}$, is the maximal rate of product formation if all recognition sites on the enzyme are filled with substrate. $K_m$ is equivalent to the substrate concentration at which the reaction rate is half-maximal. (If $[S] = K_m$, then from equation (5) we calculate the rate of product formation to be $\frac{1}{2}k_{cat}\,[E]_{tot} = \frac{1}{2}V_{max}$.) For most enzymes, the slowest step is the catalysis of [ES] to [E] + [P]. In these cases, $k_{cat}$ is much less than $k_2$, so that $K_m = (k_2 + k_{cat})/k_1 \cong k_2/k_1$ is equal to the equilibrium constant for binding S to E. Thus the parameter $K_m$ describes the affinity of an enzyme for its substrate. The smaller the value of $K_m$, the more avidly the enzyme can bind the substrate from a dilute solution (Figure 2-24b) and the lower the value of [S] needed to reach half-maximal velocity. The concentrations of the various



(a)



(b)

▲ **Figure 2-24**  (a) The rate of a hypothetical enzymatically catalyzed reaction S → P for two different concentrations of enzyme [E] as a function of the concentration of substrate [S]. The substrate concentration that yields a half-maximal reaction rate is denoted by $K_m$. Doubling the amount of enzyme causes a proportional increase in the rate of the reaction, so that the maximal velocity $V_{max}$ is doubled. The $K_m$, however, is unaltered. (b) The rates of reactions catalyzed by an enzyme with a substrate S, for which the enzyme has a high affinity, and with a substrate S', for which the enzyme has a low affinity. The $V_{max}$ value is the same for S and S', but $K_m$ is higher for S'.

small molecules in a cell vary widely, as do the $K_m$ values for the different enzymes that act on them. Generally, the intracellular concentration of a substrate is approximately the same as or greater than the $K_m$ value of the enzyme to which it binds.

## The Actions of Most Enzymes Are Regulated

Many reactions in cells do not occur at a constant rate. Instead, the catalytic activity of the enzymes is *regulated* so that the amount of reaction product is just sufficient to meet the needs of the cell.

**An Enzyme Can Be Feedback Inhibited in a Reaction Pathway**   Consider a series of reactions leading to the synthesis of the amino acid isoleucine, which is primarily used by cells as a monomer in the synthesis of proteins. The amount of isoleucine needed depends on the rate of protein synthesis in the cell. The first step in the synthesis of isoleucine is the elimination of an amino group, which converts the amino acid threonine to the compound $\alpha$-ketobutyrate. Threonine deaminase—the enzyme that catalyzes this reaction—plays a key role in regulating the level of isoleucine. In addition to its substrate-binding sites for threonine, threonine deaminase contains a binding site for isoleucine. When isoleucine is bound there, the enzyme molecule undergoes a conformational change, so that it cannot function as efficiently. Thus isoleucine acts as an *inhibitor* of the reaction for the conversion of threonine. If the isoleucine concentration in the cell is high, the binding of isoleucine to the enzyme temporarily reduces the rate of isoleucine synthesis:



This is an example of *feedback inhibition,* whereby an enzyme that catalyzes one of a series of reactions is inhibited by the ultimate product of the pathway.

In isoleucine synthesis, as in most cases of feedback inhibition, the final product in the reaction pathway inhibits the enzyme that catalyzes the first step that does not also lead to other products. The suppression of enzyme function is not permanent. If the concentration of free isoleucine is lowered, bound isoleucine dissociates from the enzyme, which then reverts to its active conformation. The binding of the inhibitor isoleucine to the enzyme and its subsequent release can be described by the equilibrium-binding constant $K_i$, which is similar to the constant $K_m$ used for substrate binding:

$$[E \cdot Ile]_{inactive} \overset{K_i}{\rightleftharpoons} [Ile] + [E]_{active}$$

$$K_i = \frac{[Ile][E]_{active}}{[E \cdot Ile]_{inactive}}$$

**Many Enzymes Have Multiple Binding Sites for Regulatory Molecules**   Some enzymes have binding sites for small molecules that affect their catalytic activity; a stimulator molecule is called an *activator.* Enzymes may even have multiple sites for recognizing more than one activator or inhibitor. In a sense, enzymes are like microcomputers; they can detect concentrations of a variety of molecules and use that information to vary their own activities. Molecules that bind to enzymes and increase or decrease their activities are called *effectors.* Effectors can modify enzymatic activity because enzymes can assume both active and inactive conformations: activators are positive effectors; inhibitors are negative effectors. Effectors bind at *regulatory sites,* or *allosteric sites* (from the Greek for "another shape"), a term used to emphasize that the regulatory site is an element of the enzyme distinct from the catalytic site and to differentiate this form of regulation from competition between substrates and inhibitors at the catalytic site.

**Multimeric Organization Permits Cooperative Interactions among Subunits**   Many enzymes and some other proteins are multimeric—that is, they contain several copies, or subunits, of one or more distinct polypeptide chains. Some multimeric enzymes contain identical subunits, each of which has a catalytic site and possibly an effector site. In other enzymes, regulatory sites and catalytic sites are located on different subunits, each with a particular structure. On binding an activator, inhibitor, or substrate, a subunit undergoes a conformational change, usually small, that triggers a change in quaternary structure. This quaternary rearrangement favors a similar conformational change in the other subunits, thereby increasing their affinity for the type of ligand initially bound (Figure 2-25). When several subunits interact cooperatively, a given increase or decrease in substrate or effector concentration causes a larger change in the rate of an enzymatic reaction than would occur if the subunits acted independently. Because of such *cooperative interactions,* a small change in the concentration of an effector or substrate can lead to large changes in catalytic activity.

Cooperative interactions among the four subunits in hemoglobin demonstrate clearly the advantages of multimeric organization. The binding of an $O_2$ molecule to any one of the four chains (each hemoglobin chain binds one $O_2$) induces a local conformational change in that subunit. This change can in turn induce a large change in quaternary structure. The quaternary change involves a rearrangement of the positions of the two $\alpha$ and two $\beta$ chains in the tetramer. The local conformational changes that accompany $O_2$ binding can then occur more readily in the remaining subunits, increasing their affinity for oxygen. The binding of a second $O_2$ makes the quaternary structural change even more likely. The cooperative



▲ **Figure 2-25**  A cooperative interaction between active sites (two identical subunits of a hypothetical enzyme). The binding of a substrate to one subunit of a multimeric enzyme induces a conformational change in the adjacent subunit,

which lowers the $K_m$ for the binding of the substrate there. Thus a small change in the substrate concentration can cause a much larger increase in the reaction rate than would occur if there were no cooperative interactions between active sites.

interaction between the chains causes the molecule to take up or lose four $O_2$ molecules over a much narrower range of oxygen pressures than it would otherwise. As a result, hemoglobin is almost completely oxygenated at the oxygen pressure in the lungs and largely deoxygenated at the oxygen pressure in the tissue capillaries (Figure 2-26).

The contrast between hemoglobin and myoglobin is revealing. Myoglobin is a single-chain oxygen-binding protein found in muscle. The oxygen-binding curve of myoglobin has the characteristics of a simple equilibrium reaction:

$$E + O_2 \underset{K_{O_2}}{\rightleftharpoons} E{-}K_{O_2}$$

Myoglobin has a greater binding affinity for $O_2$ (a lower $K_{O_2}$) than hemoglobin at all oxygen pressures. Thus, at

the oxygen pressure in capillaries, $O_2$ moves from hemoglobin into the muscle cells, where it binds to myoglobin, ensuring the efficient transfer of $O_2$ from blood to tissues.

The quaternary-structure rearrangements associated with multimeric organization also provide a way for the effects of activator or inhibitor binding at an allosteric site to be transmitted to a distant catalytic site without large changes in the secondary or tertiary structure of an enzyme, which would be incompatible with the principle that a particular primary structure must adopt a unique folded conformation. Thus, for example, small conformational changes in a domain in response to binding of an effector molecule would produce a quaternary-structure change, which amplifies the conformational signal and allows it to be transmitted robustly to other parts of the enzyme, where it would induce a small conformational change affecting enzymatic activity. Membrane-embedded receptor proteins that must transmit a conformational signal from one side of a membrane to the other are also likely to be multimeric; they transmit the signal by quaternary-structure rearrangement or by an effector-induced shift in the monomer-multimer equilibrium.



◄ **Figure 2-26**  The binding of oxygen to hemoglobin depends on cooperative interactions between the four chains. The graph shows the fraction of heme groups in hemoglobin and in myoglobin bound to $O_2$ as a function of the oxygen pressure. Note that the binding activity of hemoglobin increases sharply over a narrow range of oxygen pressures (20–40 mmHg). Hemoglobin is saturated with $O_2$ in the lungs, but it releases much of its bound $O_2$ at the low oxygen pressure in the tissue capillaries. At any oxygen pressure, myoglobin has a higher affinity for $O_2$ than hemoglobin does. As myoglobin is a principal muscle protein, this property allows oxygen to be transferred from blood to muscle.

*Enzymes Are Regulated in Many Ways*    The activities of enzymes are extensively regulated so that the numerous enzymes in a cell work together harmoniously. All metabolic pathways are closely controlled at all times. Synthetic reactions occur when the products of these reactions are needed; degradative reactions occur when molecules must be broken down. Kinetic controls affecting the activities of key enzymes determine which pathways are going to be used and the rates at which they will function.

Regulation of cellular processes involves more than simply turning enzymes on and off, however. Some regulation is accomplished through *compartmentation*. Many enzymes are localized in specific compartments of the cell, such as the mitochondria or lysosomes, thereby restricting the substrates, effectors, and other enzymes with which an enzyme can interact. In addition, compartmentation permits reactions that might otherwise compete with one another in the same solution to occur simultaneously in different parts of a cell. Cellular processes are also regulated through the control of the rates of enzyme synthesis and destruction.



▲ **Figure 2-27**   The structure of an antibody molecule illustrated in an immunoglobulin (IgG) made of four polypeptide chains: two identical heavy chains (blue) and two identical light chains (orange). Each antigen-binding site is formed by the N-terminal segments of a heavy and a light chain. The N-termini are highly variable in sequence, giving rise to the wide range of antibody specificity.

# Antibodies

Enzymes are not the only proteins that bind tightly and specifically to smaller compounds. The insulin receptor on the surface of a liver cell, for example, can bind to insulin so tightly that the receptors on a cell are half-saturated when the insulin concentration is only $10^{-9}$ M. This protein does not bind to most other compounds present in blood; it mediates the specific actions of insulin on liver cells. A molecule other than an enzyme substrate that can bind specifically to a macromolecule is often called a *ligand* of that macromolecule.

The capacity of proteins to distinguish among different molecules is developed even more highly in blood proteins called *antibodies*, or *immunoglobulins*, than in enzymes. Animals produce antibodies in response to the invasion of an infectious agent, such as a bacterium or a virus. Antibodies will be discussed at length in Chapter 25. We introduce them here because they will appear as critical reagents in the discussions of many intervening chapters.

The recognition site of an antibody can bind tightly to very specific sites—generally on proteins or carbohydrates—on the surface of the infectious agent. Experimentally, animals produce antibodies in response to the injection of almost any foreign polymer; such antibodies bind specifically and tightly to the invading substance but, like enzymes, do not bind to dissimilar molecules. The antibody acts as a signal for the elimination of infectious agents. When it binds to a bacterium, virus, or virus-infected cell, certain white blood cells (leucocytes) recognize the invading body as foreign and respond by

destroying it. The specificity of antibodies is exquisite: they can distinguish between proteins that differ by only a single amino acid and between the cells of different individual members of the same species.

All vertebrates can produce a large variety of antibodies, including ones that bind to chemically synthesized molecules. Exposure to an antibody-producing agent, called an *antigen*, causes an organism to make a large quantity of different antibody proteins, each of which may bind to a slightly different region of the antigen. For a given antigen, these constellations of antibodies may differ from one member of a species to another.

Antibodies are formed from two types of polypeptides: heavy chains, each of which is folded into four domains, and light chains, each of which is folded into two domains (Figure 2-27). The N-terminal domains of both heavy and light chains are highly variable in sequence, giving rise to the specific binding characteristics of antibodies.

## Antibodies Can Distinguish among Closely Similar Molecules

The sequence of bovine insulin is identical to that of human insulin, except at three amino acids. Yet when bovine insulin is injected into people, some individuals respond by synthesizing antibodies that specifically recognize the specific amino acids in the bovine molecule, even though human beings generally do not produce anti-

# MICROBIOLOGY

## An Introduction

### Gerard J. Tortora
Bergen Community College

### Berdell R. Funke
North Dakota State University

### Christine L. Case
Skyline College

The Benjamin/Cummings Publishing Company, Inc.

Menlo Park, California · Reading, Massachusetts
London · Amsterdam · Don Mills, Ontario · Sydney

*Sponsoring Editor:* James W. Behnke

*Developmental Editor:* Jane R. Gillen

*Production Editor:* Patricia S. Burner

*Copy Editor:* Janet Greenblatt

*Book and Cover Designer:* Michael A. Rogondino

*Artist:* Barbara Haynes

*Illustrator:* Michael Fornalski

*Photo Researcher:* Carl W. May

*About the cover:*   A technician is isolating plasmids, which are tiny circles of DNA found in bacteria. The plasmids are dissolved in a dye solution that fluoresces pink under ultraviolet light. Genetic engineering using plasmids is revolutionizing the biological sciences and industry (see pages 226–229 and 704–707).

Figure acknowledgments begin on page 749.

Copyright © 1982 by The Benjamin/Cummings Publishing Company, Inc.

All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, or transmitted, in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without the prior written permission of the publisher. Printed in the United States of America. Published simultaneously in Canada.

Library of Congress Cataloging in Publication Data

Tortora, Gerard J.
     Microbiology: an introduction.

     Bibliography: p.
     Includes index.
     1. Microbiology.     I. Funke, Berdell R.
II. Case, Christine L., 1948–
III. Title.
QR41.2.T67        576          81-21712
ISBN 0-8053-9310-2        AACR2

abcdefghij-DO-898765432


The Benjamin/Cummings Publishing Company, Inc.
2727 Sand Hill Road
Menlo Park, California 94025

Case 1:07-cv-00526-SLR-MPT    Document 13-3    Filed 10/22/2007    Page 51 of 55

tial energy and therefore serve as energy carriers to drive energy-requiring reactions. The most common energy carrier in all biological systems is adenosine triphosphate (ATP); its structure can be reviewed in Figure 2–20. The role of ATP in the relationship between catabolic and anabolic processes is shown in Figure 5–1.

A little later in the chapter, we will examine some representative chemical reactions that deal with energy production (catabolic reactions) and energy utilization (anabolic reactions) in microorganisms. We will then look at how these various reactions are integrated within the cell. But first let us consider the principal properties of a group of proteins involved in almost all biologically important chemical reactions. These proteins, the enzymes, were described briefly in Chapter 2.

Although it is beyond the scope of this text to name and discuss the actions of individual enzymes, you should be aware of the central role of enzymes in metabolic reactions. It is important to understand that a cell's metabolic pathways are determined by its enzymes, which are, in turn, determined by its genetic makeup.

## ENZYMES

Many organic chemicals are so stable that they could remain unchanged in a cell for years. To activate these chemicals, living cells produce **enzymes**, proteins that act as catalysts in chemical reactions of importance to the cell. A *catalyst* is a substance that speeds up a reaction without being



**Figure 5–1**  Relationship between anabolism and catabolism and the role of ATP. When simple compounds are combined to form complex compounds (anabolism), ATP provides the energy for synthesis. When large compounds are split apart (catabolism), heat energy is given off and some energy is trapped in ATP molecules.

**112**  Chapter 5: Microbial Metabolism



**Figure 5–2**  Mechanism of enzyme action. The surface of the substrate comes into contact with the active site on the surface of the enzyme to form an enzyme–substrate complex. The substrate is then transformed into products and the enzyme is recovered.

changed by it. Generally large globular proteins, enzymes range in molecular weight from about 10,000 to somewhere in the millions. Of the thousand or more known enzymes, each has a three-dimensional characteristic shape with a specific surface configuration due to its primary, secondary, and tertiary structures (see Figure 2–18).

## Mechanism of Enzyme Action

As mentioned in Chapter 2, catalysts lower the *activation energy* required for a chemical reaction. Although scientists do not completely understand how an enzyme does this, the sequence of events is believed to be as follows (Figure 5–2):

1. The surface of the *substrate*—that is, the molecule or molecules that are reactants in the chemical reaction to be catalyzed—contacts a specific region on the surface of the enzyme molecule, called the *active site*.

2. A temporary intermediate compound called an *enzyme–substrate complex* forms.

3. The substrate molecule is transformed (by rearrangement of existing atoms, a breakdown of the substrate molecule, or the combining of several substrate molecules).

4. The transformed substrate molecules, the products of the reaction, move away from the surface of the enzyme molecule.

5. The recovered enzyme, now freed, reacts with other substrate molecules.

Enzyme reaction is characterized by its extreme *specificity* for a particular substrate. For example, a specific enzyme may be capable of hydrolyzing a peptide bond only between two specific amino acids. And other enzymes are capable of hydrolyzing starch, but not cellulose; even though both starch and cellulose are polysaccharides composed of glucose subunits, the orientations of the subunits in the two polysaccharides differ. Enzyme specificity results from the three-dimensional shape of the active site, which fits the substrate somewhat like a lock with its key. In most instances, the substrate is much smaller than the enzyme, and relatively few of the enzyme's amino acids make up the active site.

A given compound can be a substrate for a number of different enzymes that catalyze different reactions. The fate of a given reactant (substrate) depends on the specific enzyme that reacts upon it. For example, glucose-6-phosphate, an important molecule in cell metabolism, may be acted upon by at least four different enzymes, each of which will give a different product.

Enzymes are exceedingly efficient. Under optimum conditions, they can catalyze reactions at rates that are $10^8$ to $10^{10}$ times (up to 10 billion times) more rapid than those of comparable reactions without enzymes. The *turnover number* (number of substrate molecules metabolized per enzyme mol-

# Volume I

*Todd • Sanford • Davidsohn*

# CLINICAL DIAGNOSIS *and* MANAGEMENT by LABORATORY METHODS

*Sixteenth Edition*

## JOHN BERNARD HENRY, M.D.

*Dean and Professor of Pathology, Georgetown University School of Medicine; Attending Pathologist, University Hospital, Georgetown University, Washington, D.C.; Formerly Professor of Pathology, College of Medicine, and Director of Clinical Pathology, University Hospital, State University of New York, Upstate Medical Center, Syracuse*

W. B. SAUNDERS COMPANY
*Philadelphia   London   Toronto*

W. B. Saunders Company:  West Washington Square
Philadelphia, PA 19105

. 1 St. Anne's Road
Eastbourne, East Sussex BN 21 3UN, England

1 Goldthorne Avenue
Toronto, Ontario M8Z 5T9, Canada

Library of Congress Cataloging in Publication Data

Todd, James Campbell

Clinical diagnosis by laboratory methods.

At head of title: Todd-Sanford-Davidsohn.

Includes bibliographies.

1. Diagnosis, Laboratory.    I. Sanford, Arthur Hawley, 1882–
II. Davidsohn, Israel, 1895–    III. Henry, John Bernard,
1928–    IV. Title. [DNLM: 1. Diagnosis, Laboratory.
QY4.3 T633]

RB37.T63 1979       616.07'56       77–92666
ISBN 0–7216–4639–5

Clinical Diagnosis and Management by Laboratory Methods       Volume 1   0-7216-4652-2
Volume 2   0-7216-4653-0
Single Volume   0-7216-4654-9
Set   ISBN   0-7216-4639-5

© 1979 by W. B. Saunders Company.  Copyright 1908, 1912, 1914, 1918, 1923, 1927, 1931, 1935, 1939, 1943,
1948, 1953, 1962, 1969 and 1974 by W. B. Saunders Company.  Copyright under the International
Copyright Union.  All rights reserved.  This book is protected by copyright.  No part of it may be
reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical,
photocopying, recording, or otherwise, without the written permission of the publisher.  Made in the United
States of America.  Press of W. B. Saunders Company.  Library of Congress catalog card number 77-92666.

Last digit is the print number:       9    8    7    6    5    4

destruction of the red cells with higher concentrations of the abnormal hemoglobin or selective removal of the abnormal hemoglobin from the cell.

In *heterozygous alpha hemoglobinopathies*, the abnormality in the alpha chain will affect all three hemoglobin types. Therefore, six different hemoglobin types are found—the three normal hemoglobins and the three abnormal forms. Examples are Hb D$_{Baltimore}$, Hb Ann Arbor, and Hb M$_{Boston}$.

Combinations of abnormalities exist. *Double heterozygotes for two beta chain abnormalities* produce two different abnormal beta chains; therefore, there are two abnormal hemoglobins and no hemoglobin A. An example of this is Hb S-C disease. Double heterozygotes for beta and delta chain abnormalities and for alpha and beta chain abnormalities are rare but have provided important information. The latter will have four major hemoglobin types on electrophoresis: $\alpha_2^A \beta_2^A$; $\alpha_2^X \beta_2^A$; $\alpha_2^A \beta_2^Y$; and $\alpha_2^X \beta_2^Y$.

*Double heterozygotes for beta hemoglobinopathy and beta thalassemia* are well known. Here, the quantity of abnormal hemoglobin exceeds the normal hemoglobin, in contrast to the heterozygous beta hemoglobinopathies, in which the reverse is true. Examples are Hb S thalassemias and Hb E thalassemia.

### Beta hemoglobinopathies

Hemoglobins S, C, D, and E are believed to be polymorphisms because their frequency is greater than can be explained by mutation alone (Lehmann, 1977). They occur in homozygous as well as heterozygous form and involve the beta chain.

*Sickle Cell Disease.* Homozygous Hb S disease is a serious chronic hemolytic anemia, first manifest in early childhood and often fatal before the age of 30 years. With modern medical care, however, many patients live longer. Hemoglobin S is found almost exclusively in the black population; 0.1 to 0.2 per cent of the blacks born in the United States have sickle cell anemia (Schneider, 1976).

In hemoglobin S the glutamic acid in the sixth position on the beta chain is replaced by valine. This substitution is on the surface of the molecule and changes its charge and, hence, its electrophoretic mobility. Hemoglobin S is freely soluble when fully oxygenated; when oxygen is removed from Hb S, polymerization of the abnormal hemoglobin occurs, forming tactoids (fluid crystals) which are

rigid and deform the cell into the shape which gave the cell its name (Fig. 29-7). In homozygous Hb S disease, sickling occurs at physiologic oxygen tensions and the rigidity of the red cells is responsible for the hemolysis as well as for most of the complications. The rigid cells are more vulnerable to trauma and are readily trapped by the reticuloendothelial system, especially the spleen, accounting for the hemolysis. As a result of the hemolysis, severe continued marrow hyperplasia during childhood produces bone changes: expansion of the marrow space, thinning of the cortex, and radial striations seen in the skull on x-ray. Leg ulcers are common.

COMPLICATIONS. In early childhood, bilateral painful swelling of the dorsa of the hands or feet occurs as a result of sickling and capillary stasis; this is known as the *hand-foot syndrome* or sickle cell dactylitis. It lasts about two weeks, is accompanied by changes of periostitis as observed by x-ray, and does not occur after the age of four.

The spleen is central to three complications: A *sequestration crisis* refers to sudden pooling of blood and rapid enlargement of the spleen, resulting in hypovolemic shock. This may occur in early childhood when splenomegaly is present. *Functional asplenia* (Pearson, 1969) consists of inadequate antibody responses under some conditions and an impaired ability of the reticuloendothelial system to clear bacteria and particulate material from the blood, probably due to reticuloendothelial blockade. This may partly explain the increased risk of infection in children with the disease. Salmonella and pneumococcal infections are unusually prevalent in children with sickle cell anemia. *Autosplenectomy* is the result of vaso-occlusive episodes, resulting in progressive infarction, fibrosis, and contraction of the spleen. Though splenomegaly is present in childhood, a small fibrotic remnant is the rule in the adult.

From early childhood, patients cannot produce a concentrated urine, apparently as a result of anoxic damage to the vasa recta in the medullae of the kidneys. Hematuria as a result of papillary necrosis is common.

*Vaso-occlusive crises* are debilitating episodes of abdominal and bone or joint pain, accompanied by fever, which are probably due to plugging of small blood vessels by masses of sickled cells. Bone necrosis occurs and may be a focus for salmonella osteomyelitis. Aseptic necrosis of the femoral head is occasionally a complication. The various complications as a